# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 9, 2013 Session

## STATE OF TENNESSEE v. JESSIE DOTSON

**Appeal from the Criminal Court for Shelby County**
**No. 0807688    James C. Beasley, Jr., Judge**

---

### No. W2011-00815-CCA-R3-DD  - Filed June 25, 2013

---

A Shelby County jury convicted the defendant, Jessie Dotson, of six counts of premeditated first degree murder and three counts of attempted first degree murder. The jury sentenced the defendant to death for each conviction of first degree murder. Following a separate sentencing hearing, the trial court sentenced the defendant as a Range II, multiple offender to forty years for each conviction for attempted first degree murder, to be served consecutively to each other and to the first degree murder sentences. On appeal, the defendant contends that: (1) the evidence is insufficient to support his convictions; (2) testimony regarding one of the victims' statement to police was hearsay and its admission violated the United States and Tennessee Constitutions; (3) the admission of the defendant's custodial statements violated his rights under the United States and Tennessee Constitutions; (4) the admission of testimony that the defendant invoked his right to counsel violated his due process rights; (5) the admission of testimony regarding the defendant's history of imprisonment violated his right to a fair trial; (6) the trial court's treatment of defense counsel in the jury's presence violated his right to a fair trial; (7) the admission of the pathologist's testimony regarding autopsies that she did not perform violated the defendant's confrontation rights; (8) the trial court erred in admitting photographs of the victims; (9) the trial court erred in denying the defendant's motion to provide DNA analysis of all those who came in contact with the crime scene; (10) the trial court erred in denying the defendant's motion for production of the statements of those not to be called as witnesses for the State; (11) the trial court improperly defined "reasonable doubt" in instructing the jury; (12) the trial court erred in refusing to instruct the jury on facilitation of first degree murder as a lesser included offense; (13) the trial court erred in denying the defendant's motion to strike aggravating circumstances; (14) the trial court erred in denying the defendant's motion for a probable cause finding regarding the aggravating circumstances; (15) the trial court erred in denying the defendant's motion for disclosure of information regarding the proportionality review; (16) the admission of victim impact evidence was improper; (17) the trial court erred in denying the defendant's motion to argue last during the penalty phase; (18) the State committed prosecutorial misconduct during its argument to the jury; (19) the trial court erred

in allowing the death verdicts to stand; (20) the defendant's sentences for his three convictions for attempted first degree murder were excessive; and (21) cumulative error requires reversal. Based upon our review of the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

Kathleen Morris, Nashville, Tennessee, and Marty Brett McAfee, Memphis, Tennessee, for the appellant, Jessie Dotson.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey Dean Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Damon Griffin, Reginald Henderson, and Raymond Lepone, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was convicted of six counts of premeditated first degree murder for the deaths of his brother, Cecil Dotson, Sr. ("Cecil");[1] Cecil's fiancée, Marissa Williams; Hollis Seals; Shindri Roberson; and two of Cecil's sons. The defendant also was convicted of three counts of attempted first degree murder of two of Cecil's sons and his daughter. The evidence presented at trial established that during the early morning hours of March 2, 2008, while at Cecil's home on Lester Street in Memphis, the defendant shot Cecil, Williams, Seals, and Roberson multiple times, killing them. He then repeatedly stabbed and beat Cecil's four sons, C.D.1, age nine; C.D.2, age five; C.D.3, age four; and C.D.4, age two, and Cecil's daughter, C.D.5, age two months.[2] C.D.3 and C.D.4 were killed, and C.D.1, C.D.2, and C.D.5 were severely injured but survived.

---

[1] Because Cecil Dotson, Sr. and some witnesses who testified at trial share the same last name, we will utilize their first names in referring to them. We intend no disrespect by this procedure but do so to avoid continually repeating the full names of Cecil Dotson, Sr. and these witnesses.

[2] As is the policy of this court, we will refrain from identifying the child victims by their full names.

## GUILT PHASE – STATE'S PROOF

The victims were discovered during the evening hours of March 3, 2008, when Officer Randall Davis of the Memphis Police Department responded to a call to check on the welfare of the residents at the Lester Street address. Officer Davis testified that when he and another officer arrived and approached the house, he saw that the front door was open. Upon entering the house, Officer Davis saw the body of an adult male lying beside a television. As he rounded the corner, he saw three more adult bodies beside a couch. All four adults were deceased.

Officer Davis testified that he and two other officers cleared the house while one officer secured the door. Officer Davis said he entered a bathroom, saw someone in the bathtub, and pulled back the shower curtain to find a male child, later identified as C.D.1, with a knife stuck in his head. Officer Davis testified that he initially believed that C.D.1 was dead but then saw his eyes twitch. He alerted other officers and continued clearing the house.

Officer Davis testified he next walked down a hallway to a bedroom on the left where he saw a small child who was deceased. He then entered another bedroom where he saw two children but found no signs of life in either child. Meanwhile, another officer had located an infant, later identified as C.D.5.

Officer Davis testified that there was blood throughout the house but that none of the blood appeared to be fresh. The firefighters arrived as Officer Davis was returning from the back bedroom, and he alerted them to C.D.1 in the bathtub and continued to secure the area.

On cross-examination, Officer Davis testified that when he approached the house, he detected the odor of deceased bodies. He looked into the house through the front door, saw someone's foot on the floor, and entered the house. Officer Davis did not check the adult victims for vital signs because it was obvious to him that they were deceased. However, he touched the children to see if any were still alive.

Herbert Henley, a firefighter with the Memphis Fire Department, testified that he entered the house and saw the body of a male adult kneeling facedown on the couch. He also saw two adult female bodies, one sitting on the floor against the sofa and the other propped up on the sofa leaning toward the first female. After an officer informed him that someone was in there, he entered the bathroom, pulled back the shower curtain, and saw C.D.1 in the bathtub. He realized C.D.1 was alive after seeing him move his hand, told his fellow firefighters that the child was alive, and obtained the assistance of Daniel Moore and Jason Vosburgh in transporting C.D.1 to an ambulance. Henley observed cuts on C.D.1's face and

a "sawzall blade" sticking out of the top of his head. He described the bathroom as "a mess" with "blood everywhere."

Daniel Moore, a firefighter/EMT with the Memphis Fire Department, testified that he was instructed to check on the adults in the front room. It was obvious, however, that the adults were dead, so he did not physically check each adult victim. He said that the victim lying by the television appeared to have been there for some time, explaining, "Just by looking at them and just the horrific scene that was there with all the blood and everything, it was obvious that they had been down for a while." The blood was "definitely old."

Moore testified that he and Vosburgh next entered the bloody bathroom where Henley had discovered C.D.1. As they looked in the bathtub, they saw C.D.1 turn his head and look at them, exposing a knife stuck in his head. Moore described the horrific scene: "He turned his head and the next thing we saw was one of the most horrible things I've ever seen, it was a knife stuck embedded in his skull and it was just stuck there. And it absolutely is the worst thing I've ever seen in my life." In addition to the knife embedded in C.D.1's skull, Moore observed puncture wounds on the child's abdomen and multiple superficial cuts to his neck.

Jason Vosburgh, a firefighter with the Memphis Fire Department, testified he responded to a call of possibly seven dead individuals at a residence on Lester Street. Based upon the call, Vosburgh initially believed that the deaths could have been the result of carbon monoxide poisoning, so he put on his protective gear. However, upon arriving at the house, he knew immediately that he did not need the protective equipment, explaining, "You could smell the blood in the air. It was [a] thick, spoiled smell like it had been there a while."

Vosburgh testified that when he approached the porch, he saw an officer to the right of the door holding C.D.5. He walked inside and saw the bodies of the four adult victims to his right. He and a paramedic then entered the back bedroom, where they saw the bodies of two children. One of them was dead, while the other, C.D.2, was alive. Vosburgh stated that as he and the paramedic were carrying C.D.2 down the hallway, someone informed him that another deceased victim, whose throat had been cut, was in the front bedroom.

Vosburgh testified that as he and the paramedic were placing C.D.2 onto a stretcher, someone told Henley that another deceased victim was in the bathroom. Henley checked on that victim, C.D.1, and reported that he was alive. Vosburgh and Moore then entered the bathroom and saw C.D.1, who had a knife embedded in the right side of his head, roll over and look at them.

Patrick McDevitt, a firefighter/paramedic with the Memphis Fire Department, testified he was in one of the last ambulances to arrive and that surviving victims had been removed

from the house by the time he reached the scene. He and his partner were instructed to confirm the deaths of the victims who remained inside the home, so they ran an ECG strip and touched each victim to confirm the absence of a pulse or other vital signs.

McDevitt testified he and his partner first confirmed the deaths of the children in the bedrooms. They moved the children's clothing to expose their skin in order to place the ECG strips on the children. They then moved the clothing back to its original position. McDevitt stated that he noted the absence of fresh blood and that the blood on each victim with which he came into contact appeared to be dry.

Annette Mallory, Seals's aunt, testified she last saw him a few days before his death. Rosie Puryear, Roberson's mother, testified that Roberson was twenty-two years old when she was killed and that she had last seen her approximately one month before her death.

Ida Anderson, Williams' mother, testified that Williams and Cecil were engaged and had four children, C.D.1, C.D.2, C.D.3, and C.D.5. She said that the mother of C.D.4 was Erica Smith, and Williams and Smith had tension as a result of their relationships with Cecil. According to Anderson, in March 2008, Cecil, Williams, the five children, and Cecil's other daughter had been living at the Lester Street address for four or five months. Anderson stated that Williams was twenty-seven years old and that C.D.3 was four years old when they were killed.

Anderson testified that C.D.1 has undergone many surgeries and that additional surgeries would be required. He and C.D.2 were in school. At the time of trial, C.D.5 was almost three years old and doing "exceptionally well."

Jessie Dotson, Sr. ("Jessie Sr."), the father of Cecil and the defendant, testified that in March 2008, he and the defendant were employed as painters, while Cecil performed maintenance duties for various apartment complexes. Their family referred to the defendant as "Junior." The defendant was living with his sister, Nicole Dotson ("Nicole"), in an apartment at Goodwill Village in Memphis. On Saturday, March 1, 2008, Jessie Sr. and the defendant left work early because Jessie Sr. wanted to watch the University of Memphis basketball game on television at Cecil's house. Jessie Sr. arrived at Cecil's house at approximately 3:30 or 4:00 p.m. When he arrived, Cecil, the defendant, C.D.1, C.D.2, and C.D.4 were there. Jessie Sr. was not able to watch the game because Cecil did not subscribe to cable television. Instead, he went outside to his truck and listened to the game on the radio.

Jessie Sr. testified that he saw a gun while at Cecil's house and learned that it belonged to the defendant. He described the gun as "kind of like a powder blue I guess you

could say a revolver, the kind with the thing that turn." He said the gun did not eject shell casings. Jessie Sr. stated that Cecil moved the gun from the top of the counter, commenting that the children might think it was a toy. After moving the weapon, Cecil told the defendant that he had moved his gun. Jessie Sr. said he left Cecil's house around 6:00 or 6:30 p.m. and, as he was leaving, saw Cecil on the porch cleaning his grill and preparing to barbecue. He did not see Cecil or the defendant again that night.

Jessie Sr. testified that when he arrived at Nicole's apartment to pick up the defendant for work the next day, he was not there, and Nicole did not know where he was. The defendant had not told Jessie Sr. that he was not coming to work, which surprised Jessie Sr. because they had planned to complete the job on which they had been working. Jessie Sr. stated that he instructed Nicole to tell the defendant to contact him if he wanted to continue his employment. Later that evening, the defendant called him and said that his girlfriend had hidden his cell phone following an argument. The defendant did not, however, tell him why he had not come to work and never mentioned that anything had happened at Cecil's home.

The next day, March 3, 2008, Jessie Sr. picked up the defendant for work just before 8:00 a.m., and they worked until 11:00 a.m. when they stopped due to rain. During that time period, the defendant never mentioned that something had happened to Cecil and the other people in his house. Later that same day, the defendant called Jessie Sr. and told him that Nicole wanted him to drive by Cecil's house because Erica Smith had been there to pick up her son, discovered that the door was not closed, and was afraid that something was wrong.

When Jessie Sr. arrived at Cecil's house, he saw one or two police cars parked in the front and walked up to the door, but the officers turned him away. While he was there, a neighbor told him that she had not seen Cecil and his family all weekend and that she had been feeding the dog. He then went to his brother's house, where he learned from a newscast what had occurred at the house.

Jessie Sr. testified that the defendant later called him and said that he and other family members were in protective custody. The defendant never told him what happened to Cecil. A few days before trial, however, the defendant called and told him that he knew what had occurred inside Cecil's house.

Jessie Sr. said that Cecil was thirty years old, C.D.3 was four years old, and C.D.4 was two years old when they died. He had heard that Cecil was a member of the Gangster Disciples, and when he learned of the killings, he believed they were gang-related. Jessie Sr. said that Cecil told him that he was attempting to leave the Gangster Disciples and was worried about it to such an extent that he asked Jessie Sr. to live with him for a period of time. He said that Cecil explained to him that gang members respected each other's families

-6-

and that they were unlikely to bother Cecil because of their respect for Jessie Sr. Jessie Sr. testified that, notwithstanding Cecil's assurances of his safety, several of Jessie Sr.'s brothers warned him that he would be killed by being in the midst of the trouble between Cecil and the gang members, and they talked him into moving out of Cecil's apartment after about a month.

William Waddell, the brother of the defendant and Cecil, testified he was with Cecil during the day on March 1, 2008. They visited "Doc Holiday," who wanted Cecil to perform some maintenance tasks for him. They then returned to Cecil's house where they watched a sports game and, later, picked up the defendant at Nicole's apartment and returned to Cecil's house. Waddell, Cecil, the defendant, Jessie Sr., Williams, and the children watched the University of Memphis basketball game.

Waddell testified that at some point that evening, he saw the defendant with a black and silver gun. He said the defendant generally carried a blue revolver, but he was unsure whether he saw the defendant with the gun that day. Waddell called Cecil numerous times on March 2, but he did not answer. Waddell said he first heard that something had happened to Cecil on March 3 at approximately 7:30 p.m. while he was at work. Smith had been calling him all day and said she believed that something was wrong, so he told her to call the police. Waddell went to the crime scene and met the defendant there. The defendant told him that Cecil had driven him to his girlfriend's apartment.

Willie Boyd Hill, Jr., Cecil's best friend, testified that he had visited Cecil's home on Lester Street on several occasions. Hill said he knew "Doc Holiday," "Cato," "Dread," and Seals because he, Cecil, and those men were all members of the Gangster Disciples. He stated that the defendant was a member of the Crips gang.

Hill testified that on March 1, 2008, Seals, Cecil, and the defendant came to his apartment, located on Southern Avenue in Memphis, between 10:30 and 11:30 p.m. because Seals, who had just been released from jail, had left a pistol in Hill's care and wanted to retrieve the gun. Hill described it as a "German P2 something" that said "9 millimeter" on the outside of it and said it took .380 caliber bullets. He said he had loaded the bullets into the gun, which was the "kind you put a clip in" and which ejected shell casings. Seals, the defendant, and Cecil left his apartment with Seals saying that they were going to visit his girlfriend. Seals took the loaded gun with him, and Hill did not see any of the men after they left the apartment.

Hill testified that on March 3, he received a call from Waddell, who told him that something had happened to Cecil's family which he heard was a gas leak. Hill said he went to the crime scene where he saw several police cars, news crews, and family members, and

he believed that the defendant also was there. When he saw the crime tape, he knew that it likely was not a gas leak. Hill testified that he later heard that the Gangster Disciples were involved in Cecil's death and therefore called "Cato," who denied the allegation.

Hill testified that he had a "falling out" with Cecil prior to his death and described how on the evening of February 14, 2008, he, his girlfriend, Cecil, Williams, and Smith had gone out drinking at a club before returning to Hill's girlfriend's apartment, where Cecil and Smith began arguing. He said Smith ran upstairs and went into his girlfriend's apartment, and Cecil went after her and began beating on the doors and windows, cursing both Smith and Hill's girlfriend. Hill's girlfriend called the police and when they arrived, Cecil told them that marijuana was inside the apartment. Hill was angered by this because Cecil knew that Hill also stayed at the apartment and that Gangster Disciples were not supposed to call the police on each other.

Hill testified that he told "Cato" what had happened, and that "Cato," in turn, informed "Doc Holiday." Hill then received a call from "Doc Holiday." "Doc," the "coordinator" over the Orange Mound area, told Hill to explain to "Dread," the chief of security over the area, what he had reported to "Cato." Hill was then summoned to an apartment on Dwight Street in Memphis, where he, "Doc," and "Dread" discussed the matter, and "Dread" told him to "write [Cecil] up."

Hill explained that a "write-up" is a disciplinary notice within the gang that results in punishment. Possible punishments included "[p]unches to the chest, punches to the lip, pumpkin head, three minutes to a DV" or "death violation." He said that a death violation generally was ordered only on that individual and not everyone associated with him. He did not write Cecil up, and if the Gangster Disciples had wanted to kill Cecil, they easily would have been able to get him alone and would not have waited until 2:00 a.m. Hill said that he had never heard of gangs killing innocent women and children and that if the Gangster Disciples were entering a home to kill someone, they would be armed and would not run out of bullets. Also, because "Dread" and "Doc" were close friends with Cecil, Hill did not believe they harmed him.

Hill acknowledged that he had heard that, when Cecil was contacted about his discipline from the gang, he declined to accept the discipline. He also had heard that Cecil had hung up on "Doc" and that "Doc" had slept with Williams. He further acknowledged that he and Cecil, whom he described as "outspoken" and "arrogant," had argued on other occasions besides the Valentine's Day incident and that Cecil and "Doc" had a disagreement over drywall work that Cecil performed at "Doc's" apartment.

Hill denied being a member of a gang at the time of the killings. He said, "None of

us was participating in any gang meetings or nothing like that but we still had love for it." He testified that he had contacted the police and cooperated with them, submitting both a hair and a swab sample. He cooperated because Cecil was his friend, and Cecil's family was like his own.

Hill testified that until mid-February 2008, the overseer or head of the Gangster Disciples in Memphis was "Big Easy," or Eric Brown, and he was then murdered. Hill did not know that Vernon Motley, whom the police believed had murdered Brown, was a Traveling Vice Lord or that Motley's girlfriend was Cecil's first cousin.

Hill acknowledged he had prior convictions for manufacturing, delivering, and selling a controlled substance, possession of cocaine with the intent to manufacture, sell, or deliver, possession of marijuana, and being a convicted felon in possession of a handgun and was on probation at the time of the defendant's trial.

The parties stipulated that the gun that Hill gave Seals on March 1, 2008, was a P-232 Sig Sauer handgun, a .380 caliber pistol with a seven-round magazine capacity, which could hold up to eight rounds if one round was in the chamber.

Stacey Young, a friend of Cecil, testified that at approximately midnight on March 2, 2008, Cecil, the defendant, and Seals came to her home in Cecil's blue Lincoln. Cecil introduced the defendant to Young, they talked "for a minute," and then the three men left. Cecil told Young that he was going to drop Seals and the defendant off and return. Young called Cecil at approximately 1:00 a.m., and he said that he had not "made it off Pendleton" and that he would return. He never returned, however.

Erica Smith, C.D.4's mother, testified that although Cecil and his friends were Gangster Disciples, she had never been a member of a gang. Smith described the Valentine's Day argument and conflict and the falling out between Cecil and Hill caused by Cecil's having informed the police that marijuana was in Hill's girlfriend's apartment. Smith also described the dispute between Cecil and "Doc Holiday" over Cecil's repair work at "Doc's" apartment and "Doc's" failure to pay him.

Smith testified that at approximately 12:30 a.m. on March 2, 2008, Cecil, the defendant, Seals, and Roberson came to her apartment located at 2848 Kimball Avenue, and she went outside to talk to them. Cecil told her that he would return, but she told him not to do so. She called Cecil at approximately 1:15 a.m. and spoke to him, called him again at 1:30 a.m. but he did not answer, called a third time at 2:00 a.m. and again spoke to him. During that last telephone call, she heard Cecil and the defendant arguing and using profanity.

Smith testified that because she and Cecil were supposed to attend church together on Sunday morning, March 2, she called him at 7:00 a.m., but he did not answer. After continuing to call and receiving no answer, she went to his house at approximately 3:00 p.m., blew the horn, exited her car, and knocked on the storm door. The wood door was cracked open and the radio was playing, but she did not hear any of the children. She left without entering the house.

Smith testified that she continued calling Cecil throughout the day and into the next day, to no avail. She knew something was wrong when she went to his place of employment and learned that he was not there, explaining that he never missed work. She began calling Cecil's relatives and, after learning that none of them had heard from him, returned to Cecil's house, calling the police en route. When she got there, she parked and waited for the police. Smith said that the officers entered the house and then came outside, bringing with them a baby with her neck cut and asking her if she was the baby's mother. Smith testified that her son, C.D.4, was killed in the house.

Charity Wright, an employee of Crickett Wireless, identified from Cecil's cell phone records the phone numbers of Cecil, Stacey Young, and Erica Smith. Wright testified that Smith called Cecil's number on March 2, 2008, at 12:59 a.m. and that the call lasted seven minutes and ten seconds. Young called Cecil through a possible three-way call at 1:06 a.m., and the call lasted two minutes and ten seconds. Smith called again at 1:11 a.m., but Cecil did not answer. She also called at 1:25 a.m., 1:30 a.m., and 1:37 a.m., but Cecil did not answer. Smith called Cecil again at 1:37 a.m.; the call was answered and lasted twenty-eight seconds. The next call came in at 3:11 a.m. and was sent to voicemail.

Keaira Jones ("Keaira"), the daughter of Sheila Jones ("Sheila"), whom the defendant was dating in March of 2008, testified that, at that time, she was living with her mother at 1403 Silver Street. On Saturday, March 1, 2008, at 10:00 or 10:30 p.m., the defendant and Cecil came to her home, and both appeared to be intoxicated. The defendant was looking for Sheila, and Keaira told him that she had left earlier with her aunt. Cecil said that he wanted to leave, but the defendant said he wanted to come inside. The defendant entered the apartment and looked through the rooms and closets.

Keaira testified that the defendant returned at approximately 4:00 or 4:30 a.m., and she allowed him to enter. Approximately five minutes later, he knocked on her bedroom door and asked to talk to her. She was putting her son to sleep and told the defendant that she would speak to him shortly. She fell asleep and never opened the door. Before falling asleep, she heard water running in the bathroom. Keaira was asleep when her mother came home. The defendant left the next morning.

-10-

Keaira testified that after the defendant and her mother left, she noticed bleach spots on the brown rug in the bathroom. She also saw a bottle of Clorox bleach in the closet, which was not where it was usually stored.

Sheila Jones testified she met the defendant through Nicole, with whom she had worked. She knew that the defendant had been living with Nicole and had been released from jail. On Saturday night, March 1, 2008, Sheila and a friend had a "ladies night out." When Sheila returned at approximately 5:00 a.m., she found the defendant lying in her bed, which surprised her because she had told him that she planned a ladies night out that evening. He told her that "ladies don't come in at five o'clock in the morning." She and the defendant got up at approximately 10:30 or 11:00 a.m. on March 2, and she did not know whether the defendant was supposed to be at work that morning.

On Monday, March 3, the defendant asked Sheila to pick him up at "Foxy's" house, but she explained to him that she had to take her grandson somewhere first and would pick him up later wherever he was. When the defendant told her the Lester Street address, she headed there, only to find that the street was blocked by ambulances, fire trucks, and police cars. Sheila said the defendant, who was "kind of upset and shaking," told her that something had happened to his brother.

Sheila testified that the defendant never told her that he knew what had occurred on Lester Street. After she learned that the defendant had been arrested, she spoke to him by telephone and visited him. Approximately one to two weeks later, Sheila asked the defendant why he would not assist the police in their investigation, and he replied that "they got to figure it out." Sheila said that she had seen the defendant with a gun on one or two occasions. She said the gun had "a little blue on it" and a "wheel."

Nicole Dotson, the sister of the defendant and Cecil, testified that Cecil and his family had been living at the house for five or six months prior to their deaths. She considered both Williams and Smith to be her sisters-in-law and referred to Hill as her brother. At one point, Cecil and Hill had referred to themselves as Gangster Disciples but did not "mingle" on the streets with gangs or gang members. The defendant was a member of the Kitchen Crips.

Nicole testified that the defendant moved in with her in August 2007 after he was released from jail. She said that the defendant held a "grudge" against their family because he believed they should have visited more often while he was in jail. According to Nicole, the defendant expressed those feelings to her daily.

Nicole testified that on March 1, 2008, Cecil came to her apartment to pick up the defendant for a barbecue at Cecil's house, but the defendant had not yet returned from work.

-11-

Once the defendant returned from work, Cecil and two of his sons returned to the apartment to pick up the defendant and drive him to the barbecue, which she did not attend. She next saw the defendant on Sunday morning at approximately 10:00 or 11:00 a.m., after hearing a car drive up and looking out the window to witness the defendant having a physical altercation with his girlfriend, Sheila, in the front seat of Sheila's car. Nicole did not see the defendant again until he returned home Sunday night.

Nicole said that on March 3 at 6:30 p.m., she went to Cecil's house with the defendant and Tammy Randolph, their cousin. Ambulances, fire trucks, and police cars were at the scene and the police would not allow her to enter the house. Nicole said she did not know who had died and who had survived. She stated that the defendant instructed her not to talk to the media because they would blame him due to his criminal background. He also told her, while still at the scene, that he believed Hill and "Trell" had committed the homicides and became angry when their family called those men to the scene.

Sometime after March 3, Nicole, her mother, her four children, her three brothers, and her niece went to the home of Nicole's sister, Christina Hill Waddell, and her cousin, Sharhonda Lane, on Gayle Street in Memphis. While at their house, Nicole received two calls on her cell phone from her telephone at her apartment. The defendant brought her cell phone to her and asked if someone was in her apartment because the telephone number for her apartment appeared when someone called her cell phone. The defendant told her that the person who called sounded like a man but was disguising his voice. While the defendant was explaining this to Nicole, the person called the cell phone again, and the defendant answered. Nicole said she was "[t]errified" and called the police.

Nicole said that following the calls, she and Waddell drove to the police department. At some point, she received a call from her sister's house during which the caller related that something was wrong and that it involved the defendant. Nicole then spoke to the defendant. The defendant was "frantic" and said that "they going to put this on me. Just bury me and put me with my brother."

Nicole testified that she and the rest of the family were placed in protective custody. During that time, police officers came to talk to the defendant and took him away in handcuffs. Nicole said the defendant never told her that he was at Cecil's home at the time of the homicides or that he rode C.D.1's bicycle away from the scene. Nicole said that Cecil and the defendant were "gun fanatics."

Sharhonda Lane, the cousin of the defendant and Cecil, testified that on either Tuesday, March 4, or Wednesday, March 5, her family came to stay at her house. The next morning, Nicole and Waddell went to the police department. While they were gone, Lane

was awakened by a "commotion" and the defendant threatening suicide. The defendant, who held a gun belonging to Waddell to his head, said that he did not want to return to jail, that they were trying to "pin" the offenses on him, and that he was not going to jail for something he did not do. Lane said that during that time, the news on television was showing a story profiling the defendant. A police car pulled up outside the house, and the defendant believed that the officers were coming for him. Lane said she went outside to speak to the officers and gave them her cell phone so they could speak to the defendant. The officers told the defendant that they were not there to arrest him but were placing the family in protective custody. On cross-examination, Lane testified that, prior to the defendant's threatening to commit suicide, the media had been discussing his background on television for "hours."

Officer Laneeze Stepney of the Memphis Police Department testified that on March 6, 2008, he and his partner arrived in a marked police car and parked one house down from an address on Gayle Street, with instructions to watch the house and not to let anyone enter or leave. Officer Stepney said that he first spoke to a woman who eventually came outside and reported that the defendant said that if the officers entered the house, he was going to commit suicide. Officer Stepney then had the woman call the defendant, and he spoke with him on her cell phone for five to seven minutes until he was able to convince him to allow the officers to enter the house. Inside the home, the defendant told Officer Stepney, "[E]verybody think[s] I did it. I've been all on the news and the police saying I did it." Officer Stepney said he tried to calm the defendant, who was acting "real nervous like he had a lot on his mind."

C.D.1 testified that, at the time of trial, he was in the fifth grade. He said that in his bedroom he slept on the top bunk bed and his brothers, C.D.2 and C.D.3, slept on the bottom bunk. His older sister had the other bedroom, and his parents' bedroom was in the back of the house. C.D.1 said that on the night of the attacks, he was watching television in his sister's room because the television in his room was not working. C.D.1 heard a gunshot and walked out of his sister's room and into the hallway. C.D.1 said he "peeked" into the living room and saw the defendant pointing a gun at Cecil. He saw "some smoke and sparks come out the gun." The defendant was pointing the gun at Cecil's face, who did not say anything. C.D.1 testified, "I was looking and when I saw sparks out of the gun, I looked down on the ground and I saw dude on the floor." C.D.1 said "dude" was wearing a black shirt and black pants.

C.D.1 testified that he heard another gunshot and "peeked" through the door. He walked into the hallway and saw the defendant shooting at a woman who was on the arm of the couch. He did not know who the woman was. The woman told the defendant that she loved him, but he "just kept on shooting."

C.D.1 said he then returned to his sister's room and sat down on the bed. He heard footsteps coming toward the door, turned, and saw the defendant holding a "handheld knife." C.D.1 described the knife as the type that opens and closes. He said the defendant cut him on the neck, and he told the defendant he loved him, but the defendant replied, "[N]o, you don't." C.D.1 then lay down on the bed, and C.D.4 began crying. The defendant told C.D.4, "[D]on't worry about it, you ain't going to get hurt."

C.D.1 testified that he tried to retrieve the telephone from the hallway to call the police. He saw the defendant's feet in the doorway, and the defendant asked him what he was doing. When he said that he was going to call the police, the defendant said that if he did, he would kill C.D.1's parents and Cecil's friends. C.D.1 said he asked the defendant if he could use the restroom and noticed that the defendant had a "kitchen knife" in his hand. He said the defendant "ma[d]e [him] put [his] head in the tub." The defendant then tried to stab him in the chest, but he put his hand up to block the blow and the knife went into his head instead.

C.D.1 said he saw his mother, Williams, in the doorway saying that she did not want to die. The defendant asked her for Cecil's cell phone and car keys, and Williams replied that the keys likely were in Cecil's car. The defendant then said, "[S]orry because I ain't let your husband or your husband's friends get away with it and the kids." C.D.1 then heard a "huge fall on the ground."

C.D.1 testified that he next saw the defendant walking in the hallway with a garbage bag and another kitchen knife. The defendant went into the bedroom of C.D.1's sister, and C.D.1 heard someone yelling and the defendant saying "shut up." C.D.1 then heard C.D.3 ask to use the restroom and saw blood dripping from C.D.3's head onto the rim of the toilet seat. He said C.D.3 asked the defendant if he could return to his room, and the defendant said that he could. Next, the defendant went into the kitchen, grabbed another knife, and entered the bedroom of C.D.1 and his brothers. C.D.1 said he saw C.D.3 lying on the bed and the defendant stab C.D.3, who then fell on the floor. C.D.1 said he heard "rambling" in the hallway near the laundry room as if the defendant was attempting to move something out of the way. C.D.1 said he then fell asleep in the bathtub.

C.D.1 testified that when he awoke, he saw firemen in his bedroom looking at C.D.3. One of the firemen came into the bathroom and got C.D.1 out of the bathtub. C.D.1 was transported to the hospital by ambulance. He said no one was with the defendant during the attacks and the defendant acted alone.

C.D.1 testified that on the same night that the "bad thing" happened, a woman named "Cassandra" knocked on the door and said that she needed to use the restroom. She and

some other people, including a man with a mask with "[a] little bit of blood" on it, entered the house. C.D.1 had never seen the man before and said that Cecil called him "Roderick." C.D.1 did not recall who allowed "Roderick" to enter the house. He acknowledged, however, that he told "Ms. Pat" that Cecil allowed "Roderick" to enter the house and that he was mad at Cecil for doing so. C.D.1 testified that "Roderick" said something to Cecil about the gang and also told Cecil, "[Y]ou got too big, boy." "Roderick" fired a gun at Cecil and said, "[N]ever stop playing with the gang boy, . . . you never know what would happen, boy."

On redirect examination, C.D.1 identified the defendant as the person who stabbed him in the head, shot his parents and their friends, and hurt his brothers and baby sister.

On recross-examination, C.D.1 testified that he saw a fight in the living room between Cecil and the man in the mask and that the man was shooting at Cecil. He later met with "Ms. Caroline" and "Ms. Pat" at "Ms. Pat's" office. When they asked him how he knew some of the things he told them, he replied that his "granny" had told him.

C.D.2 testified that, at the time of trial, he was eight years old and in the third grade. He recalled living on Lester Street with his parents, brothers, and sister and said that he was six years old when he moved there. He said that the defendant stabbed him on the nose, forehead, and wrist and that no one else was with the defendant.

C.D.2 testified that the attacks occurred at night but before he had eaten dinner. He did not recall hearing gunshots that night. He did not see the defendant shoot anyone, and no one told him that the defendant shot anyone. C.D.2 said the defendant got the knife from his car, but he could not remember the color of the defendant's car. C.D.2 said that while he did not see the defendant stabbing his parents, he recalled that his parents and their friends were stabbed. C.D.2 said that when his parents were killed, all of the children, other than one of his brothers and the baby, were locked in his sister's bedroom. His brother told him that Williams was injured while she was in the living room changing the baby's diaper.

C.D.2 testified that he heard Smith on the telephone calling the police. "Auntie Foxy" also was present when they were attacked. C.D.2 acknowledged that he told "Ms. Pat" that his father never should have opened the door. He also discussed this with C.D.1. He said the fight began after his father opened the door. C.D.2 also said that there were many people fighting that night and that a man, whom he did not know, was fighting his father and his father's friends.

C.D.2 stated that after the defendant stabbed C.D.1, C.D.1 snuck out of the house, got on his bicycle, and rode to his grandmother's house. He said that when C.D.1 left, everyone was still alive in the house and that they were talking, singing, and having fun.

On redirect examination, C.D.2 testified that he was in his sister's room when the defendant stabbed him. He told "Ms. Pat" that the defendant stabbed him. On recross-examination, C.D.2 testified that he talked to "Ms. Pat" after he had been living with his family for a period of time. People had discussed the events, and C.D.2 had listened to their discussions.

Lieutenant Walter Davidson of the Memphis Police Department, who was assigned as the case coordinator, testified that on March 3, 2008, he received a call at his home from Lieutenant Toney Armstrong instructing him to go to the scene where four adults and two children were dead. Lieutenant Armstrong also reported that three children were being transported to the hospital and were not expected to survive.

Lieutenant Davidson testified that he remained at the crime scene until the medical examiners removed the victims' bodies and transported them to the morgue and that when he left in the early morning hours of March 4, a uniformed officer remained behind on the scene. Lieutenant Davidson said he was aware that a cameraman from the television show, *The First 48*, was at the scene.

Lieutenant Davidson testified that he and Lieutenant Armstrong decided to quarantine the children in the hospital to prevent contact with relatives, the media, or anyone other than medical personnel. They did not know the identity of the perpetrator and wanted to ensure that the perpetrator would not attempt to injure the children in the hospital. The identities of the surviving children were not released. He said that the officers had information regarding possible gang involvement and that Sergeant Terry Max was assigned to investigate any possible gang involvement. Sergeants and detectives from the Safe Streets Task Force and the Organized Crime Unit assisted in canvassing the neighborhood and interviewing neighbors. Gang members were interviewed, as well as others who wanted to provide information. Lieutenant Davidson said officers received numerous leads from CrimeStoppers tips, including some from "crackpots" and "psychics" telling them "ridiculous things."

Lieutenant Davidson testified that when he learned that C.D.1 was awake, he sent Sergeant Caroline Mason to the hospital to talk to him. He explained that officers decided to attempt to speak with C.D.1 in the hospital early into the investigation due to the possibility that C.D.1 might die. Sergeant Mason reported back to him that C.D.1 was "in and out" of consciousness and was cursing, "talking crazy," and screaming out names. C.D.1 mentioned Cassandra, Williams' sister, but she was interviewed and it was "obvious" that she was not involved. At some point, officers decided to send Pat Lewis with the Child Advocacy Center to the hospital with Sergeant Mason to talk to C.D.1. Lieutenant Davidson said that if C.D.1 said something that made sense, they attempted to investigate that lead.

Lieutenant Davidson said that on March 7, 2008, officers received a telephone call from a nurse at the hospital informing them that C.D. 1 was now awake and rational, so he sent Sergeant Mason back to talk to him. During that interview, C.D.1 reported that "Uncle Junior," whom officers identified as the defendant, was responsible for killing his family and stabbing him and his siblings. In response, officers from the Tactical Unit retrieved the defendant, who was in a safe house with the rest of his family.

Lieutenant Davidson explained that the victims' family, including the defendant, was in protective custody because members of the Gangster Disciples had learned that officers were searching for them in connection with the case, were angry that they were being implicated in the killing of children, and had reportedly kicked in the door of the house of one of the victims' relatives. Lieutenant Davidson testified: "We had a trillion Crime Stoppers tips saying that we needed to look at [the defendant] but from my standpoint, he was a family member, he wasn't a suspect" until C.D.1 implicated him.

Lieutenant Davidson testified that the defendant was interviewed and remained in custody for several hours. After Lieutenant Armstrong played the recording of C.D.1's interview during which he implicated the defendant, he confessed to shooting the adult victims and stabbing the children. The defendant then asked for his mother. Officers retrieved his mother from the safe house, and he confessed to her also. After the defendant confessed, officers investigated whether the offenses could have occurred as stated by him. Lieutenant Davidson said that the evidence was consistent with the information that the defendant provided in his confession. He told his mother that following the homicides, he rode C.D.1's bicycle to 1403 Silver Street, the home of his girlfriend, Sheila Jones. Sergeant Dave Parks and Sergeant Joe Stark went to that address, where they located C.D.1's yellow bicycle. The defendant told Lieutenant Armstrong that he committed the offenses alone and told his mother, "I did it," not that "we did it."

On redirect examination, Lieutenant Davidson testified that on March 7, 2008, C.D.1 told officers who committed the homicides, and the person whom he identified confessed. He said that as a result, "the gang issue was out" and that he considered the case to be solved. Since March 7, C.D.1 has identified only the defendant as the perpetrator.

Sergeant James Terry Max of the Memphis Police Department testified that on March 4, 2008, Lieutenant Davidson requested that he and Sergeant Stark interview the defendant, who had been brought into the office and placed in an interview room. Sergeant Max said the defendant was not under arrest but was considered a possible witness at that point. During that initial interview, the defendant told the officers that he left work at approximately 3:00 p.m. on March 1 and went to Nicole's apartment. Cecil arrived in his Lincoln, along with two of his children. Cecil drove the defendant to Cecil's house on Lester

Street, arriving at approximately 4:15 p.m., and found Williams, Cecil, Waddell, and Cecil's five children there. They had planned to watch a basketball game between the University of Memphis and Southern Mississippi State University on television. Cecil's television, however, did not receive the channel on which the game was broadcast.

The defendant told officers that he, Cecil, and "E," who had arrived later in the evening, left Cecil's house between 10:00 and 10:30 p.m. Sergeant Max testified that "E" was later identified as Seals. The defendant said they went to "Frank's" apartment in the area of Highland Avenue and Spottswood Avenue. Officers later identified "Frank" as Willie Boyd Hill. The defendant said that Seals went into Hill's apartment. Shortly thereafter, a man with a light complexion and wearing glasses exited Hill's apartment, and Cecil got out of the car and talked to the man for some time. Twenty to thirty minutes later, Seals exited Hill's apartment, and Seals, Cecil, and the defendant left.

The defendant further told the officers that he, Seals, and Cecil next went to an apartment complex by the Clayborne Homes housing project to pick up Seals's girlfriend. The defendant, Cecil, Seals, and Seals's girlfriend then went to the Kimball Cabana Apartments to purchase marijuana, arriving there at approximately 11:30 p.m. or midnight. Cecil then went into a downstairs apartment. When he came out, he went to the car and got the defendant, and they went into the same apartment where there were four black men whom the defendant did not know. Cecil introduced the defendant to the men as his brother and told them that the defendant had just been released from prison. Cecil purchased a quarter-ounce bag of marijuana, and the defendant purchased $20 worth of marijuana. After they left the apartment, they saw Erica Smith in the parking lot and spoke with her. The defendant said they then stopped at a woman's house located off Lamar Avenue, talked to her for approximately thirty minutes, and then left.

The defendant told officers that they next went to the Kansas Court housing project to pick up his son. His son was not there, and they spoke to his son's grandmother. They remained there for approximately ten minutes, gave her money, and left. The defendant said Cecil then dropped him off at Sheila's apartment at approximately 2:15 or 2:30 a.m. Cecil, Seals, and Seals's girlfriend left. The defendant stated that Sheila was not at the apartment. Keaira and her boyfriend were there. The defendant said he and Keaira argued because Keaira was alone with her boyfriend. The defendant said that he went to bed and that Sheila returned at approximately 5:05 a.m.

Sergeant Max testified that when the officers asked the defendant whether Cecil had any enemies, the defendant related the conflict between Seals and Cecil that had occurred approximately two weeks prior to Cecil's death when Cecil, Smith, Seals, and Seals's girlfriend had returned to Seals's apartment following a visit to a club, Seals's girlfriend had

called the police after Cecil slapped Smith, and Cecil had informed the responding officers that there were drugs in Seals's apartment. The defendant told the officers that Seals had written Cecil up for a violation through "Doc Holiday," and that a meeting or jury trial with the Gangster Disciples was supposed to have been held to determine Cecil's guilt, but Cecil never attended the meeting or trial.

Sergeant Max testified the defendant told officers that Cecil always carried a .45 caliber handgun, but he did not see it when he was with Cecil on March 1 and during the early morning hours of March 2. Cecil also had an AK-47 assault rifle with two magazines that he kept under a dresser, a sawed-off shotgun, and a nine-millimeter handgun that he believed Williams had purchased recently. The defendant did not say that there had been an altercation at Seals's apartment on March 1 and did not provide a reason for going to Seals's apartment that night.

Sergeant Max testified that, up until that point, he had not been investigating any involvement by the Gangster Disciples but that officers then began following leads regarding the Gangster Disciples. Officers, however, later learned that one of the surviving children had identified the shooter, and they then arrested the defendant and brought him back to the homicide office, where he confessed to the attacks.

On cross-examination, Sergeant Max testified that he was unaware that C.D.1 told the police that a man named "Roderick" committed the offenses. He said he was not present when C.D.1 told officers that his "daddy opened the door, my daddy shouldn't have opened the door." Sergeant Max stated that the defendant told them that, following the murders, Waddell asked Seals to call someone and find out what had happened and that Seals called "Doc Holiday" and asked him what had happened or who committed the offenses.

Sergeant Max testified that, during the course of his investigation, he also spoke to Cedric Atkins about information he had received about Cecil's having stolen $300,000 from a drug dealer. In addition, on March 7, 2008, Lieutenant Armstrong instructed him to meet with Deputy Bartlett of the Shelby County Sheriff's Department to interview a confidential informant, who told the officers that he had heard that Cecil had taken $50,000 in drug money from "Doc Holiday." Sergeant Max showed the informant colored copies of photographs taken from Cecil's home to determine whether the informant could identify "Doc Holiday" and Cecil in order to verify that the informant knew fellow Gangster Disciples. The informant was able to make such an identification. At that point in the investigation, officers believed that they had identified "Doc Holiday." They were able to obtain a telephone number for him, and his name was mentioned as the governor of the Gangster Disciples.

Lieutenant Caroline Mason of the Memphis Police Department testified that in March 2008, she was a sergeant in the Homicide Bureau. On Wednesday, March 5, she was assigned to LeBonheur Children's Hospital with instructions to assess the surviving children and determine what information they could provide. She said C.D.1 was badly injured and in "pretty bad condition" but improved every day. C.D.1 was "saying things," and Lieutenant Mason relayed those statements to Lieutenant Armstrong.

On March 7, Lieutenant Armstrong instructed Lieutenant Mason and Sergeant Stark to speak to the defendant. The defendant, who was under arrest at that time, waived his rights and agreed to speak with them. Lieutenant Mason testified that she explained to him that they wanted to clear up some things and determine whether he wanted to add any information to what he provided in his March 4 interview. She asked the defendant whether he had any affiliation with a gang, and he replied that he was a Crip in prison. She then asked the defendant whether he had any problems with Cecil and questioned him regarding their relationship. The defendant stated that on one occasion, Cecil had called the police and falsely reported that the defendant had committed a robbery.

Lieutenant Mason testified that she asked the defendant to tell them again about what he did on March 1 and the last time that he saw Cecil alive. He then essentially repeated the same account he had provided during the March 4 interview, with one or two differences. Among those were that he, Cecil, and Seals had gone to Hill's apartment for Seals to retrieve a gun from Hill. The defendant also said that when Cecil called him into the home in which he had purchased marijuana, he introduced the defendant to those inside the apartment as his "bitch ass brother who just got out of prison." Lieutenant Mason said that when the defendant recalled this introduction, he "frowned." The defendant told them that, after purchasing marijuana, they went to pick up the defendant's son, but he was not home. Cecil then dropped him off at Sheila's home, and he did not see Cecil again.

Memphis Police Department Deputy Director Toney Armstrong, who was a lieutenant with the Homicide Bureau at the time of the murders, testified that, on March 3, 2008, he received a call from the felony response lieutenant, who informed him of six deceased victims inside a house on Lester Street and of three surviving children who had been transported to the hospital. Upon arriving at the scene at approximately 6:30 or 7:00 p.m., he was briefed by Sergeant Anthony Mullins, obtained a search warrant, and then entered the house, which presented "probably one of the most bizarre scenes [he] had ever seen," containing the bodies of four adults in the front of the home and the bodies of two children in adjacent bedrooms in the back of the home.

Deputy Director Armstrong testified that a film crew from the television show, *The First 48*, was at the crime scene when he arrived and that, while he did not approve of their

presence, he had no authority to limit their access or instruct them when to film. He explained that "[t]he City approved for *The First 48* to have all of the access and privileges to go out on all homicides with us."

Deputy Director Armstrong testified that because he did not know who committed the crimes, he ordered that the children in the hospital be taken into protective custody and guarded by officers in the Tactical Unit, with instructions that no one other than police personnel approved by him be allowed access to them. To the best of his knowledge, no family members were allowed contact with the children from March 3 through March 8. He then dispatched Lieutenant Mason to the hospital to obtain any information that the children might be able to provide.

Deputy Director Armstrong said that, in the meantime, officers were investigating potential leads in the case, including tips from CrimeStoppers, some of which reported that the killings were gang-related and many of which identified the defendant as a potential suspect. He stated that Larry Godwin, who was then the Director of Police Services, arranged for him to meet with the heads of the Drug Enforcement Administration, the Federal Bureau of Investigation (FBI), and other law enforcement entities in the city. Prior to the meeting, Lieutenant Mason called him to report that C.D.1 had implicated the defendant as the perpetrator. He instructed Lieutenant Mason not to tell anyone of what she had learned until his meeting was completed, because he wanted to listen to the tape recording of C.D.1's identification before informing other officers.

Deputy Director Armstrong testified that after listening to the tape recording of C.D.1's identification of the defendant as the perpetrator, he had the defendant transported to the Homicide Bureau and assigned Lieutenant Mason and Sergeant Max to interview him. At some point during that interview, however, the defendant refused to talk further with those two officers, so he, therefore, decided to conduct the interview with the defendant himself.

Deputy Director Armstrong testified that he talked to the defendant about how horrific the crimes were and watched the defendant's body language. He said the defendant seemed "really, really tight, like he was doing everything he could not to talk to me." The defendant gave one- or two-word answers to questions and would not engage in open conversation. Deputy Director Armstrong said, "Most of the time if I asked him a question, he would nod his head or shake his head. But you could tell he was doing everything he could not to engage me in an open conversation as to where we had open dialogue back and forth with each other."

Deputy Director Armstrong said he knew that the defendant was very familiar with the criminal justice system because he recently had been released from prison. He asked the

defendant whether he believed in God, and the defendant said that he did. He also asked him whether he believed in heaven and hell, and the defendant said that he did. Deputy Director Armstrong stated that the defendant was "struggling to try to maintain his composure." There were times in which the defendant leaned forward as if he wanted to make a statement, but then he would lean back. Deputy Director Armstrong said he could tell that the defendant was hiding something.

At one point, Deputy Director Armstrong allowed the defendant to grab his hands. He explained that by doing so, he was telling the defendant that he knew something was weighing heavily on the defendant's mind. He said that it appeared that the defendant was about to speak to him, but the defendant then refused to engage in conversation. The defendant asked to use the restroom, and Deputy Director Armstrong allowed him to do so. When the interview resumed, Deputy Director Armstrong asked the defendant what his family called him, and the defendant replied, "Junior." He asked the defendant if anyone else in his family was referred to as "Junior," and the defendant said, "[N]o." Deputy Director Armstrong asked the defendant if anyone else in his family looked like him or if anyone in the family had ever confused him with someone else, and the defendant answered in the negative to both questions. He then asked whether someone in his family would be referring to him if the person said "Junior," and the defendant said he or she would.

Deputy Director Armstrong testified that he then played the tape recording of C.D.1 stating that he had been stabbed by his "Uncle Junior," and the defendant became visibly upset to the point that he appeared to be about to cry. The defendant told Deputy Director Armstrong that he and Cecil went somewhere to get a gun, began arguing, and continued to argue during the drive back to Cecil's house. When they returned to Cecil's home, the argument escalated, Cecil reached for a shotgun, and the defendant began shooting using both his gun and Williams' gun. The defendant said that he then attempted to "get rid" of the children because they had seen him. The defendant stated that he "stuck them," using the knives from the kitchen drawer. Deputy Director Armstrong said that a silverware container was found turned over in the kitchen.

Deputy Director Armstrong testified that the defendant began to cry and appeared relieved because "he had gotten the weight of the world off his shoulders. But it was almost like I'm defeated." Deputy Director Armstrong testified that he questioned the defendant in greater detail about what had occurred in the house based upon what the deputy director knew from the crime scene. He said he noted that some of the women's clothing had been altered, but the defendant, at that point, stopped the interview and asked for an attorney and to speak to his mother. The defendant's mother was still in protective custody with other family members and was brought to the police department.

Priscilla Shaw, the mother of Cecil and the defendant, testified that when the police discovered the victims' bodies, her nephew drove her to the scene. When she arrived, several people were at the scene, including Nicole and the defendant. Nicole told her that three of the children were alive but that the remaining victims were dead. Shaw did not know until later which children had survived.

Shaw testified that while she and other family members were staying at a home on Gayle Street, Nicole received a call on her cell phone from the telephone number of her apartment. The defendant told Nicole that someone was calling from her home. Nicole became frightened and called the police. Nicole and Waddell then went to the police department to show officers the cell phone. Nicole called and said that a police officer was being sent to the house to watch over them.

Shaw said that when someone announced that the officer had arrived, the defendant began acting "real crazy." The defendant said that the officers were there to get him and that they were "going to put this on me, they going to put this on me." The defendant believed that Nicole and Waddell were at Nicole's home and not at the jail as Nicole claimed when she called. At one point, the defendant stated, "[J]ust bury me with my brother." He pointed a gun at his head and entered the bathroom. Shaw gathered her grandchildren and ran into another bathroom. She said they came out when they did not hear a gunshot.

Shaw said that while they were in protective custody, officers took the defendant away in handcuffs. During the early morning hours of March 8, officers drove Shaw to the homicide office after they informed her that the defendant wanted to see her. Upon arriving, she went into a room where she spoke to the defendant. No one else was in the room with them. She took the defendant's hands and asked him what was happening. She asked if the police were "trying to put it on him." The defendant did not respond and held his head down. When he looked up, he told Shaw that he "did it." Shaw asked him, "[W]hy the babies?" The defendant said they saw him. He stated that he and Cecil had been arguing all day and that Cecil had a gun. Shaw asked the defendant if Cecil had pointed the gun. The defendant said Cecil did not but was "just talking and swinging it." When Cecil laid down the gun, the defendant began shooting and later rode the bicycle away from the scene. Shaw testified, "I asked him [why] the kids and he said they saw me. And I said but the baby, the baby. He didn't say nothing, just shook his head. And I got up and told him I love him and left."

Sergeant Anthony Mullins, a homicide investigator with the Memphis Police Department who was admitted by the trial court as an expert in general crime scene investigation and bloodstain pattern analysis, testified that when he arrived at the scene, he and two felony response investigators walked through the house to ensure that no one else was inside the home. Lieutenant Armstrong arrived, and Sergeant Mullins walked him

through the front rooms of the house to show him where the victims were found and to provide an overview of the crime scene. They decided to obtain a search warrant for the property in order to collect evidence, and Sergeant Mullins returned to the homicide office and prepared a search warrant, which a judge later signed.

Sergeant Mullins testified that after obtaining the search warrant, he, Sergeants Davidson and Parks, Lieutenant Armstrong, and two crime scene officers began processing the scene. After they had completed their documentation that first night, eight people from the Shelby County Medical Examiner's Office arrived, including the medical examiner, two death investigators, and several technicians who removed the victims' bodies. By 2:30 a.m. on March 4, 2008, all of the victims' bodies had been transported to the morgue.

Sergeant Mullins testified that he and other officers returned to the secured scene at around 10:30 or 11:30 a.m. on March 4 to continue their work. He described the living room as very small with only five to ten feet of space available around the furniture and the bodies of the four adult victims. He said Cecil was found in a kneeling position on the sofa, with his upper body on the sofa cushion near the seam where the two cushions met. Roberson was seated on the floor with her legs extended out and her head to the side between the sofa and the loveseat. Williams was slumped over toward Roberson, and Seals was on the other side of a large television and could not be seen upon entering the room.

Sergeant Mullins testified that a plastic baggy with what appeared to be three to five rocks of crack cocaine was found on the outer portion of Roberson's vagina and a bag of marijuana was found in Cecil's left hand. He noted very thick coagulated blood, which he described as arterial blood from a wound with extensive bleeding, on a sofa cushion near the air conditioner and near the area where Roberson's body had been found. Sergeant Mullins stated that this area of blood was consistent with the wound that Roberson received on her leg. There was not much blood on the floor where Roberson was found sitting, however. He stated that Roberson's pants were pulled down to the knees and were saturated with blood, which was consistent with blood from an arterial wound as the blood was "gushing" out with every heartbeat. Roberson also had holes in her pants corresponding to her wounds.

Sergeant Mullins testified that the crime scene appeared to have been staged, noting that the position in which some of the victims' bodies were found did not match their wounds and some of the blood evidence. Based upon the blood and other physical evidence, he believed that Roberson was shot on the couch and that her body was then moved and her pants pulled down following the shooting. He said the bag of crack cocaine was slightly touching Roberson and seemed to have been placed there. Williams was lying on Roberson, but there were bloodstains on the carpet on the other side of Williams. Based upon this evidence, he believed that Williams had also been moved.

-24-

Sergeant Mullins noted that Seals's pants were pulled down below his knees to his ankles and that a wallet was beside him. The officer stated that there was a pool of blood near Seals's body, with a "void" in it where no blood was on the carpet, indicating that there had been an object had in the area that the blood had gone around. Based upon the blood pools, Sergeant Mullins did not believe that Seals moved on his own.

Sergeant Mullins testified that while Cecil's pants were pulled down, his pants were more in line with the style in which he saw other men wear their pants. Cecil received numerous gunshot wounds, including one to the bottom of his foot and several to his lower legs. Once Cecil's body was moved, officers found two spent projectiles underneath him. Sergeant Mullins stated that Cecil also received several wounds to the front of his body, which he could not have received had his body been in the position in which it was found. Sergeant Mullins stated the wounds to the front of Cecil's body were fatal. He explained that he thought the bag of marijuana was placed in Cecil's hand and that the bag was so large that Cecil would have been unable to close his fingers around it. Sergeant Mullins said that the bag would have come out of Cecil's hand while he was being shot and that he would not have been holding the drugs if he had been attempting to flee or defend himself.

Sergeant Mullins testified that spent projectiles were found on the sofa cushion, on top of a piece of plastic from a window unit air conditioner, on the floor under Cecil, under the sofa, inside the arm of the sofa, between two sofa seat cushions, from a wall behind the sofa, and from the east wall of the living room. A total of eight spent shell casings from a .380 caliber firearm and thirteen spent shell casings from a nine-millimeter firearm were recovered in the living room. .380 caliber spent shell casings were recovered between the seat cushion and back of the sofa, under the coffee table, under the sofa, and near a large amount of clothing stacked in a corner. One nine-millimeter spent shell casing was recovered on the floor near Cecil's leg, and another nine-millimeter spent shell casing was recovered under the coffee table near a .380 caliber spent shell casing. A sealed Ziploc bag was found on the north end of the loveseat underneath a black jacket. The Ziploc bag contained a total of sixteen spent shell casings, eleven of which were nine-millimeter spent shell casings and five of which were .380 caliber spent shell casings.

Sergeant Mullins further testified that a 12-gauge, sawed-off shotgun, which was loaded with four live rounds, was found on a stack of clothing in the corner of the living room. Cecil's body was found a little more than an arm's length from the shotgun. Five more live rounds of shotgun ammunition were found just under the sofa. A pellet gun air rifle was recovered underneath the clothes, and containers of pellets were on the nearby coffee table.

Sergeant Mullins testified that the quickest exit from the bathroom or the bedrooms

-25-

was through the living room and the front door. There were also exit doors in the laundry room and the master bedroom, but to reach those doors from the bathroom or bedrooms required walking through the living room. The door in the laundry room had a cord tied from the outer storm door to the doorknob on the other side of the door, and it appeared it had not been used for some time. Sergeant Mullins said that the door in the master bedroom, however, was operable. He testified that if the children were in the bedrooms watching television when the shots were fired, they would have had to go through the living room to reach an exit. Most of the windows in the home had bars. If the perpetrator was standing in the doorway, the children were trapped. Sergeant Mullins stated that of the more than 100 homicides involving gangs that he had investigated, none of them also involved killing women and then killing children with knives.

Two pieces of broken wood were found in the hallway near a gas heater that was affixed to the wall, and two larger pieces of wood that were broken were found inside the bathroom next to the toilet. Three small pieces of broken wood were also found in the bathroom. Two knife blades with the handles broken off were recovered from the bathtub where C.D.1 was found. One of the knives had "Farberware" written on it. Two small pieces of black plastic that appeared to be kitchen knife handles also were recovered from the bathtub. There were bloodstains on the floor and bath mat and around the bathtub and toilet. A bloody partial palm print on the tile wall was determined to belong to C.D.3. Three green hair beads were recovered from the bathroom, two in the door jamb and one against the wall east of the door. C.D.4 had been found wearing green beads in his hair.

Sergeant Mullins said that C.D.3's body was discovered facedown on the floor in what he designated as bedroom one. From the bedroom, officers also recovered two wooden boards. Broken pieces of braided hair were scattered around the bedroom floor.

Sergeant Mullins testified that C.D.4's body was in what he designated as bedroom two. Officers also recovered seventeen green hair beads similar to those worn by C.D.4 scattered under the bed and against the wall. A wooden board and two knife blades were located inside the bedroom. The wooden board appeared to have blood on it. One knife blade was between a pillow and pillowcase, and the other blade was between the mattress and the corner of the wall and almost on top of the box springs. Officers had to move the bed in order to locate the second knife blade. Neither blade had a handle. A knife handle was recovered from bedroom two. Sergeant Mullins noted blood on the bed, the window blinds, the wall by the bed, and on the ceiling near the ceiling fan.

In the kitchen, officers discovered a gray plastic silverware tray overturned on the floor, a spent projectile under a table, and a defect in the wall that appeared to have come from the direction of the living room. A box with eleven or twelve rounds of nine-millimeter

ammunition was found in the dresser in the master bedroom. Officers collected a cordless telephone that was on the floor between the dresser and the laundry room and another cordless telephone that was further back in the bedroom.

Sergeant Mullins testified that a photograph of blood spatter on the bathroom wall over the toilet tank showed "cast-off," which is generated when the blood from a blunt force object, a sharp object, or another weapon comes off the weapon during an attack and strikes a nearby object. He stated that the photograph showed three distinct trails indicative of three different blows. The top trail was almost horizontal on the wall, indicating that the victim was close to the wall when struck. He was unable to determine whether a knife or a wooden board was used on the victim resulting in the cast-off but said that because the cast-off was "a fairly wide pattern," his impression was that it was "from one of the boards."

Sergeant Mullins identified impact spatter on top of the toilet tank and explained that impact spatter results when a bloody object strikes another object. He also identified a transfer stain toward the bottom of the toilet and explained that a transfer stain results when a bloody object hits a second object leaving a stain on the second object. He stated that a body part could have struck the toilet, resulting in the transfer stain, and that the blood from the impact could have hit the top of the toilet tank, resulting in the impact spatter.

Sergeant Mullins noted a cast-off pattern on the wall over the bathtub and close to where C.D.1 was found. He said either a knife or a board could have made the cast-off pattern. Another cast-off pattern from a different blow was on the wall near the soap dish. A "smeared type" transfer stain was further down in the bathtub.

Sergeant Mullins identified cast-off spatter on the bathroom wall next to C.D.3's bloody palm print. He stated the cast-off was not necessarily associated with the bloody palm print. Rather, the cast-off could have been the result of a different blow or from the blood of a different victim. Sergeant Mullins noted cast-off spatter on the wall above the handles of the bathtub.

Sergeant Mullins testified that blood had dropped down the toilet tank and run down the toilet bowl. He said the blood was from a victim who had been actively bleeding. He also said that based upon the location and pattern on the dripped blood, someone had raised up the toilet seat and put it down at some point.

Sergeant Mullins testified that in bedroom one, where C.D.3 was found, there was a pool of blood where he was lying and numerous broken pieces of braided hair. He said the force of a blow to the head would have broken off the weaker braids. Sergeant Mullins noted large spots of dripped blood on the carpet indicating that C.D.3 may have aspirated some

blood. He explained, "I would expect to see more if that were the case but because it's carpet and it soaks up so much, it's hard to say. But this indicates to me especially with the broken pieces of braid that [C.D.3] may have received a blow while he's laying on this carpet."

Sergeant Mullins found multiple patterns of cast-off and impact spatter in bedroom two where C.D.2 and C.D.4 were found. The patterns were in multiple directions, indicating multiple blows. Sergeant Mullins also found overhead cast-off on the ceiling, which he believed resulted from the use of a knife to stab in an overhead motion.

Sergeant Mullins testified that the blood spatter at the scene was consistent with a "one-on-one struggle" rather than a "quick in-and-out execution" of the children. In the bathroom, there were multiple blows and movement. C.D.1 was found in the bathtub in which quite a bit of blood was pooled. Sergeant Mullins stated that based upon the cast-off, at least one and up to three blows were delivered in the bathtub. Noting the dripped blood and C.D.3's bloody handprint in the bathroom, he stated that some of the blood in the bathroom could have been from another victim. Sergeant Mullins also noted a large drop of blood on the bathroom floor next to two green beads similar to those that C.D.4 had in his hair. While acknowledging that the beads could have been on the floor prior to the attack, the officer said that the beads also could have fallen out of C.D.4's hair during the attack as they were found next to the blood on the floor. Sergeant Mullins said, "There is a lot of movement in the bathroom. There's more than one blow being delivered in the bathroom. You've got several pieces of broken wood that would be indicating at least one good blow, but from the blood evidence there's more than one and there's movement within that scene."

Sergeant Mullins testified that more than one assault occurred or more than one blow was delivered in bedroom two. He noted the large amount of impact spatter on the wall, the cast-off spatter on the ceiling, and the blood all over the bed. Sergeant Mullins did not believe that the assault of C.D.3 occurred solely in bedroom one. He testified that "because the wounds he had I would expect if he was assaulted in this room, there would be more blood in this room instead of the pooling blood from where he laid." Sergeant Mullins also noted evidence that C.D.3 was in the bathroom at some point during the attacks.

Sergeant Mullins testified that officers did not recover a .380 caliber handgun or a nine-millimeter handgun from the crime scene but that they collected five knife blades, including the blade that was in C.D.1's head. They also collected one knife handle and broken pieces from another knife handle. Officers did not find the other three handles, nor did they find any other set of intact kitchen knives at the scene.

Sergeant Mullins noted that paperwork, a telephone, lipstick or lip balm, a wrapped condom, and business cards were on the living room floor. He said it appeared as if someone

had emptied the contents of a purse on the floor, but he did not locate a purse that he could match with the contents. Officers located a purse next to Seals's body with the contents inside, which they later identified as belonging to Williams.

Sergeant Mullins testified that the knife blade found in the pillowcase in bedroom two had blood on it and was bent. He found no evidence indicating that the blade had been broken off inside a victim. He did not know if any of the victims had wounds indicative of the assailant sticking the knife blade in the victim and then moving it back and forth to remove the handle. Rather, he believed the handle of the knife had been removed following the attacks. Officers had to move items around in order to discover the knife blades recovered from bedroom two. Shell casings were gathered and placed in a Ziploc bag.

Sergeant Mullins said C.D.3 may have been moved from one room, placed in bedroom one, and then received the final strike. He explained, "The level of violence delivered to [C.D.3] couldn't have happened in that room without some additional blood evidence. So there has to be some movement after the fact." Sergeant Mullins testified that the person or persons responsible for the murders spent some time in the house following the murders. He explained that Roberson was not petite and that it would have taken time to pull tight pants off anyone who is deceased or nearly deceased. Once Roberson was pulled to the floor, Williams' legs were pulled across Roberson's legs. The drugs were then placed on Roberson and Cecil. He said that locating the sixteen shell casings that were found in the Ziploc bag also would have taken some time.

Sergeant Mullins testified that officers collected fabric from Cecil's chin and mouth and from his left hand. He said the fabric from Cecil's chin and mouth was possibly from a pillow that had been placed over Cecil's face when he was shot in an attempt to muffle the sound. He stated that three hairs were collected from Roberson's right leg, thigh, and buttocks and sent to the FBI laboratory for testing. The hairs did not belong to the defendant or anyone in the house. Sergeant Mullins did not, however, believe that the hairs were significant due to their location on Roberson's body. Roberson's pants had been pulled down, and the hairs were found in blood on her body.

Sergeant Mullins also said he was not surprised by any hair found in the house due to the amount of traffic at the home during the five months in which Cecil lived there. He said that because the defendant had been in Cecil's home on prior occasions, he would not have been surprised to have found the defendant's DNA in the home. He stated that one of the hairs found on Roberson was an Asian hair and explained his decision not to test the Asian hair found against known heroin dealers:

After [the defendant] was identified by a surviving witness and

-29-

confesses to the crime and gives corroborating evidence to the crime scene and we work on what he says and verified the things that he says, and continue our investigation and what he says and what the witness says match, no sir, I'm not going to go chase down heroin drug dealers to see if they could have been in this house five weeks before this happened[.]

Sergeant Mullins testified that the same nine-millimeter handgun was used to shoot Roberson and Seals and to shoot Cecil in the left thigh and Williams in the left calf. Bullets from a .380 caliber handgun were recovered from Cecil's scapula and neck and Seals's back. A .380 caliber bullet was also found at a house located behind 722 Lester Street. Testing was insufficient to determine whether the .380 caliber bullet from that house and the .380 caliber bullets recovered from the Lester Street house were fired from the same handgun.

Sergeant Mullins said that all of the adult victims except Seals were shot in the legs at least once. He stated that Cecil likely was shot in the front first but acknowledged that he could not make that determination based solely on the physical evidence. The gun used to shoot Cecil in the leg was different from the gun used to shoot him in the neck. He could not determine whether the adult victims were sitting or standing when the shots were fired.

Sergeant Mullins testified that officers seized a Magna bicycle that the defendant had ridden from Cecil's house on the night of the murders. They had hoped to find blood from the victims on the bicycle to establish that the defendant had come into contact with the victims' blood and transferred it to the bicycle. Sergeant Mullins did not believe that any blood from the victims was found on the bicycle. Genetic material from an unknown male was found on the bicycle.

Sergeant Mullins testified that the position of the shotgun at the scene as it related to the position of the blood reinforced his opinion that the scene was altered and that the shotgun had been moved to the location where the officers found it. He explained that, according to the defendant's statement, Cecil kept the shotgun in the position in which it was found and grabbed it at the time the defendant started shooting. Sergeant Mullins found the defendant's statement difficult to believe because blood was found at the end of the barrel of the shotgun with C.D.5 as a minor contributor. The barrel would not have been exposed to any blood spatter in the position in which it was found, and blood spatter was not on any of the items on which the shotgun was found. Sergeant Mullins also noted that Cecil was found holding a bag of marijuana and would not have attempted to shoot the shotgun while holding the marijuana.

Sergeant Mullins believed the four adult victims were moved either close to death or after death. The knife blades that were recovered had been placed where they were found.

Only one knife handle was located, and Sergeant Mullins did not know whether the handle matched any of the knives that were used. Officers did not recover the handguns used; the shotgun had been moved; the boards may have been placed in the location in which they were discovered; and sixteen shell casings had been gathered and placed in a Ziploc bag. Sergeant Mullins believed the two deceased children may have been moved either after death or close to death. He also believed that C.D.3 may have been assaulted in another room and that the fatal blow may have been delivered in the room where he was discovered.

Sergeant Mullins believed Seals was found in the same area in which he was shot. He said Seals's body was rolled from one side to the other because there were two different blood pools on the floor near his body with a distinct distance between them. He also said Seals's body possibly was rolled to the other side when his pants were pulled down and his wallet was removed.

Sergeant Mullins said blood evidence did not support a theory that Roberson was shot in the legs and was then mobile for some time. He explained that a direct wound could have resulted in arterial gushing, which is a distinct pattern. He believed that near or after Roberson's death, the perpetrator pulled her down onto the floor from the sofa, pulled down her pants, and pulled up her shirt.

Sergeant Mullins testified that most of the assault of C.D.3 occurred in the bathroom and that C.D.3 also may have been assaulted in the bedroom in which he was found. Sergeant Mullins did not know if C.D.3's body was moved. He said C.D.3 possibly could have been placed in the bedroom before he died. Based upon the blood evidence in the bedroom, Sergeant Mullins believed C.D.3 may have received a blow in the area in which his body was found.

Sergeant Mullins said that the altering of the crime scene could have been completed "fairly quickly" if the perpetrator was moving quickly. Collecting the evidence would not have taken long if the perpetrator knew where it was. Regardless, Sergeant Mullins believed someone spent considerable time at the scene. He explained, "My opinion is it took enough time to alter things in this scene as opposed to boom, boom, stab, stab, out the door. There's a difference. If you consider all the movement in the scene after this is done, it's going to take a few minutes but not necessarily hours, I would not think."

Sergeant Mullins acknowledged that the defendant's DNA was not found on any of the physical evidence tested, including the bicycle, although it had been ridden by a man who, in his opinion, moved six bodies that had fresh blood on them.

Sergeant Mullins acknowledged that if the perpetrator shot Williams first in the thigh, Cecil likely would have taken some action to prevent the perpetrator from shooting the next person. He also acknowledged that Cecil might not have reacted if another perpetrator was pointing a .380 caliber handgun at Cecil while the first perpetrator was shooting the women in the legs with a nine-millimeter handgun. Sergeant Mullins testified that the location of the bullet wounds was not consistent with the theory of multiple gunmen shooting Cecil's legs to obtain information. He did not know the sequence of the shots to Cecil's legs. He believed that several of the gunshot wounds may have been made post-mortem or close to Cecil's death.

On redirect examination, Sergeant Mullins testified that the theory of the offenses was developed from interviews with C.D.1 and the defendant. In his view, the TBI report of the results of testing of the physical evidence did not exonerate the defendant, and there was no evidence at the crime scene that was inconsistent with the defendant's admission to the police regarding the offenses.

Sergeant Mullins testified that the weapons used came from inside the home. During the course of the investigation, officers were able to place a nine-millimeter handgun belonging to Cecil and Williams and a .380 caliber handgun belonging to Seals inside the home. The knives were retrieved from the kitchen, and there was no evidence that the boards were from any location other than the home. Sergeant Mullins said the person who committed the offenses was familiar with the home and was comfortable enough to remain in the home long enough to alter the crime scene. He also said that based upon his experience, gang members would not have remained inside the home following the murders and would not have arrived at the house unarmed. Sergeant Mullins believed the crime scene was more consistent with the account provided by the defendant than with a "gang hit."

Sergeant Mullins testified that four weeks prior to the attacks, Cecil called the police on the defendant and threatened to have him sent back to jail. The defendant was a member of the Kitchen Crips gang. Sergeant Mullins said that knowledge of gangs and drug activity would be useful in staging a crime scene in the way in which this crime scene was staged.

Officer Ruth Horne of the Memphis Police Department testified that she was assigned to the Crime Scene Investigation Unit in March of 2008 and was asked to go to 1403 Silver Street to tag a bicycle, a rug, and a bottle of bleach. She said she found the bicycle, which the parties stipulated belonged to C.D.1, in a shed behind the house.

Linda Otterstatter, a physical scientist forensic examiner in the Trace Evidence Unit of the FBI laboratory in Quantico, Virginia, testified that she compared debris recovered from the crime scene with hair samples from Cecil, Roberson, Williams, C.D.3, C.D.4, the

defendant, and Willie Boyd Hill, Jr. No head hair samples were submitted for Seals, C.D.1, C.D.2, or C.D.5. She testified that head hairs similar to those of Roberson and C.D.4 were recovered from Roberson's back. She also identified two head hairs with Caucasian characteristics and one hair with Mongoloid characteristics that were on Roberson's back. The hairs were dissimilar microscopically to the known head hair samples she received. These hairs were submitted for mitochondrial DNA analysis.

Otterstatter testified that she identified debris recovered from Williams' right hand as a head hair similar to those of Williams. One body hair fragment was discovered on the left side of C.D.3's left hand. The hair was not suitable for microscopic comparison purposes and was submitted for mitochondrial DNA analysis. Otterstatter identified hairs recovered from the northwest bedroom as head hairs similar to those of C.D.3.

On cross-examination, Otterstatter explained that the hairs found on Williams were not submitted for mitochondrial DNA analysis because she did not feel that such analysis was important to the case as she would expect to find the victim's hairs on the victim. Otterstatter also said that she could not cannot "say for certain that that hair came from that person to the exclusion of all others." She compared head hair and pubic hair and was unable to conduct a comparison of body hair. Otterstatter did not believe that such a conclusion could be reached through mitochondrial DNA analysis either. She acknowledged that mitochondrial DNA is passed through the mother from generation to generation. Otterstatter testified that while nuclear DNA analysis results in an identification of the donor, the root of the hair and the tissue on that root are required for such an analysis. She said that some of the hairs that she analyzed had roots on them but that she did not submit those hairs for nuclear DNA analysis because she "would not submit hairs that were similar to the victims that were collected from the victims."

Deborah Polanskey, a forensic mitochondrial DNA examiner in the mitochondrial DNA unit of the FBI laboratory, testified that two types of DNA are found in the cells of the human body: nuclear DNA and mitochondrial DNA. Nuclear DNA is inherited from both parents and is unique to each individual except in cases of identical twins. Mitochondrial DNA is inherited maternally and is not unique to an individual, as siblings with the same mother share the same mitochondrial DNA type. She stated that the gender of the person supplying the DNA cannot be determined through mitochondrial DNA analysis.

Polanskey testified that hair has little or no nuclear DNA but has thousands of copies of mitochondrial DNA. Thus, a result is more likely to be obtained in analyzing mitochondrial DNA than in analyzing nuclear DNA. Polanskey explained that when she receives multiple reference samples from a maternal line such as a mother and her children, she need not test each sample. Rather, she can test the sample from the mother, and the result

represents the mitochondrial DNA type of her children.

Polanskey conducted mitochondrial DNA testing on four hairs: two hairs with Caucasian characteristics and one hair with Mongoloid characteristics recovered from Roberson's back and a fragment of a body hair recovered from C.D.3's left hand. She had known samples from Cecil, Roberson, Seals, the defendant, and Willie Boyd Hill, Jr. She also had known samples from Erica Smith, the mother of C.D.4, and Williams, the mother of C.D.1, C.D.2, C.D.3, and C.D.5.

The mitochondrial DNA sequence for the two hairs with Caucasian characteristics were the same. Thus, Polanskey could not exclude the two hairs as coming from the same source. The DNA sequence of the two hairs differed from the known samples that she received. The hair with Mongoloid characteristics did not include sufficient mitochondrial DNA to obtain a result. The mitochondrial DNA sequence from the hair found on C.D.3's hand was concordant with the mitochondrial DNA sequence of Williams. As a result, Polanskey could not exclude Williams, C.D.1, C.D.2, C.D.3, and C.D.5 as the source. She was able to exclude the defendant as the source.

Special Agent Lawrence James, a forensic scientist for the TBI who was allowed by the trial court to testify as an expert in the field of forensic serology and DNA analysis, testified at length regarding the numerous blood samples throughout the house that he analyzed, all of which were matched to one of the victims. He said he obtained a partial DNA profile from a bullet fragment recovered from the sofa in the living room. The gender marker was consistent with a male, and Cecil could not be excluded as a contributor to the DNA profile. He also analyzed the hair beads recovered from the crime scene, swabbing all of the beads as one sample in the hope that the DNA obtained would be sufficient to result in a DNA profile. He was able to obtain only a partial profile indicating that a male's DNA was present on the sample that he collected from all of the beads. After comparing that partial profile with the DNA profile of the victims and the defendant, he concluded that none of those individuals contributed to the DNA on the beads.

On cross-examination, Special Agent James testified that he analyzed clothing but was unsure whether the clothing belonged to the defendant. He determined that the defendant's blood was on the pants. He did not find any of the victims' blood on the clothing. Special Agent James also did not find any of the victims' blood on the bicycle. He did not find the defendant's DNA on the knife blades, the knife handles, the victims' bodies, the wood boards, the glass, the pillows, the shotgun, the shell casings, or the shoes. Roberson's nail scrappings revealed the DNA profile of an unknown female.

TBI Special Agent Forensic Scientist Cervinia Braswell, an expert in firearms and firearms identification, testified that the following bullets were recovered from Cecil's body: a nine-millimeter bullet from the left thigh, a .380 caliber bullet from the right scapula, and a .380 caliber auto bullet jacket fragment from the oral cavity which was part of the .380 caliber bullet recovered from his neck. She also analyzed a nine-millimeter bullet jacket fragment recovered from Cecil's clothes. A nine-millimeter bullet jacket and fragments were recovered from Roberson's left thigh, and a nine-millimeter bullet jacket and fragments were recovered from Williams' left calf muscle. A nine-millimeter bullet jacket and fragments were recovered from Seals's C-1 vertebra, and a .380 caliber bullet was recovered from the left side of his back.

Special Agent Braswell testified that she received a nine-millimeter pistol recovered from an address at 1985 Gayle and that she determined that the nine-millimeter bullets from the crime scene were not fired from that pistol. She also analyzed a .45 automatic cartridge case. Dirt was on the inside and outside of the cartridge case. Special Agent Braswell stated that because dirt was caked on the cartridge case, it had been at the location where it was recovered "for a little while." She also concluded that the .380 caliber casings recovered from the 719 Carpenter address were not fired from the same gun from which the other .380 caliber casings were fired.

Special Agent Braswell said a .380 caliber firearm typically holds eight cartridges, with seven cartridges in the magazine and one cartridge in the gun. A nine-millimeter firearm typically holds thirteen rounds with twelve rounds in the magazine and one round in the gun. The agent said she analyzed a total of thirteen nine-millimeter cartridge casings and eight .380 caliber cartridge casings. She concluded that the nine-millimeter casings were fired from the same nine-millimeter firearm and that the .380 caliber bullets were fired from the same gun. Special Agent Braswell testified it was possible for a single person to fire a .380 caliber firearm in the living room, unload the firearm, fire a nine-millimeter firearm, and unload the firearm in a quick amount of time.

On cross-examination, Special Agent Braswell acknowledged that she could not determine whether there was one shooter or multiple shooters. She said a total of six .380 caliber bullets, nine nine-millimeter bullets, and ten .380 caliber cartridge casings were submitted for testing. She tested two .380 caliber cartridge casings recovered from 719 Carpenter. She determined that the two casings were fired from an automatic weapon but were not fired from the same weapon that fired the casings recovered in the living room of the crime scene.

Special Agent Braswell testified that while a nine-millimeter firearm can fire .380 caliber rounds, she would be able to determine whether this occurred by examining the

cartridge case. She explained that a .380 caliber cartridge casing is shorter and has a slightly smaller diameter so that when it is shot using a nine-millimeter firearm, the cartridge casing will bulge out. Special Agent Braswell said that the .380 caliber casings recovered were not fired using a nine-millimeter firearm.

Special Agent Braswell said a nine-millimeter firearm could hold fewer than twelve cartridges in a magazine. Some nine-millimeter firearms only hold ten cartridges and one cartridge in the chamber. A standard sized nine-millimeter firearm holds twelve rounds in the magazine and one round in the chamber. The agent said .380 caliber firearms do not vary as much as nine-millimeter firearms.

Special Agent Braswell testified that she did not find any gunshot residue on the clothing of Cecil, Roberson, or Williams but found gunpowder particles on the holes of Seals's shirt. She said the lack of gunshot residue on the clothing of Cecil, Williams, and Roberson meant either that the shooter fired the gun outside the maximum range in which the gun would leave residue or that an intermediate object, such as a pillow, was between the gun and the victim. Special Agent Braswell said that in cases of contact residue, tearing of the clothing, singeing around the hole, and dark areas of soot and smoke are present. Contact gunshot residue generally does not result when the firearm is fired more than eighteen inches away. The agent acknowledged that she would be unable to provide an accurate measure of the distance from which the gun was fired without testing the shooting patterns of the actual gun used. Absent the gun used in shooting Seals, she could only estimate that the gun was fired at a distance of at least two feet and no more than four feet away. She could not determine the distance of the shooter from Cecil, Williams, and Roberson. She also could not determine which of the two bullets recovered from Seals left the residue on his clothing.

Dr. Michael Muhlbauer, an expert in the field of adult and pediatric neurosurgery, testified that he performed surgery on C.D.1, C.D.2, and C.D.5 on March 3, 2008. He said that when C.D.1 arrived at LeBonheur Children's Hospital, he was awake and moaning. C.D.1 had trauma and swelling to his forehead and part of a steak knife sticking out of his head. Dr. Muhlbauer noted C.D.1 had a laceration in his scalp that was six or seven inches long and extended down his forehead. C.D.1's skull was severely fractured, and large pieces of his skull had been driven inward. C.D.1 also had either a "glancing" stab wound or two separate stab wounds on the back of his arm and chest, a superficial laceration across his neck, and a laceration on his left thumb. Dr. Muhlbauer said that C.D.1 would not have survived the injuries absent medical intervention.

Dr. Muhlbauer testified that when C.D.2 arrived at the hospital, he was "essentially semicomatose." C.D.2 had injuries that were, in Dr. Muhlbauer' opinion, consistent with having been beaten with boards, including multiple fractures to his face, mid-face, and lower

portion of his skull, a fractured nose, and a small skull fracture with bruising on the back of his brain. In addition, he had stab wounds on one of his eyes, his forehead, and his neck. Dr. Muhlbauer testified that C.D.2 would not have survived without medical intervention.

Dr. Muhlbauer testified that C.D.5 arrived at the hospital with significant head trauma, which included a large cut in her scalp that exposed her bone. He said that the right side of C.D.5's skull had been pushed or crushed in with a blunt object resulting in an "open-depressed skull fracture." He stated that the CT scan revealed that the covering of her brain was "probably cut" and that her brain was mildly bruised. Dr. Muhlbauer testified that C.D.5's injuries were consistent with being struck with boards. She also had stab wounds to her left lower extremity. Dr. Muhlbauer said that absent medical intervention, C.D.5 would not have survived.

Dr. Lisa Funte, a Shelby County medical examiner who was admitted by the trial court as an expert in forensic pathology, testified regarding the victims' autopsies, three of which she had performed herself and three of which had been performed by another medical examiner in the Shelby County Medial Examiner's Office, Dr. Miguel Laboy.

Dr. Funte testified that Seals, whose autopsy had been performed by Dr. Laboy, died as a result of multiple gunshot wounds. Seals had three gunshot wounds: one to the mouth, in which the bullet fractured some of the teeth and the jaw and then continued into the neck, fracturing the first and second cervical vertebrae; one to the midline upper chest area, in which the bullet injured the left lung and exited from the back; and one to the side of the chest near the right armpit, in which the bullet traveled through the right chest cavity, injuring the right lung, and penetrated into the muscles of the back.

According to the toxicology report, Seals had marijuana and ethanol or alcohol in his system. Dr. Funte testified that one of the products of decomposition is ethanol and that she, therefore, was unable to determine whether the ethanol was the result of alcohol consumption, a product of decomposition, or both.

Dr. Funte testified that Williams, whose autopsy she had performed, also died of multiple gunshot wounds. Williams had five gunshot wounds: one to the left side of the head that resulted in injuries to the skull and brain; one in which the bullet entered the right side of the chest near the breast and exited the left side of the back, in the process causing injuries to the lungs and vertebral column; one to the left leg, which resulted in injuries to the muscles, tibia, and fibula; one to the right thigh, which resulted in injuries to the soft tissue and muscle; and one to the left side of the abdomen, which resulted in soft tissue and muscle injuries. The toxicology report indicated the presence of ethanol in Williams' body.

Dr. Funte testified that Roberson, whose autopsy she performed, also died of multiple gunshot wounds. Roberson had four gunshot wounds: one to the right thigh, in which the bullet injured the soft tissue and muscle of the thigh, traveled through the femoral vein, and continued through the soft tissue and muscle on the right side toward her back; one to the left knee, in which the bullet injured soft tissue and muscle; one to the left calf in which the bullet injured soft tissue and muscle; and one to the left thigh, which again injured soft tissue and muscle. Dr. Funte testified that the gunshot wound to Roberson's right thigh in which the bullet passed through her femoral artery would have resulted in a great deal of blood loss but would not have caused an immediate loss of life, as an individual with such an injury could die in as little as five to ten minutes or survive up to twenty to thirty minutes, depending on the circumstances. According to the toxicology report, no drugs or volatile alcohol were present in Roberson's system.

Dr. Funte testified that Cecil, whose autopsy was performed by Dr. Laboy, also died of multiple gunshot wounds. Cecil had eight gunshot wounds: one to the head that fractured his jaw; one to the neck, in which the bullet traveled through the soft tissues and muscles of the neck and fractured and penetrated through cartilages in the trachea and larynx; one to the chest, in which the bullet traveled through the muscle and soft tissue and into the back; one to the right thigh, in which the bullet perforated through the thigh, injuring soft tissue and muscle; two to the left thigh, in which the bullets injured soft tissue and muscle; one to the left leg, in which the bullet injured soft tissue; and one to the left foot. Toxicology results showed ethanol in Cecil's system. Dr. Funte testified that fiber was found in the area around the entry of the gunshot wound to Cecil's head, consistent with a shooter putting a fiber-filled pillow over Cecil's face and firing the gun through the pillow.

Dr. Funte testified that two-year-old C.D.4, whose autopsy she performed, died of multiple sharp force injuries. C.D.4 had multiple incised and stab wounds to the head, torso, and extremities, including seven stab wounds that resulted in penetration of the skull with associated skull fractures, injury of the right middle meningeal artery with epidural hemorrhage, and edema of the brain with herniation. Among other injuries, C.D.4 had a puncture-style stab wound to the right side of his head, two puncture-style stab wounds to the left cheek, two incised wounds on the left side of his face near his eye, an incised wound on his right ear beginning at the top of the ear and traveling along the inside of the orifice of the ear, a group of incised wounds of varying lengths and an incised wound leading to a stab wound on his torso, multiple incised and stab wounds on his back, and a mixture of sharp force and blunt force injuries on the left side of his torso. Dr. Funte said that incised wounds on C.D.4's back and left wrist were parallel and equally spaced and were suggestive of a serrated knife blade. C.D.4 also had an incised wound and a puncture stab wound on the base of his right thumb.

Dr. Funte also identified abrasions and contusions on C.D.4's body that she categorized as blunt force injuries. C.D.4 had abrasions on the right side of his chin, the right side of his lower lip, his cheek, the right side of his mouth, the right side of the upper lip, and the right side of the head. Dr. Funte said the shape of the abrasion on the head almost formed the outline of a rectangle, and was possibly consistent with the use of a board to strike C.D.4 on the side of the head. C.D.4 also had a combination of an abrasion and a bruise on the right side of his neck behind his ear and bruises on the left side of his neck and on his elbow.

Dr. Funte also noted discoloration on C.D.4's right eyelid and right cheek, which could have been caused by impact to the eye or could have been related to the skull fractures and impact to the right side of his head. She stated that the nature of C.D.4's injuries was not suggestive of the possibility that C.D.4 attempted to fend off his attacker and that the initial head injury she described would have been fatal without medical intervention. Had C.D.4 sustained only that wound, he could have survived for several minutes and up to one day. Had he received medical treatment within an hour of receiving his injuries, he could possibly have survived although it was not "necessarily probable."

Dr. Funte testified that four-year-old C.D.3, whose autopsy was performed by Dr. Laboy, died of blunt force and sharp force injuries. She said C.D.3 had blunt force trauma to his head with lacerations and bruises, multiple linear depressed fractures of the calvarium and base of his skull, deep scalp hemorrhage, multiple contusions to the brain, and subarachnoid hemorrhage. Dr. Funte also noted that C.D.3's head had areas of abrasions and lacerations and an incised wound above his left ear that tore part of the scalp away from his skull and reflected it over his ear.

In addition, C.D.3 had incisions to the head, neck, and right hand; a stab wound to the chest in which the knife blade went all the way through his body, injuring the left lung, the left hemidiaphragm, the stomach, spleen, and liver; linear abrasions and bruises on his left arm; abrasions on his forehead; an abrasion and bruising on his right ear; a gaping incised wound to his neck; abrasions on his right arm; a contusion and abrasions on his left arm; and an incised wound on his ring finger that was possibly consistent with his having either held his hand up to stop the attacker from stabbing him or with his having attempted to grab the knife.

Dr. Funte testified that the injury resulting from blunt force trauma to the head alone would have resulted in C.D.3's death without medical intervention. Had C.D.3 sustained only this injury, he could have survived several minutes to many hours. Dr. Funte said that after C.D.3 was hit in the head, he likely would have been rendered unconscious. The stab wound to C.D.3's chest also would have resulted in death.

On cross-examination, Dr. Funte acknowledged that she could not determine the order in which the wounds on each victim occurred. Several of the adult victims had wounds below the belt and in their knees and legs. She said that a leg wound can be fatal. Roberson had a wound to the right thigh that severed the femoral vein. Dr. Funte could not determine exactly how long Roberson would have lived following the injury. She said that the wound was fatal and that Roberson possibly could have lived thirty to forty minutes after sustaining the injury.

Dr. Funte testified that C.D.4 had incised wounds and that C.D.3 had lacerations. She said the majority of the incised wounds were superficial and not very deep. She also said the wounds could have resulted from a slashing cut from a knife. Dr. Funte was not able to determine whether a serrated or smooth-edged knife was used in each injury. She identified two injuries that had a unique pattern of equally spaced incised wounds, which was indicative of a serrated blade. Dr. Funte said that while a serrated blade may not always leave such a pattern, it will do so if dragged across the skin.

Dr. Funte testified that a black hair and a white hair were collected from Williams' hand and that hairs were collected from Roberson's back. A white substance was collected between Roberson's labia and vulva. Dr. Funte could not determine whether Roberson was carrying the substance there to hide it or whether the substance was placed there by someone else. A green substance was collected from Cecil's hand. The color of Cecil's skin on his hand just below where the green substance was found was tan or brown. Blood was below the area of the hand.

On redirect examination, Dr. Funte testified that the hairs recovered on Roberson were bilaterally on her buttocks and right thigh. On recross examination, she said Roberson's clothing was not removed at the scene. Her pants had been pulled down, and her shirt was in disarray. Dr. Funte stated that it appeared from the wound pattern on Roberson's legs and the wound pattern on her jeans that she was wearing the jeans when she was shot.

## GUILT PHASE – DEFENSE PROOF

Cedric Atkins testified that approximately one and one-half weeks before Cecil was killed, he and Cecil had a conversation in a hotel room in which Cecil told Atkins that he owed money to the "mob." Atkins said the "mob" was a group of people who have money and respect and sell narcotics or "whatever." Atkins testified that following Cecil's death, he contacted an officer with the Memphis Police Department with whom he had previously served as an informant and told him about his conversation with Cecil. Atkins said he answered the officer's questions truthfully, never demanded money from the officer or anyone else, and was not promised anything in exchange for the information. Approximately

one week later, the officer contacted Atkins and informed him that the information he provided was not useful. Atkins acknowledged that he had been convicted of theft during the year prior to the defendant's trial and that he did not want to testify and was doing so only pursuant to a subpoena.

On cross-examination, Atkins testified that he did not recall asking the police what was "in it for [him]." He told the officer that he had just met Cecil on the night in which he and Cecil had the conversation and that that night was the first time he had an extended conversation with Cecil. Atkins testified that he told the officer that he ran into Cecil at a hotel and that Cecil told him that he owed $300,000 and that he should avoid owing people money.

Sergeant Joseph Stark testified that he interviewed Waddell on March 4, 2008, at approximately 8:00 p.m. Waddell stated that "Frank" had told him that those inside the residence were tortured and that Cecil's fingers were cut off. Waddell also stated that Cecil and "Doc" had a "falling out." Sergeant Stark said that Waddell informed him that Cecil and "Frank" were Gangster Disciples.

William Carroll, an employee of AT&T, testified that an eight-second call was made from the Lester Street residence on March 1, 2008 at 11:35 p.m. to number 8xx-xxxx. Carroll was unable to determine whether anyone answered that call. He said that the next activity on the telephone was on March 3 from a 589 number, which could have been a telemarketer.

Thirty-four-year-old Markel Vester testified that he joined the Gangster Disciples in 1997 or 1998 when he was twenty-five or twenty-six years old. He knew "Doc Holiday" and "Frank" but did not know whether "Doc Holiday" held any rank in the Gangster Disciples in March of 2008. He stated that Cecil was a member of the Gangster Disciples when he met him and that Cecil performed maintenance duties at the apartment complex where he lived. Vester testified that "Frank" called him and told him about what had happened to Cecil and the other victims. Vester said he last spoke to Cecil approximately two to three weeks before his death. He did not recall whether he spoke to Cecil over the telephone on March 1 or March 2. He said Cecil did not call him on the Saturday or Sunday prior to his death. Vester stated that in March of 2008, his cell service was through Cricket Wireless and that his cell phone number was 2xx-xxxx.

Charity Wright, who was recalled to testify regarding Cecil's cell phone records from Crickett Wireless, testified that the records showed that Smith called Cecil on March 2, 2008, at 1:37 a.m. and that the call lasted approximately fifty-six seconds. She said the call either was not answered or went to voicemail. She stated that Smith also called Cecil at 1:30 a.m.

-41-

and that the call lasted fifty-nine seconds but was not answered. Wright said that she was mistaken if she had earlier testified that those calls had been answered.

Wright further testified that Cecil called Markel Vester's number at 12:38 a.m., with the call lasting for seventeen seconds. Wright said that the call could have been answered but that there was no way of determining whether a conversation occurred. She stated that Cecil called the same number again at 12:39 a.m., and the call lasted forty-four seconds. Wright said that it was difficult to determine whether the call was answered.

Dr. Nancy Aldridge, a psychotherapist who was admitted by the trial court as an expert in the forensic evaluation of children, explained the protocol for conducting a forensic interview of a child and expressed her concern about the manner in which the interviews of C.D.1 and C.D. 2 had been conducted, including the fact that C.D.1 was interviewed shortly after being discovered, was interviewed on four or five occasions, and gave different statements as to what had occurred. She also expressed concern at the fact that the forensic interviews of the children did not occur until August 13, 2008, more than five months after the incident.

Dr. Aldridge testified that she believed that the initial account provided by C.D.1 was "possibly" reliable because C.D.1 appeared to have been reliving the trauma that he experienced while providing that initial statement and was appropriately asked open-ended questions by the interviewers. She explained that what actually occurred generally is discovered during the initial interview of a child, as the child's memories become more unclear as he or she is repeatedly interviewed and is contaminated by information from others. She elaborated that when a person continues to question a child after the child has provided an answer, the child may believe that the initial answer was not acceptable and provide a different answer.

Dr. Aldridge noted the importance of recording all statements from the beginning, particularly when the child is severely traumatized, to learn the sequence of the child's memory and how the memory resurfaced. She said that some of the records she reviewed referenced interviews where no transcripts or recordings existed, which meant that she did not know who had spoken to C.D.1 or what C.D.1 was asked or told prior to the recorded interviews.

Dr. Aldridge testified that she had concerns regarding the reliability of the information obtained from the children during the August 2008 interview due to the length of time that had elapsed and the fact that the children might have been exposed to other information about the crimes from family members. The manner in which the children testified at trial also gave her pause: "The concern that I had for these children is they seemed to be very,

very clear as to what questions were going to be asked each one of them and what their answers were. So they were very prepared for the testimony." Dr. Aldridge said that although the reliability of C.D.1's testimony was an issue for the jury, she could reason that C.D.1 would agree with whatever question was asked of him. She also noted the potential for contamination of the children's memories during the two-and-one-half-year period that elapsed from the time of the attacks to the trial.

On cross-examination, Dr. Aldridge acknowledged that she did not know whether C.D.1's identification of the defendant as the perpetrator was wrong but reiterated that she had "concerns."

The defendant testified that after he had completed work on Saturday, March 1, 2008, Cecil and two of Cecil's sons picked him up at the home of his sister, Nicole, to take him to Cecil's house on Lester Street for a barbecue, stopping en route from Nicole's to Cecil's house to purchase some liquor. He said that his father, Waddell, and Seals arrived at Cecil's house a little later, where Williams and the other children were already assembled, and that they listened to the basketball game on the radio. His father left after the game concluded, but the defendant remained at Cecil's house all evening where he, Cecil, and Seals drank, smoked, and grilled. The defendant stated that Seals and Cecil discussed the gun that "Frank" was holding for Seals and that Cecil told Seals to retrieve it. Seals asked Cecil for clothes because he had just been released from jail. Cecil said that he had clothes for him, and Seals said that he would clean up later.

The defendant testified that after dark, he, Seals, and Cecil left the house in Cecil's Lincoln, going first to visit "Frank" at the Barclay Apartments. The defendant said that Cecil, Seals, and "Frank" were members of the Gangster Disciples and that he had joined the Kitchen Crips in the 1990's. At "Frank's" apartment complex, both Seals and Cecil exited the vehicle, and a man walked down the steps. They discussed "Frank" and the incident that occurred on February 14 while the defendant remained inside the vehicle. Seals then walked up to "Frank's" apartment where he remained for thirty to forty minutes before the defendant went to the apartment to get him. The defendant stated that Cecil remained in the parking lot where he was arguing with the man who had walked down to talk to him. The defendant said the man was attempting to calm Cecil. He explained that at that time, Cecil and "Frank" were "into it." The defendant said Cecil believed that the man should be on his side. Cecil also had stated this to Seals, which was why Seals went to retrieve the gun from "Frank." The defendant stated Cecil commonly argued with others.

The defendant testified that the man attempted to hug Cecil and that Cecil asked him why he was doing so. Cecil said he did not have anything on him and pulled up his shirt. Cecil told the man that he wanted to fight "Frank" and instructed the man to get "Frank."

-43-

Instead, the man got into his black Impala. Cecil yelled, "[Y]'all know where I stay at" and returned to his car. The defendant said that he and Cecil laughed and that he told Cecil that "Frank" had tried to call him. "Frank" called again, and Cecil answered the call. However, it was Seals on the other end of the call asking them where they were, and the defendant told him they were waiting on him. Cecil then told the defendant that he had "punk'd" the man. The defendant said he told Cecil to get Seals, but Cecil refused. The defendant then went to the door of "Frank's" apartment and knocked. "Frank," "Trell," "Tammy," and a man whom the defendant did not know were there. The defendant told Seals that they were ready to leave, and they left.

The defendant said he, Cecil, and Seals then went to the home of his girlfriend, Sheila Jones. The defendant and Cecil entered the home looking for Sheila, but she was not there. The defendant stated he caught the boyfriend of Sheila's daughter in one of the bedrooms with his pants halfway down. He said Sheila's daughter began cursing him, and they left. They next went to the home of "Marilyn," the grandmother of the defendant's son. They were there for less than five minutes because his son was not there.

The defendant testified that they then went to an apartment complex near GE Patterson to pick up Roberson, Seals's girlfriend. Roberson asked whether they had any marijuana, and Cecil said that he knew where to purchase some so they went to an apartment at Kimball Cabanas where they purchased $45 worth of marijuana. Cecil got out of the car and then returned, telling the defendant that he wanted to introduce him to "his folks." The defendant explained that "folks" referred to Gangster Disciples. Four people were inside the apartment, and the defendant and Cecil remained for approximately five minutes. They also saw Smith in the apartment complex. Cecil talked to her while the defendant remained inside the vehicle. The defendant yelled out her name, and she came to the vehicle and spoke to everyone inside. She and Cecil then continued to talk for approximately five minutes. When Cecil returned to the vehicle, he was talking to Smith on his cell phone.

The defendant said that after they left the apartment complex, they went to another woman's home and stayed for thirty to forty minutes. They then returned to Cecil's house where Williams and the children were. The defendant stated he, Cecil, Seals, Williams, and Roberson were in the living room. Williams was drinking a wine cooler while Roberson was preparing a marijuana cigarette. According to the defendant, Cecil asked Williams to put sheets on their bed. Cecil told Williams that he planned to allow Seals and Roberson to sleep in their bedroom located in the back of the house and that he and Williams would sleep in the living room.

The defendant said that he volunteered to put the sheets on the bed and that he was beside the bed with a quilt in his hand when he heard two or three gunshots. He

-44-

acknowledged that he was carrying a blue .44 caliber handgun on him at the time. He said he heard screaming and hid under the bed. He heard more noise which he later determined to be the family's dog that was in a nearby cage. The defendant said he heard a few shots followed by other shots seconds later. He could not determine whether the shots came from the same gun or different guns.

The defendant said he hid under the bed for several minutes. Based upon the sound the dog was making, it appeared as if someone was walking around in the same bedroom where he was hiding. He was unable to hear noise from other areas of the home and eventually came out from under the bed and went into the living room. He asserted that he believed all of the victims, including the children, were dead. The front door was open, and he left the house riding a bicycle he found behind a door in the living room.

The defendant testified that he went to Sheila's home where Keaira allowed him to enter. He said he went into Sheila's bedroom and then to the bathroom where he vomited. The defendant stated he then cleaned the sink with bleach and brushed his teeth. He then knocked on Keaira's bedroom door, telling her that he needed to talk to her, but they never had any conversation.

The defendant explained why he did not call the police: "Y'all done heard testimony about the gangs. I'm in a gang. We don't call the police. It's just that simple. We don't call the police. It's not part of what we do. If I call the police, I'll be just like my brother."

The defendant testified that officers interviewed him on March 5, 2008, and that the interview was videotaped. He said that when he was interviewed by Lieutenant Mason and Sergeant Stark on March 7, he told them that he worked from 8:00 a.m. until 3:00 p.m., that Cecil picked him up and drove him to Cecil's house, that they watched a game, and that Cecil drove him back home. The defendant acknowledged that his statement that Cecil drove him back home was untrue. The defendant said he did not tell the police what had occurred when questioned on March 5 because "I don't talk to police."

The defendant testified that he spoke to Waddell, who had informed the defendant of his conversation with "Frank." The defendant said he asked Waddell if he knew "Doc's" actual name. The defendant stated that Waddell had spoken to a woman who said that the defendant was being reported by the media as the killer. The defendant also stated he and his family saw the news report. The defendant acknowledged that after seeing his face on a news report, he put a gun to his head and threatened suicide, saying that he was not going to return to prison for something he did not do and that he should have died with his brother. He said that when the police officers came following his threats, they did not offer to take him to a hospital or a mental health facility.

The defendant testified that before Lieutenant Armstrong interviewed him, he had been in the Homicide Bureau for hours and was handcuffed. He said that Lieutenant Armstrong played a tape recording of the defendant's nephew identifying him, but did not play the portion of the tape in which his nephew identified others. The defendant testified that after playing the recording, Lieutenant Armstrong began screaming about the defendant's family and said that he was tired of "playing games." According to the defendant, Lieutenant Armstrong said he knew that the defendant was "bullshitting" and that he was "sick of it." The defendant said that Lieutenant Armstrong stated he wanted answers now and that he began "pounding" on the table.

The defendant testified that he then told Lieutenant Armstrong that Cecil had reached for a shotgun and that the defendant just started shooting. The defendant then asked for his mother. He told his mother that he had a gun and that when Cecil sat his gun down, the defendant began shooting. He also told her that he "stuck" the children.

The defendant testified that from the time his family was discovered until the interview, he had not slept, had cried about what had happened, and was depressed. He stated he requested to see his mother on approximately three occasions during the interview, but Lieutenant Armstrong told him that he would not be allowed to see anyone until he told the officer what he wanted to know. He said that, earlier on March 7, he had told different officers that he did not kill the victims. He insisted that his statement to Lieutenant Armstrong that he shot Cecil was not true, and he maintained that he did not kill Cecil or any of the other victims.

The defendant testified that at the time the victims were killed, his cousin, Tammy Randolph, was dating Vernon Motley. At some point prior to the deaths of the victims, Randolph told the defendant that the police were looking for Motley for a charge of murder. She gave the defendant a .44 caliber firearm to hold. At some point, Randolph also told the defendant to give the gun to her other cousin, "Antonio."

On cross-examination, the defendant testified that when he left Cecil's house on the bicycle, he believed nine people were dead inside the house. He acknowledged that he did not call 9-1-1 for his family and that he went to Sheila's home and went to bed. The next day, he did not go to work or call anyone about the offenses and went to dinner with Waddell. He also went to work Monday morning with his father but did not tell either of his parents about what had occurred. The defendant acknowledged that he lied to his family about the last time he saw Cecil.

The defendant said that he did not escape through the back door of the house because a key was needed to do so. He also did not use the cordless telephone in the bedroom to call

9-1-1.  The defendant said he remained under the bed for approximately thirty minutes.  He never heard the children screaming or anyone hitting the children with boards.  He remained under the bed while the killers gathered the shell casings and pulled down Roberson's pants.  The defendant said that when he entered the living room, Roberson was in the position that she appeared in photographs of the crime scene.  He saw C.D.1 lying in the bathtub but did not "pay attention" to the knife in C.D.1's head.  He did not check on C.D.1 to determine whether he was alive and believed that everyone in the house was dead.

The defendant testified that he was in the interview room with Lieutenant Armstrong for four to five hours, and he maintained he had confessed only after Lieutenant Armstrong screamed at him and threatened him:

> He didn't pound on the table.  It was he asked me when he played the tape and after he played the tape, he played the tape what, 12, 13 times.  And after he played it 12 to 13 times, after I still told him I didn't do it, that's when he said I'll kill your mother f***ing ass myself, you cold-hearted murdering killing mother f***er.

According to the defendant, Lieutenant Armstrong then said, "I got something for you.  I'm going to throw your ass on that 4th floor and I'm going to let them kill your mother f***ing ass."

The defendant acknowledged that his testimony at trial regarding the events was not consistent with what he had told his mother.  The defendant said he leaned across the table and told his mother, "[T]hey trying to put this on [me]."  His mother asked for the names of those who were trying to do this so that she could get him help.  The defendant said that he told her he did not know their names and that they were watching him.  He and his mother then grabbed each other's hands, and he told his mother not to worry and that he had committed the offenses.  The defendant acknowledged that he told his mother that he and Cecil began arguing and that, after Cecil put down his gun, the defendant began shooting.  His mother asked how he got away from the house, and the defendant told her that he rode a bicycle.  The defendant believed he told his mother that he killed the children because they saw him.  The defendant insisted, however, that he lied to his mother and that his trial testimony was the truth.

At the conclusion of the guilt phase, the jury convicted the defendant of six counts of premeditated first degree murder for the deaths of Cecil, Williams, Seals, Roberson, C.D.3, and C.D.4.  The jury also convicted the defendant of three counts of attempted premeditated first degree murder of C.D.1, C.D.2, and C.D.5.  The trial then proceeded to the penalty phase with regard to the defendant's six first degree murder convictions.

**PENALTY PHASE**

During the penalty phase, the parties stipulated that the defendant previously had been convicted of second degree murder, which was a violent felony. The State also presented the victim impact testimony of Ida Anderson, Williams' mother, and Annette Mallory, Seals's aunt.

Anderson testified that she was raising her grandchildren and, as a result, had lost her job and was struggling financially. Her family also was in counseling as a result of the offenses. Mallory testified that at the time of his death, Seals had three children whom he loved and supported. She said Seals's death "hit [her] hard." He was like a younger brother to her until his mother died, and then she became a mother figure to him.

Glori Shettles, a mitigation specialist, testified on the defendant's behalf regarding his family history and background. She said some of the defendant's family members were willing to provide information about him but were unwilling to testify on his behalf. From her investigation, she learned the following about his history. The defendant's parents were married in 1972 when his mother, Priscilla Shaw, was fifteen years old and his father, Jessie Dotson Sr., was nineteen years old. They soon had a daughter, Nicole. Jessie Sr. joined the Army and was stationed in Florida where the defendant was born. At some point, Shaw and Nicole returned to Memphis where Nicole became so ill that Jessie Sr. left his base and returned to Memphis. Jessie Sr. was honorably discharged from the Army. He wanted to keep his family in Florida but was unable to obtain employment, so the family returned to Memphis.

Shettles testified that Jessie Sr. was jealous of Shaw, who went on a church trip to New Orleans, returned with a boyfriend, and told Jessie Sr. that she no longer wanted to be married to him. They remained married for some time after that incident, however. The defendant's parents argued often, and Jessie Sr. was physically abusive to Shaw on more than one occasion, with the children witnessing the abuse. By this time, Cecil, who was three years younger than the defendant, was born. Shaw wanted to leave Jessie Sr. and saved money to do so, with the result that Jessie Sr. returned home one day to find Shaw and the children gone. Shaw did not contact Jessie Sr. until four to five months later. The defendant was six years old at this time, and the children did not know what had happened to their father.

Shettles testified that the family moved often during the defendant's childhood. The defendant left school at the age of sixteen while in the eighth grade. By that time, he had attended ten different schools. Shettles noted that a large number of moves was often one of the risk factors for poor performance in school and in life. The defendant was diagnosed

with a learning disability in reading and math and was enrolled in resource classes. He also had disciplinary problems at school and at home. School mental health records indicated that he was provided with individual counseling. Counselors attempted to meet with Shaw, but she either cancelled the appointments or did not attend them.

Shettles testified the defendant failed the fourth grade twice due to his large number of absences from school. The defendant was teased for not having proper clothing and did not attend school as a result. Thereafter, the defendant was socially promoted in school. Shettles believed that the defendant was capable of performing better in school but did not do so due to the number of absences and tardies. After the defendant left school, he was employed for a brief period. Shettles said the only legitimate job that the defendant ever held was as a security guard at the age of eighteen.

Shettles testified that by the time the defendant was fifteen years old, he became involved in the juvenile court system and had several arrests and juvenile adjudications. Shaw could not control the defendant and did not know what to do. She attended juvenile court with the defendant on many occasions and when she could not attend, Nicole attended on her behalf.

Shettles testified that the family did not have much money and that Shaw was not home often. As a result, Nicole cared for her brothers. The food was locked up, and they were not able to get to it. When the family went to the maternal grandmother's house for Sunday dinner, money went missing from their grandmother's purse. Shettles said the defendant and Cecil were taking the money to purchase food and were severely punished as a result. In addition, their grandmother told Shaw that the defendant and Cecil were no longer welcome in her home.

Shettles testified that at the age of nineteen, the defendant pled guilty to second degree murder and was sentenced to eighteen years in prison. The defendant received many write-ups when he first entered prison for refusing to participate, cursing at an officer, and other offenses that did not involve weapons. He also received write-ups for violent activities. The defendant completed fourteen of his eighteen-year sentence in prison. He was considered for parole on two occasions before he actually made parole. The defendant's mother and her husband only visited him once while he was in prison, and he spoke to his father on a few occasions by telephone. Shettles said that while in prison, the defendant participated in a behavioral modification program and "thrived" in the program.

Shettles testified that the defendant has family who value his life but that it had been difficult for them to attend trial and show their support. The defendant also had a son with whom he was continuing a relationship. The defendant had a friend who was afraid to

appear at trial and a friend of his grandmother who was eighty-one years old and cared for him.

On cross-examination, Shettles testified that the defendant was suspended from school so many times that the Memphis City Schools refused to allow him to continue to attend. He had more than one juvenile adjudication that involved the use of weapons. The defendant fought often, and his school and juvenile records referenced problems with his brother. Shettles was aware that the defendant joined the Crips gang while in prison and that he received a violent write-up after he and four other inmates cut an inmate who was trying to leave the Crips.

At the conclusion of the penalty phase, the jury unanimously found the presence of the following three statutory aggravating circumstances with regard to the defendant's conviction for the first degree murder of Cecil Dotson, Sr.: (1) the defendant was previously convicted of one or more felonies involving the use of violence; (2) the defendant "knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder"; and (3) the defendant committed mass murder. See Tenn. Code Ann. § 39-13-204(i)(2), (3), (12) (2006). The jury unanimously found the presence of the same three statutory aggravating circumstances with regard to each of the defendant's three convictions for the first degree murders of Williams, Seals, and Roberson, as well as two additional statutory aggravating circumstances: (1) the murder was committed for the purpose of avoiding, interfering with, or preventing the lawful arrest or prosecution of the defendant or another; and (2) the murder was knowingly committed while the defendant had a substantial role in committing, or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit any first degree murder. Id. at (i)(6), (7). Regarding the defendant's two convictions for the first degree murders of C.D.3 and C.D.4, the jury unanimously found the presence of the same five aggravating circumstances that it found for the first degree murders of Williams, Seals, and Roberson, as well as two additional statutory aggravating circumstances: (1) the victim was less than twelve years old and the defendant was eighteen years old or older; and (2) the murder was especially heinous, atrocious, or cruel. Id. at (i)(1), (5). The jury determined that these aggravating circumstances outweighed any mitigating circumstances and imposed a sentence of death for all six convictions.

## SENTENCING HEARING

During the separate sentencing hearing to determine the defendant's sentences for his three attempted first degree murder convictions, Ida Anderson testified that she adopted her grandchildren and now cares for them. She said that the children were "devastated," that the attacks "wrecked us, completely," and that the entire family has been in counseling. She

stated that C.D.1 had undergone multiple surgeries and would require an additional surgery. C.D.2 also had undergone multiple surgeries and had scarring. His eye was not "even," and he would also require an additional surgery. C.D.5 also had scarring on her leg that needed surgery. Anderson had been terminated from her job because she missed so much work following the attacks, and both she and the children received social security benefits. In addition, other family members, as well as some friends, had contributed financially. Anderson stated that her daughter had to give up her house and move in with her to help and that she was not in a position to care for the children by herself.

At the conclusion of the sentencing hearing, the trial court sentenced the defendant to forty years for each of the attempted first degree murder convictions to be served as a Range II multiple offender. The trial court ordered that each sentence run consecutively to each other, as well as the death sentences, for an effective sentence of death plus 120 years.

## ANALYSIS

We will review the issues raised on appeal by the defendant.

### I. Sufficiency of the Evidence

The defendant contends that the evidence is insufficient to support his convictions, saying that it is insufficient to establish premeditation and his identity as the perpetrator and that the physical facts rule requires the reversal of his convictions.

Once a jury finds a defendant guilty, his presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). On appeal, the convicted defendant has the burden of demonstrating to this court why the evidence does not support the jury's verdict. State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. Carruthers, 35 S.W.3d at 558; Tuggle, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to reweigh or reevaluate the evidence. State v. Reid,

91 S.W.3d 247, 277 (Tenn. 2002); Bland, 958 S.W.2d at 659. Likewise, we do not replace the jury inferences drawn from the circumstantial evidence with our own inferences. See State v. Elkins, 102 S.w.3d 578, 582 (Tenn. 2003); Reid, 91 S.W.3d at 277.

First degree murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). An intentional act requires that the person have the desire to engage in conduct or cause the result. Id. § 39-11-106(a)(18). A premeditated killing is one "done after the exercise of reflection and judgment." Id. § 39-13-202(d). Premeditation means that

> the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.

Whether premeditation is present is a question of fact for the jury, and it may be determined from the circumstances surrounding the killing. Bland, 958 S.W.2d at 660; State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Circumstances that may be indicative of premeditation include declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). A defendant's failure to render aid to a victim can also indicate the existence of premeditation. State v. Lewis, 36 s.W.3d 88, 96 (Tenn. Crim. App. 2000).

In cases where a defendant has been charged with the attempted commission of a crime, there must be evidence that the defendant acted "with the kind of culpability otherwise required for the offense" and acted "with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2). Criminal attempt also occurs when the defendant "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Id. § 39-12-101(a)(3).

## A. Premeditation

The defendant argues that the evidence at trial established that he committed the crimes while in a state of excitement and passion. In support, he points to his statement to police in which he related how he and Cecil were arguing and that Cecil was waving a gun around when the defendant grabbed his own gun and started shooting. The defendant argues that there is no evidence that he was "sufficiently free of that 'excitement and passion' before the children were assaulted, some of them fatally." We respectfully disagree.

Viewed in the light most favorable to the State, the evidence established that the defendant shot the adult victims multiple times and then repeatedly stabbed and beat the young children, moving from room to room to do so. Although the defendant told police that he first began shooting after Cecil reached for a shotgun, he told his mother that he began shooting after Cecil laid down his gun and that he attacked the children because they had seen him. We note that Sergeant Mullins testified that the shotgun appeared to have been placed in the corner near Cecil, the position in which police discovered it, as part of the staging of the scene.

Moreover, the killings and attempted killings were particularly cruel. Seals was shot in the face and chest, and the gun was close enough to Seals's face that it left stippling on his face when fired. Williams was shot in the head, chest, leg, thigh, and abdomen. Roberson was shot in both thighs and the left knee twice. Cecil had eight gunshot wounds, including to the head, neck, chest, thigh, and foot, and there was material on his face consistent with a pillow having been placed over his face and a gun fired through the pillow. The children were repeatedly and violently stabbed with knives and beaten with wooden boards, and C.D.1. was left in the bathtub with a knife sticking out of his head. In addition, the defendant talked to some of the victims, rejecting their claims that they loved him and continuing with his violent attacks.

The defendant altered the scene to make it appear as if the murders were drug or gang-related, moved bodies, disposed of or hid kitchen knives and handles, and collected the cartridge casings. He escaped on a bicycle and hid it in his girlfriend's shed. Instead of attempting to render aid or summon help, he went to a restaurant for dinner the next night and reported to work on the Monday following the attacks, without telling anyone about the crimes. He also lied to his family about the last time he had seen Cecil. This evidence was more than sufficient to establish the element of premeditation in the defendant's convictions for first degree murder and attempted first degree murder.

## B. Physical Facts Rule

The defendant also contends that the evidence against him was largely based on the testimony of C.D.1, portions of which were negated by the "physical facts rule," requiring reversal of his convictions. We, again, respectfully disagree.

The physical facts rule is "'the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded.'" State v. Allen, 259 S.W.3d 671, 679 (Tenn. 2008) (quoting State v. Hornsby, 858 S.W.2d 892, 894 (Tenn. 1993)). When a witness's testimony "cannot possibly be true, is inherently unbelievable, or is opposed to natural laws, courts can declare the testimony incredible as a matter of law and decline to consider it." Id. (quotation omitted). For the physical facts rule to apply, the testimony "must be unbelievable on its face, i.e., testimony as to facts or events that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature." Id. at 680. For example, testimony that a witness "saw the sun set in the east" could be disregarded. Id.

The physical facts rule, however, is a power "that should be used sparingly." Hornsby, 858 S.W.2d at 895. When the testimony "is capable of different interpretations, the matter should be left for the jury to decide as the sole arbiter of credibility." Id. The determination of whether there are inconsistencies in testimony, the reconciliation of conflicts in testimony, and the determination of how this might affect a witness's credibility, are within the province of the jury. Id. "[T]he improbability of the truth of the testimony, which justifies rejection under the physical facts rule, cannot rest upon any theory involving the consideration of the comparative credibility of the witnesses." Id. at 896 (quotations omitted). The physical facts rule may not be invoked "where its application depends upon assumptions or calculations based upon estimates as to speed, distance, time, and other such uncertain matters in the movement of objects." Allen, 259 S.W.3d at 680 (quotations omitted).

The defendant asserts that although C.D.1 testified that he saw the defendant attacking his siblings and speaking to Williams while C.D.1 was in the bathtub, "it would have been impossible to see inside the bedroom from his vantage point in the tub." The defendant also asserts that C.D.1's testimony that he was stabbed in the neck while lying on the bed in his sister's room was contradicted by the lack of his blood on that bed.

C.D.1 did not, however, testify that the defendant "stabbed" him in the neck, but instead that the defendant "cut" his neck. We note that Dr. Muhlbauer confirmed that C.D.1 had a superficial laceration across his neck and that no evidence was presented regarding what amount of blood, if any, such a superficial laceration would have produced. Regardless, we cannot conclude that C.D.1's testimony regarding the attack violated the physical facts rule. As this court has previously noted, "the fact that a witness testifies and

-54-

that testimony ends up being inconsistent with other testimony raised at trial, . . . even if [it is] scientific testimony, does not make it inadmissible testimony." Lemar Brooks v. State, No. M2010-02451-CCA-R3-PC, 2012 WL 112554, at *16 (Tenn. Crim. App. Jan. 11, 2012), perm. app. denied (Tenn. May 16, 2012) (quotations omitted). Throughout his testimony, C.D.1 identified the defendant as the perpetrator. The jury could have resolved any conflicts and discrepancies in his testimony by attributing them to his youth, his head injury, or the extreme trauma he must have experienced by witnessing and experiencing the horrific attacks against him and his family members. We conclude, therefore, that this issue is without merit.

## C. Identity

Lastly, the defendant contends that the evidence is insufficient to establish his identity as the perpetrator. Specifically, he argues that his statement was inconsistent with the physical evidence and that the forensic evidence excluded him as the perpetrator. However, he confessed that he was the perpetrator, both in a statement to police and during his conversation with his mother. In addition, two of the child victims identified him as their attacker. By convicting the defendant of the indicted crimes, the jury obviously rejected the defendant's trial testimony in which he claimed to have been hiding under the bed while the murders and attempted murders were perpetrated by others. We conclude, therefore, that the evidence is more than sufficient to sustain the defendant's convictions.

## II. Admission of C.D.1's Statement Identifying the Defendant

The defendant contends that testimony of various witnesses that C.D.1 identified the defendant as the perpetrator violated his right to confront witnesses under the United States and Tennessee Constitutions. The defendant specifically complains of testimony offered by Sergeant Mullins on cross and redirect examination, Lieutenant Davidson on direct and redirect examination, and Sergeant Max on direct examination. The State responds that the defendant failed to object at trial to the testimony based upon a violation of his confrontation rights and that the admission of the testimony does not rise to the level of plain error. We agree with the State.

The defendant did not object to the testimony of Sergeant Mullins and Lieutenant Davidson and only objected to Sergeant Max's testimony on the basis of hearsay. The defendant also failed to raise the issue in either his initial or amended motion for new trial. When a defendant raises an issue for the first time on appeal, the issue will generally be deemed waived and will be considered only within the limited parameters of an appellate court's discretionary plain error review. State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005); see also Tenn. R. App. P. 3(e); Tenn. R. App. P. 36(a); Tenn. R. Crim. P. 52(b). The defendant bears the burden of persuading the appellate court that the trial court committed

-55-

plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial. State v. Bledsoe, 226 S.W.3d 349, 354-55 (Tenn. 2007).

Under plain error review, relief will only be granted when five prerequisites are met: (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice. State v. Gomez, 239 S.W.3d 733, 737 (Tenn. 2007).

We cannot conclude that the admission of the testimony breached a clear and unequivocal rule of law. Interpreting the Sixth Amendment, the United States Supreme Court noted in Crawford v. Washington, 541 U.S. 36, 59 n.9 (2004), that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." The Confrontation Clause "does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." Id. Our supreme court has reached the same conclusion under article I, section 9 of the Tennessee Constitution. State v. Banks, 271 S.W.3d 90, 118-19 (Tenn. 2008). C.D.1 testified at trial and was cross-examined by the defendant "face to face." We conclude, therefore, that the defendant was not deprived of his right to confront C.D.1, and he is not entitled to relief regarding this issue.

### III. Admission of the Defendant's Confessions

The defendant contends that the trial court erred in admitting his confessions to Deputy Director Armstrong and to Shaw, asserting that he was arrested without probable cause, that Deputy Director Armstrong obtained his confession in violation of his assertion of his right to remain silent, and that Shaw was acting as an agent for the State and obtained his confession in violation of his assertion of his right to counsel. The defendant acknowledges that he failed to seek suppression of the confessions based upon an illegal arrest and failed to seek suppression of his confession to Deputy Director Armstrong based upon his invocation of his right to remain silent. Nonetheless, he urges this court to review the issues under a plain error analysis.

Rule 12(b)(3) of the Tennessee Rules of Criminal Procedure requires that all motions to suppress be presented prior to trial. Failure to make the motion before trial results in waiver, although a court may grant relief from the waiver for good cause shown. Tenn. R. Crim. P. 12(f). The defendant did not seek suppression of his statements prior to trial and did not object at trial to the admission of Deputy Director Armstrong's testimony regarding his confession. Instead, he filed a motion to suppress his statements to Shaw on October 6, 2010, during the trial, arguing that he had previously asserted his right to counsel and that

Shaw was acting as an agent for the State. Prior to Shaw's trial testimony, the trial court held an evidentiary hearing on the issue outside the jury's presence, at the conclusion of which it denied the motion. Thereafter, the defendant failed to raise any of these issues in either his initial or amended motion for new trial. Thus, we agree with the State that the defendant waived the issues, see Tenn. R. Crim. P. 12(b)(3), (f); Tenn. R. App. P. 36(a), and that our review is limited to plain error.

## A. Legality of the Arrest

The defendant first argues that his statements should have been suppressed because they were the fruit of his illegal seizure, *i.e.* his warrantless arrest. Both the United States and Tennessee Constitutions offer protection from unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. I, §7. "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997). An officer may arrest a person without a warrant when the officer has probable cause for believing that the person has committed a felony. See Tenn. Code Ann. § 40-7-103(a)(3); State v. Melson, 638 S.W.2d 342, 350 (Tenn. 1982). For probable cause to exist, the facts and circumstances as they are known to the officer at the time of the arrest must be "'sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.'" Bridges, 963 S.W.2d at 491 (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).

Relying upon this court's opinion in State v. Courtney Bishop, No. W2010-01207-CCA-R3-CD, 2012 WL 938969 (Tenn. Crim. App. Mar. 14, 2012), perm. app. granted (Tenn. Aug. 15, 2012), the defendant asserts that he was arrested for investigative purposes and without probable cause in violation of both the state and federal constitutions. As the State correctly notes, however, Courtney Bishop does not stand for the proposition that an officer may not arrest a suspect based upon probable cause and then seek to obtain a confession. Rather, this court concluded in that case that the practice of arresting a suspect without probable cause and then conducting an investigation in an effort to find probable cause justifying the arrest was unconstitutional. Id. at *7-12.

Before the defendant was arrested, C.D.1 identified him to the police as the perpetrator. As a victim in the case, C.D.1 was a citizen informant whose statement is presumed to be reliable. See State v. Yeomans, 10 S.W.3d 293, 296 (Tenn. Crim. App. 1999); see also Melson, 638 S.W.2d at 354 (defining a citizen informant as including the victim of the crime). The evidence presented at trial establishes that the officers had

probable cause when they arrested the defendant. We conclude, therefore, that the defendant is not entitled to relief regarding this issue.

## B. Admission of the Defendant's Confession to Deputy Director Armstrong

The defendant next argues that his confession to Deputy Director Armstrong should have been suppressed because he invoked his right to remain silent, and Deputy Director Armstrong refused to honor the invocation of this right. The defendant does not deny that he initially waived his rights after a valid Miranda warning but instead asserts that he invoked his right to remain silent when he informed Lieutenant Mason and Sergeant Stark that he no longer wished to speak to them. Generally, the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide a privilege against self-incrimination to those accused of criminal activity. As our supreme court has explained:

> In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The procedural safeguards must include warnings prior to any custodial questioning that an accused has the right to remain silent, that any statement he makes may be used against him, and that he has the right to an attorney.

State v. Blackstock, 19 S.W.3d 200, 207 (Tenn. 2000).

The defendant, however, misconstrues the evidence presented at trial. While Lieutenant Mason testified that the defendant stated he no longer wished to speak to her and Sergeant Stark, she also testified that the defendant instructed them that he wished to speak to other officers. An accused who wishes to invoke his or her right to remain silent must do so unambiguously. Berghuis v. Thompkins, 560 U.S. 370 (2010). We cannot conclude that the defendant made an unambiguous invocation of his right to remain silent by his request to speak to officers other than the ones who were interviewing him at the time. Because no clear and unequivocal rule of law was violated, the admission of the defendant's confession to Deputy Director Armstrong did not rise to the level of plain error.

## C. Admission of the Defendant's Confession to Shaw

The defendant next argues that his confession to Shaw was obtained in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Tennessee Constitution because Shaw was acting as an agent for the

State and obtained the confession in violation of his previously invoked right to counsel. We disagree.

At trial, Deputy Director Armstrong testified that during his interview with the defendant, the defendant requested an attorney and asked to speak to his mother. As a result, Deputy Director Armstrong arranged to have Shaw transported from protective custody to the police department. Shaw, during the jury-out hearing on the motion to suppress, testified that while she, the defendant, and other family members were in protective custody, officers came and took the defendant away. Either later that evening or during the early morning hours, officers returned and informed Shaw that the defendant had requested to see her. Shaw denied that Deputy Director Armstrong or any other officer asked her to obtain any information from the defendant for them. She said that when she spoke to the defendant, no one else was in the room with them. At the conclusion of Shaw's testimony, the trial court denied the defendant's motion to suppress.

On review, an appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). A trial court's conclusions of law and application of the law to the facts are reviewed de novo without any presumption of correctness. Id. The State, as the prevailing party, "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quotations omitted). Questions regarding the assessment of a witness's credibility, the weight and value of the evidence, and the resolution of evidentiary conflicts are entrusted to the trial court as the trier of fact. Meeks, 262 S.W.3d at 722.

In Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980), the United States Supreme Court held that the rationale of the Miranda decision prohibited both express questioning by the police and its "functional equivalent." The Court explained that "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301 (footnotes omitted). According to the Court, "[t]he latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Id.

In Arizona v. Mauro, 481 U.S. 520 (1987), the United States Supreme Court addressed the circumstances under which questioning by a private third party constitutes the functional equivalent of interrogation. In Mauro, the defendant admitted to officers that he had killed his son and directed them to the child's body. After being advised of his Miranda rights, the defendant invoked his right to counsel. The defendant's wife was then allowed to meet with him in the presence of an officer who tape-recorded the conversation.

The Court held that the questioning of the defendant by his wife did not constitute an "interrogation." Id. at 528. The Court reasoned that there was no evidence that the police sent in the defendant's wife for the purpose of eliciting incriminating statements. Id. The Court considered the situation from the defendant's perspective and concluded that it was unlikely that the defendant would have felt "that he was being coerced to incriminate himself" by his wife's presence. Id. Finally, the Court concluded that the decision to allow the defendant's wife to see him was not "the kind of psychological ploy that properly could be treated as the functional equivalent of interrogation." Id. at 527 (footnote omitted). Thus, in the absence of "compelling influences, psychological ploys, or direct questioning," the "possibility" that an accused will incriminate himself or the officer's subjective "hope" that he will do so is not the functional equivalent of interrogation. Id. at 528-29.

In the present case, there was no evidence that Shaw was sent by the police to see the defendant "for the purpose of eliciting incriminating statements," see id. at 528, or that the officers asked, directed, induced, or threatened her to obtain information from the defendant. According to Shaw's testimony, she was escorted to the interview room, where she and the defendant were allowed to speak to each other unsupervised, and the officers did not provide any instructions on what questions to ask the defendant. Accordingly, we conclude that Shaw was not acting as a "state agent." See State v. Smith, 933 S.W.2d 450, 453 (Tenn. 1996); State v. Kendall Edward Johnson, No. M2011-00792-CCA-R3-CD, 2012 WL 3731699, at *11-14 (Tenn. Crim. App. Aug. 29, 2012), perm. app. denied (Tenn. Jan. 14, 2013).

We also cannot conclude that the defendant was coerced to incriminate himself by Shaw's visit. As noted in Mauro:

> In deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in Miranda and Edwards [v. Arizona, 451 U.S. 477 (1981)]: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment. . . . Police departments need not adopt inflexible rules barring suspects from speaking with their spouses, nor must they ignore legitimate security concerns by allowing spouses to meet in

private.

481 U.S. at 529-30.

The evidence in the present case does not establish that the police used the coercive nature of the defendant's confinement to extract an inculpatory statement from him that he would not have otherwise made to his mother in an unrestrained environment. We, therefore, conclude that the trial court properly denied the defendant's motion to suppress evidence of his confession to his mother.

## IV. Admission of Testimony that the Defendant Invoked his Right to Counsel

The defendant also contends that the State presented evidence in its case-in-chief that he invoked his right to remain silent and his right to counsel in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution and article I, sections 8 and 9 of the Tennessee Constitution.

### A. Right to Remain Silent

The defendant first asserts that Deputy Director Armstrong improperly commented about the invocation of his right to remain silent. The defendant complains about the following testimony during the State's direct examination of Deputy Director Armstrong:

Q.  If you would, explain to the jury how you ended up coming into contact personally with [the defendant]?

A.  I watched the interview of Sergeant Mason and Sergeant Max's interview with [the defendant], during which he shut down on them and didn't want to talk to the two of them anymore. I then made a decision that I would go in and conduct the investigation – conduct the interview myself.

. . . .

Q.  Tell the jury what you did when you walked into the room with [the defendant] and take them through kind of how you talked to him and what he was telling you.

A.  I walked in and I introduced myself. I told him I was Lieutenant Armstrong. I actually pulled up another chair and put my feet up in it

-61-

and kind of leaned back and we just talked. We talked about how horrific this crime was. I watched his body language. At that point he seemed as if he was really, really tight, like he was doing everything he could not to talk to me. If I asked him a question, his answers were one-word answers, maybe one- or two-word answers. He wouldn't engage me in open conversation. Most of the time if I asked him a question, he would nod his head or shake his head. But you could tell he was doing everything he could not to engage me in an open conversation as to where we had open dialogue back and forth with each other.

The State later questioned Deputy Director Armstrong as follows:

Q.    So you had this background information and then you went to talk to [the defendant]. Explain to the jury how the interview went, some of the things that you continued to say and what you talked about with [the defendant].

A.    Like I said, I walked into the interview room. I introduced myself. I pulled up a chair. I propped up my feet and we basically started talking and I asked Jessie to tell me some of the things that are important to you. He said my family. We talked about religion. I asked him whether or not he believed in God. He told me that he did. I asked him whether or not he believed in heaven and hell. He told me that he did. I could tell that he was almost like he was struggling to try to maintain his composure. There [were] several times that we talked it was almost – he leaned forward as if I want to tell you something but he'd get his self [sic] together and he'd lean back. So I could tell he was hiding something. I could tell he was doing everything he could, like I said, not to engage me in open conversation because he was trying to keep – limit his words to the least as he could.

The defendant did not object to the testimony at trial and did not raise the issue in his motion for new trial. Accordingly, this issue is waived. Furthermore, the issue does not rise to the level of plain error. The evidence established that the defendant was under arrest when Lieutenant Mason and Sergeant Stark interviewed him, that they informed him of his Miranda rights, and that he waived his rights and agreed to talk to them. Thereafter, the defendant did not exercise any of his Miranda rights until he requested counsel during his interview with Deputy Director Armstrong after which all questioning ceased.

Deputy Director Armstrong's testimony regarding the defendant's interview with Lieutenant Mason was not a reference to the invocation of his right to remain silent. As we have previously stated, the evidence presented at trial establishes that the defendant did not invoke his right to remain silent during the interview with Lieutenant Mason. Rather, the defendant told Lieutenant Mason and Sergeant Stark that he wished to speak to a different officer.

The defendant also contends that Deputy Director Armstrong's testimony regarding the defendant's reluctance to answer questions was an impermissible comment on the invocation of his right to remain silent. Silence for a period of time is insufficient to invoke the right to remain silent. Berghuis, 560 U.S. at ___. Rather, "an accused who wants to invoke his or her right to remain silent [must] do so unambiguously." Id. Because the defendant's reluctance to answer questions does not amount to an invocation of his right to remain silent, Deputy Director Armstrong's testimony regarding such reluctance was not improper. Accordingly, we conclude that a clear and unequivocal rule of law was not breached, and the issue does not rise to the level of plain error.

## B. Right to Counsel

The defendant next contends that testimony regarding his invocation of his right to counsel was improperly admitted. According to the defendant, such testimony was improperly presented during defense counsel's cross-examination of Sergeant Mullins and later during the State's direct examination of Deputy Director Armstrong.

### 1. Sergeant Mullins

Defense counsel questioned Sergeant Mullins on cross-examination regarding the importance of the defendant's statement to police and the non-existence of a typewritten statement. Defense counsel also questioned Sergeant Mullins regarding what questions he would have asked the defendant and what information he would have documented. The following exchange occurred:

Q. If you were interviewing [the defendant] in this case and he told you where the knives and the guns went, would that have been important enough for you to write down?

A. Yes, sir. Again, if he told us where anything was, any evidence from this crime scene, just like the bicycle, we would have followed up. I don't see why anybody would not have. We followed up on everything that I know of that he said as far as his actions afterwards.

. . . .

Q.   If you were interviewing [the defendant] and you asked him about grabbing hair or ripping beads out, would you have asked him that question and recorded his answer on paper?  Would you have documented what was asked and what was said?

A.   If I was able to interview [the defendant], I would have asked a lot of questions before he asked for his attorney.  Now how many questions he was asked before he asked for an attorney, I couldn't tell you.  I would have asked a lot of questions before such time.

. . . .

Q.   So you would have specifically after looking at the crime scene, you would have asked some questions about like holes in the cushion and you would have documented your question and your answer?

A.   Yes, sir.  See, again, realize how this investigation went.  The crime scene was kind of my job.  And I did not at any point between the original call-out and the interview, arrest and interview of [the defendant], have a chance to sit down with anybody and say okay, here's what I found in this room, in this room and in this room.  I didn't hardly stop in those four or five days.  If I had been able to interview [the defendant], I would have had very different questions than anybody else on this case because I had more knowledge about that than any of them did and did they know about certain things, yes, but specific small details, I know more about that than anybody else on the team.

The defendant did not object to the testimony at trial.  Therefore, the issue is waived.  Moreover, the issue does not rise to the level of plain error.  Defense counsel's cross-examination of Sergeant Mullins essentially was an attack on the method employed by the officers who interviewed the defendant and the officers' failure to ask certain questions and document those answers.  Sergeant Mullins responded in part by explaining that the defendant had requested counsel and that he was unaware of what questions were asked before counsel was requested.  Through this method of cross-examination, the defendant opened the door to Sergeant Mullins' testimony.  "[A] litigant is not 'permitted to take advantage of errors which he himself committed, or invited, or induced the trial [c]ourt to commit.'"  State v. Sexton, 368 S.W.3d 371, 410 (Tenn. 2012) (quoting Norris v. Richards,

246 S.W.2d 81, 85 (Tenn. 1952)). We conclude, therefore that the defendant is not entitled to relief regarding this issue.

## 2. Deputy Director Armstrong

During the State's direct examination of Deputy Director Armstrong, the following exchange occurred:

Q.     Did you make any attempts to go into greater detail with [the defendant] about what occurred in that house based on what you knew from the crime scene?

A.     I did. From the crime scene I could tell some of the women's clothing had been altered and I asked him about that. And as I tried to ask him additional questions about that, he asked for an attorney.

Q.     He asked for a lawyer?

A.     Yes, he did.

The defendant objected to the testimony and requested a mistrial. The trial court denied the request for a mistrial, finding that the testimony was relevant "in light of the line of questioning that's been going on" and "in light of all the issues with regard to recorded statements, formal statements." The trial court then instructed the jury as follows:

Ladies and gentlemen, before we go any further, let me just say this to you. Under our laws and under the Constitution of the United States, every person is entitled to have representation. People are advised and in this case a person is advised of their rights. They are advised that they have the right to talk to an attorney at any time. Once they request the permission to talk to an attorney, all questions cease, okay. There's no more questioning after that point. Everybody has a right to that. That is a right that is entitled to all of us as citizens of the United States. You are to draw no conclusions from that, other than all questions cease at the point somebody says they want to talk to an attorney. Does everybody understand that? That's the only conclusion you may draw from that, all questions cease at that point.

The State then questioned Deputy Director Armstrong as follows:

Q.     And on that note, . . . you weren't unable to get a formal written

-65-

statement from [the defendant] because he stopped the interview?

A.     He did stop.

Deputy Director Armstrong mentioned the defendant's request for counsel during cross-examination in the following exchange with defense counsel:

Q.     When I asked you about the comment [the defendant] made to you that you lied to me, would that be something important enough to put into your supplement, Deputy Director Armstrong?

A.     I don't see where it's relevant, no, sir.

Q.     So it's not important?

A.     I don't see where it's relevant as far as what if you decide – no, sir.  At that point when he decided that he wanted an attorney, we ceased the interview.

Defense counsel later questioned Deputy Director Armstrong regarding the lack of detail of the offenses in the defendant's confession.  The following exchange occurred:

Q.     Okay.  What did [the defendant] tell you he did with the boards that were in the house?

A.     The only weapons that we ever discussed were pistols and the knives. Again, we did not get a chance to get into specifics where I was able to sit down and ask him specific questions to get specific answers from him because by the time we got to that point, he requested an attorney and I ceased the interview.

The defendant submits that the trial court erred in denying his motion for a mistrial. We respectfully disagree.  A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action.  State v. Middlebrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991).  A mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did.  State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994).  The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record.  See State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998).  Moreover, the burden of establishing the necessity for mistrial lies with the

party seeking it. <u>State v. Williams</u>, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

A defendant may not be penalized at trial for the exercise of his constitutional right to remain silent after arrest. <u>Doyle v. Ohio</u>, 426 U.S. 610, 618 (1976); <u>Braden v. State</u>, 534 S.W.2d 657, 661 (Tenn. 1976). Generally, the prosecution may not comment at trial that a defendant invoked the right to remain silent in the face of accusation. <u>Braden</u>, 534 S.W.2d at 660; <u>Ware v. State</u>, 565 S.W.2d 906, 908 (Tenn. Crim. App. 1978). Tennessee courts have held that a prosecutor's improper comment regarding a defendant's privilege against self-incrimination is not reversible error if it can be established that the error is harmless beyond a reasonable doubt. <u>See, e.g.,</u> <u>State v. Deangelo Davis</u>, No. W2008-00992-CCA-R3-CD, 2009 WL 1841725, at *4-5 (Tenn. Crim. App. June 26, 2009) (holding that the officer's comment regarding the defendant's post-arrest silence was improper but did not rise to the level of reversible error), <u>perm. app. denied</u> (Tenn. Oct. 19, 2009); <u>State v. Jonathan D. Rosenbalm</u>, No. E2002-00324-CCA-R3-CD, 2002 WL 31746708, at *5-6 (Tenn. Crim. App. Dec. 9, 2002) (holding that any error in questioning the defendant regarding his post-arrest, post-<u>Miranda</u> silence was harmless beyond a reasonable doubt), <u>perm. app. denied</u> (Tenn. May 27, 2003).

We conclude that even if Deputy Director Armstrong's comment regarding the defendant's request for counsel were improper, any error was harmless beyond a reasonable doubt and did not create a "manifest necessity" for a mistrial. The jury previously had heard that the defendant had requested counsel when the defendant opened the door to such testimony during the cross-examination of Sergeant Mullins. Furthermore, the record does not reflect that the prosecutor deliberately elicited the testimony in order to create an inference of guilt on the part of the defense. Rather, as the trial court found, the testimony was relevant to address the questions posed by defense counsel throughout trial regarding the officers' failure to question the defendant regarding certain details of the offenses and the officers' failure to obtain a recorded statement from the defendant. In addition, the trial court gave a curative instruction to the jury, which we must presume that the jury followed. <u>See</u> <u>State v. Young</u>, 196 S.W.3d 85, 111 (Tenn. 2006). Finally, the State's case against the defendant was strong such that the jury would have convicted the defendant in the absence of the improper testimony.

The defendant asserts that the error was compounded by Deputy Director Armstrong's testimony on cross-examination and the State's mention of the testimony in closing arguments. We note, however, that, similar to the cross-examination of Sergeant Mullins, Deputy Director Armstrong's mention of the defendant's request for counsel occurred as he attempted to respond to defense counsel's questions as to why he failed to obtain details about the murders from the defendant, and thus, was a response elicited, at least in part, by defense counsel. Moreover, in our view, the State's comment during rebuttal closing

arguments that "[w]hen [the defendant] was brought down to the police department, he could have cleared it all up[,] [b]ut he didn't" was not a reference to the defendant's request for counsel, but instead a comment on the discrepancies between the defendant's statements and his trial testimony. We conclude, therefore, that the defendant is not entitled to relief regarding this issue.

## V. Admission of Evidence Regarding the Defendant's Prior Imprisonment

Prior to trial, the defendant filed a motion in limine seeking to prohibit the State from introducing evidence of his prior incarceration for second degree murder. Following a hearing, the trial court entered an order denying the defendant's motion. The court analyzed the issue under Tennessee Rule of Evidence 404(a) and (b). The court noted the prosecution's statement that it did not intend to reveal to the jury the nature of the charges for which the defendant had been incarcerated. The court further noted:

> [T]he State essentially set forth three categories of statements from the defendant and witnesses regarding the defendant's prior incarceration: (1) [s]tatements made by the defendant to family members relating to the relationship between the defendant and his brother and victim, Cecil Dotson, which include references to the defendant's incarceration and which the State argues are relevant to intent and motive; (2) statements made, after the commission of the crimes in question, by the defendant to family and to the police relating to [the] defendant's unwillingness to return to jail or concern over returning to jail, which the State argues are relevant to demonstrate motive and state of mind; and (3) statements of witness[es] who the State contends only relationship with the defendant is based upon his former incarceration and which the State contends cannot be presented without reference to that fact.

The trial court found that the statements regarding the relationship between the defendant and Cecil that referenced the defendant's prior incarceration and the defendant's statements following the murders regarding his unwillingness to return to prison were "highly probative as to the defendant's intent, motive and state of mind at the time of the commission of the offense[s] and outweighed any prejudicial effect to the defendant." The court also found clear and convincing evidence of the defendant's prior incarceration. The court limited the State's use of evidence of the defendant's prior incarceration, finding that "the mere fact that a witness'[s] knowledge of the defendant was in part or fully conditioned upon defendant's incarceration was simply insufficient to warrant the witness divulging this fact to the jury." The court instructed the State to "limit these types of witnesses' references to the fact that the defendant was previously incarcerated."

During trial, the State asked Deputy Director Armstrong what information he had about the defendant before interviewing him. Deputy Director Armstrong responded, "Before going in that interview room, I knew that [the defendant] was very familiar with the criminal justice system because he had recently been released from prison." Defense counsel objected, arguing that Deputy Director Armstrong's testimony violated the trial court's order. The trial court found that the testimony was not inappropriate and noted that multiple witnesses already had testified to the defendant's prior incarceration.

The State then asked Deputy Director Armstrong why background information was important before conducting an interview. Deputy Director Armstrong responded:

> You try to get as much information about a person as you can. Before you interview them, you want to know how many times they've been arrested. You want to know if they're familiar with the criminal justice system. You want to know if it's the first time they've ever been arrested and you want to know have they ever been arrested of anything, a violent crime, age. So it helps in an interview to know as much as you can about a person before you proceed with it.

The trial court then instructed the jury as follows:

> Before we go any further, ladies and gentlemen, there has been testimony in this case about whether or not [the defendant] had been in jail. There's been some testimony with regard to the fact that he's been in jail. I want you to understand the fact that he has been in jail has no bearing whatsoever on your decision in this case. You're to decide this case based upon the facts that are presented in this case. The only reason that issue has even come before you is it plays into certain parts of the proof. That's the only thing you're to consider that for. Does everybody understand that? Thank you.

The defendant contends that Deputy Director Armstrong's testimony violated the trial court's order on the motion in limine, as well as Rule 404(b) of the Tennessee Rules of Evidence. Rule 404(b), Tennessee Rules of Evidence, provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

The rationale behind the general rule of inadmissibility in Rule 404(b) is that the admission of evidence of other wrongs poses a substantial risk that the trier of fact may convict the defendant based upon the defendant's bad character or propensity to commit criminal offenses, rather than upon the strength of the evidence of guilt on the specific offense for which the defendant is on trial. State v. Dotson, 254 S.W.3d 378, 387 (Tenn. 2008); State v. James, 81 S.W.3d 751, 758 (Tenn. 2002).

Evidence of other crimes, wrongs, or acts may be admitted as relevant to issues of "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake." Tenn. R. Evid. 404(b), Advisory Comm'n Cmts.; see Burch v. State, 605 S.W.2d 227, 229 (Tenn. 1980). To minimize the risk of unfair prejudice in the introduction of evidence of other acts, however, Rule 404(b) establishes protective procedures that must be followed before the evidence is admissible. See Tenn. R. Evid. 404(b); James, 81 S.W.3d at 758. Upon request, the trial court must hold a hearing outside the jury's presence to determine whether the evidence of the other acts is relevant to prove a material issue other than the character of the defendant. James, 81 S.W.3d at 758. The trial court must state on the record the specific issue to which the evidence is relevant and find the evidence of the other crime or act to be clear and convincing. Id. If the trial court substantially follows the procedures in Rule 404(b), the court's decision will be given great deference on appeal and will be reversed only if the trial court abused its discretion. Id.

The State acknowledges that Deputy Director Armstrong's testimony regarding the defendant's past incarceration did not involve one of the permissible purposes set forth in the trial court's order on the motion in limine. It argues, however, that the trial court's order did not specifically prohibit the testimony and that the testimony was relevant to assist the jury in assessing "the integrity of the defendant's confession – that the defendant knew his rights,

-70-

had experience with police, and would not be easily coerced into confessing to a heinous crime he did not commit." We note, however, that while Deputy Director Armstrong testified that he would want to know whether an accused had a criminal history before an interview, he never testified why knowledge of a prior criminal history was important. Thus, we cannot conclude that Deputy Director Armstrong's testimony was relevant for the purposes asserted by the State.

We conclude, however, that any error in admitting the testimony was harmless. By the time that Deputy Director Armstrong testified, multiple other witnesses had testified to the defendant's prior incarceration within the bounds set forth by the trial court in its pretrial order. Deputy Director Armstrong did not state the length or reason for the defendant's incarceration. The trial court also gave a limiting instruction, which the jury is presumed to have followed. See Young, 196 S.W.3d at 111. Accordingly, the defendant is not entitled to relief regarding this issue.

### VI. Trial Court's Treatment of Defense Counsel

The defendant next contends that the trial court's reprimand of defense counsel in open court prejudiced his right to a fair trial. The exchange about which the defendant complains occurred after defense counsel first questioned Sergeant Mullins about the presence at the crime scene and during the defendant's police interview of a camera crew from the television show, *The First 48*, and then asked Sergeant Mullins the following question about a cameraman who was recording the trial:

Q.      . . . That guy is from A and E, isn't he, *The First 48*? We're still continuing the story, aren't we?

A.      As far as I know, yes, sir.

Q.      We're filming the rest of the show; right?

Before Sergeant Mullins answered the question, the trial court interrupted, stating:

THE COURT: [F]or the record, the Supreme Court of the State of Tennessee has authorized cameras in the courtroom. This Court allows one camera in the courtroom and all media outlets feed off of the one camera. That camera and the TV station associated with that is the lead camera that's in the courtroom. Every media outlet and every channel is peeling off of one camera. That is one that has been authorized by the Supreme Court to be here.

-71-

[DEFENSE COUNSEL]: I understand.

THE COURT: This Court is not authorizing a television show or to be part of a television show. They are following the rules that the Supreme Court says. So let's make sure the record is clear that this is not a TV show and this is not being produced as a TV show and it's not being edited as a TV show. This is a trial.

[DEFENSE COUNSEL]: Can I ask him who the producer that's running the camera works for?

THE COURT: No, sir.

[PROSECUTOR]: I'm going to object to relevance.

THE COURT: That camera is in this courtroom and you know that camera is in this courtroom under the rules of the Supreme Court of Tennessee. They are one of a party of media outlets that are using that feed. So let's don't talk about this being part of a TV show. You want to ask questions, let's ask relevant questions.

[DEFENSE COUNSEL]: I am asking questions about this.

THE COURT: This is not apart [sic] of a television show . . . . Let's move on to something that's relevant.

Defense counsel continued by questioning Sergeant Mullins about the presence of a camera and the crew from *The First 48* during the time the defendant was interviewed by police. The trial court again interrupted, informing defense counsel that it believed Sergeant Mullins had previously answered that question. The State requested a bench conference, and the trial court denied the request:

That he was not present when that interview was conducted so let's move into areas that he's aware of, okay. I've allowed this to go for a long way, and I know where you're going and I understand why you're going there. He's already testified he wasn't present when that interview was conducted. He doesn't know who was in there.

During a subsequent jury-out hearing, co-counsel objected to the trial court's "calling down" defense counsel when he was questioning a witness. The trial court explained that

defense counsel had accused the court of being part of a television show. The court stated, "And that's when I said enough. This is not part of a TV show. This is a court of law." The trial court agreed that in the future, it would not "call [defense counsel] down" in the jury's presence but would call them to the bench instead. The court thereafter apologized to defense counsel "for losing [its] temper." When the jury returned, the trial court then offered the following apology to the jury:

> All right. Ladies and gentlemen, first, let me apologize to you for losing my temper. I've already apologized to the lawyers. You need to understand that – and I know you do, this is an adversarial proceeding. But within that adversarial proceeding there [are] certain rules of decorum that we all must operate under, me included. I've worked with these lawyers for many years.

> Sometimes I lose my temper and it's inappropriate. I should not do that. I should not do it in the manner in which I sometimes lose my temper. So I've apologized to them. I apologize to you. I will say to you, you cannot, should not, nor would it be proper for you to in any way hold [the defendant] or anybody else responsible for my lack of being able to maintain my own cool. So I say that to you with all d[ue] respect. I hope you accept my apology.

"[A]ll litigants are entitled to the 'cold neutrality of an impartial court' and have a right to have their cases heard by fair and impartial judges." Wright v. Pate, 117 S.W.3d 774, 778 (Tenn. Ct. App. 2002) (quoting Kinard v. Kinard, 986 S.W.2d 220, 227 (Tenn. Ct. App. 1998)). Cannon 3(A) of the Code of Judicial Conduct provides that a trial judge should be "patient, dignified, and courteous to the litigants, jurors, witnesses and lawyers" during the course of a trial, and instructs the trial judge to perform his or her judicial duties without bias or prejudice. Tenn. Sup. Ct. R. 10.[3] While the trial judge is extended broad discretion in controlling the course and conduct of the trial, the trial judge must refrain from expressing "any thought that might lead the jury to infer that the judge is in favor of or against the defendant in a criminal trial." State v. Cazes, 875 S.W.2d 253, 260 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 66 (Tenn. 1992).

It is apparent that defense counsel's cross-examination of Sergeant Mullins about the presence of the camera crew and the fact that the trial was being filmed for possible use in a future television show came across to the trial court as an attack on the integrity and formality of the trial process, which led to the court's reprimand to counsel. While we can

---

[3] The Code of Judicial Conduct was revised, effective July 1, 2012. Because the trial occurred prior to the effective date of the revisions, we refer to the Code that was in effect at the time of the trial.

understand and sympathize with the trial court's frustration, we agree that the court should have avoided reprimanding defense counsel in the presence of the jury.

We do not, however, believe that the trial court's remarks, when viewed in the context of the entire trial, deprived the defendant of his constitutional right to a fair trial. The remarks constituted a brief portion of a multi-week trial; the trial court apologized to both defense counsel and the jury for the remarks; and the trial court appropriately instructed the jury that it was not to consider its comments against the defendant. We, therefore, conclude that, considering the record in its entirety, the error was harmless beyond a reasonable doubt. See State v. John D. Joslin, No. 03C01-9510-CR-00299, 1997 WL 583071, at *42-43 (Tenn. Crim. App. Sept. 22, 1997), perm. app. denied (Tenn. Nov. 9, 1998) (holding that while the trial court's remark was improper, the error was "harmless beyond a reasonable doubt").

The defendant also complains that his right to a fair trial was violated by the fact that the trial court continued to interject during defense counsel's cross-examination of Sergeant Mullins, instructing defense counsel to repeat or rephrase questions and refusing to allow defense counsel to ask certain questions. The record, however, demonstrates that the trial court merely asked defense counsel to repeat or rephrase questions that were unclear and refused to allow counsel to repeatedly ask the same questions. By doing so, the trial court was fulfilling its duty to ensure that the proceedings "move[d] along in an orderly and systematical manner." State v. Evans, 838 S.W.2d 185, 195 (Tenn. 1992). We conclude, therefore, that the defendant is not entitled to relief regarding this issue.

### VII. Admission of Autopsy Reports and Dr. Funte's Testimony

The defendant contends that the admission of the autopsy reports of Cecil, Seals, and C.D.3 that were prepared by Dr. Miguel Laboy and Dr. Funte's testimony regarding those autopsies violated his right to confront witnesses under the United States and Tennessee Constitutions. The defendant failed to object to the admission of those reports and Dr. Funte's testimony at trial and failed to raise the issue in his motion for new trial. Therefore, our review is limited to plain error.

### A. Admission of Reports of Autopsies Not Performed by Witness

In Crawford v. Washington, 541 U.S. 36, 68 (2004), the United States Supreme Court held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." Id. The Court adopted what came to be known as "the primary purpose test" for distinguishing testimonial statements from

nontestimonial statements, concluding:

> Statements are nontestimonial when made in the course of police investigation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis v. Washington, 547 U.S. 813, 822 (2006). Objective evaluation of "the circumstances in which the encounter occurs and the statements and actions of the parties" is necessary to determine whether a statement is testimonial or nontestimonial. Michigan v. Bryant, __ U.S. __, 131 S. Ct. 1143, 1156 (2011).

In Melendez-Diaz v. Massachusetts, 557 U.S. 305, 307 (2009), the Court concluded that "affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine" were testimonial and subject to exclusion as violating the confrontation clause. The Court concluded that "the affidavits 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial'" and that "under Massachusetts law the *sole purpose* of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance." Id. at 311 (citations omitted). The Court held that absent a showing that the analysts were unavailable to testify at trial and that the defendant had a prior opportunity to cross-examine them, the defendant was entitled to confront the analysts at trial. Id. The Court concluded that live confrontation of the witness by the defendant was the only constitutionally permissible way "to challenge or verify the results of a forensic test" and observed that confrontation would "weed out" fraudulent and incompetent forensic analysis. Id. at 318-19. The Court rejected the argument that reports of forensic testing were admissible as business records and that business records were exempted from the ruling in Crawford. Id. at 321-24.

In Bullcoming v. New Mexico, __ U.S. __, 131 S. Ct. 2705, 2709 (2011), the prosecutor introduced the results of forensic testing through the testimony of a forensic analyst who was familiar with the laboratory's testing procedures but did not participate or observe the test on the defendant's blood sample. The Court held that the defendant's confrontation rights were violated, noting that "if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront the witness." Id. at 2713. The Court rejected the argument that substitute testimony satisfied the

constitutional requirement based upon the reliable nature of the tests themselves, explaining that "the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" Id. at 2715 (quoting Melendez-Diaz, 557 U.S. at 319 n.6). The Court concluded that the Confrontation Clause "does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." Id. at 2716.

Based upon the holdings of Melendez-Diaz and Bullcoming, this court recently held that an autopsy report is testimonial and that the admission of its contents absent the presence for cross-examination of the pathologist who conducted the autopsy violated the defendant's right to confront the witnesses against him. State v. James Drew Freeman, Jr., No. M2011-00184-CCA-R3-CD, 2012 WL 1656975, at *10-13 (Tenn. Crim. App. May 9, 2012), perm. app. denied (Tenn. Oct. 17, 2012).

More than one month after this court released the Freeman opinion, however, the United States Supreme Court released its opinion in Williams v. Illinois, __ U.S. __, 132 S. Ct. 2221 (2012). Williams involved a bench trial in a rape case during which a forensic specialist from the Illinois state laboratory testified that she matched a DNA profile produced by an outside laboratory from a vaginal swab taken from the victim to a profile that the state laboratory obtained using a sample of the defendant's blood. In a plurality opinion, the Court concluded that the testimony did not violate the Confrontation Clause. Id. at 2240. The Court noted that while the report from the independent laboratory was not introduced into evidence, the admission of the report would not have violated the Confrontation Clause even if the report had been introduced for its truth. Id. at 2242.

The Court stated that the "Confrontation Clause refers to testimony by 'witnesses against' an accused." Id. The Court explained:

> The abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions.

Id. The Court noted that while it held that the forensic reports at issue in Melendez-Diaz and Bullcoming qualified as testimonial statements, "the Court did not hold that all forensic reports fall into the same category." Id. at 2243. Rather, the introduction of the reports, which reported an elevated blood-alcohol level and the presence of an illegal drug, violated

the Confrontation Clause "because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial." Id. There was no ongoing emergency, as both suspects had already been captured, and the tests were "relatively simple" and generally could be performed by a single analyst. Id. The Court also noted that the technicians who prepared the reports must have realized that the contents of the reports would be incriminating. Id. The Court also noted earlier in its opinion that the forensic reports in Melendez-Diaz and Bullcoming included a testimonial certification, made in order to prove a fact in a criminal trial. Id.

The Court explained that an objective test is to be applied in determining the primary purpose of an out-of-court statement. Id. "We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances." Id. The Court concluded that the primary purpose of the report from the independent laboratory in Williams was not to accuse the defendant or to create evidence for use at trial. Id. Rather, the primary purpose of the report was to "catch a dangerous rapist who was still at large." Id.

The United States Supreme Court's opinion appears to have effectively abrogated this court's holding in James Drew Freeman, Jr. that the admission of an autopsy report prepared by a pathologist who does not testify at trial violates the Confrontation Clause. As Justice Breyer recognized in his concurring opinion in Williams, "[a]utopsies, like the DNA report in this case, are often conducted when it is not yet clear whether there is a particular suspect or whether the facts found in the autopsy will ultimately prove relevant in a criminal trial." 132 S. Ct. at 2251 (Breyer, J. concurring). In this case, the autopsy reports were created on March 4, 2008, before the defendant was identified as a suspect, and their primary purpose was not to target the defendant as the perpetrator but instead to identify the injuries sustained by the victims and their causes of death. Accordingly, we conclude that the defendant has failed to establish that a clear and unequivocal rule of law has been breached, necessary for plain error review.

We further conclude that review of the issue for plain error is not "'necessary to do substantial justice,'" Smith, 24 S.W.3d at 283 (quoting Adkisson, 899 S.W.2d at 641-42), because even if the autopsy reports were admitted in error, the error was harmless beyond a reasonable doubt. See Coy v. Iowa, 487 U.S. 1012, 1021 (1988); James Drew Freeman, Jr., 2012 WL 1656975, at *13. The defendant did not contend that the victims' deaths were the result of anything other than homicide, but instead challenged his identity as the perpetrator. Moreover, the evidence at trial, as we have previously reviewed, was more than sufficient to sustain the defendant's convictions.

**B. Dr. Funte's Testimony Regarding Autopsies She Did Not Perform**

The defendant also contends that the admission of Dr. Funte's testimony regarding the autopsies that she did not perform violated his right to confront witnesses. We disagree. The testimony was well within Dr. Funte's field of expertise, and the autopsy reports prepared by Dr. Laboy were "of a type reasonably relied upon by experts." See Tenn. R. Evid. 703; James Drew Freeman, Jr., 2012 WL 1656975, at *14. The autopsy reports were admitted into evidence without objection by the defendant, and, thus, Dr. Funte could properly provide testimony from the reports and reveal some of the contents of the reports to the jury. The defendant also had the opportunity to cross-examine Dr. Funte regarding her conclusions of the victims' causes of death and to identify limitations placed upon Dr. Funte's testimony due to her failure to participate in the autopsies. This court has held that "the Confrontation Clause does not limit experts offering their own opinion regardless of the independent admissibility of the material relied upon." Id. (citations omitted). Accordingly, the defendant has failed to establish that a clear and unequivocal rule of law has been breached or that review of the issue for plain error is "'necessary to do substantial justice.'" Smith, 24 S.W.3d at 283 (quoting Adkisson, 899 S.W.2d at 641-42).

**VIII. Admission of Photographs**

The defendant contends that the trial court erred in denying his motion to prohibit the display of photographs of the victims after death. The admissibility of relevant photographs of victims and the crime scene is within the sound discretion of the trial court, and the court's ruling on admissibility will not be disturbed on appeal absent a showing of an abuse of that discretion. State v. Carruthers, 35 S.W.3d 516, 576-77 (Tenn. 2000); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). As our supreme court stated in Carruthers, the modern trend is to vest more discretion in the trial court's rulings on admissibility. 35 S.W.3d at 577 (citing Banks, 564 S.W.2d at 949).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. The court must determine the relevance of the visual evidence and weigh its probative value against any undue prejudice. Id. The term "unfair prejudice" has been defined as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 950-51.

In Banks, our supreme court provided trial courts with guidance for determining the admissibility of relevant photographic evidence. The trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. Id. at 951.

The defendant argues that the trial court erred in admitting photographs of the victims' facial injuries and crime scene photographs of the three child victims. We note, however, that the defendant raised no objections to the admission of the photographs at trial and at a pretrial hearing objected only to six photographs that depicted the children's injuries, which were taken at the hospital. At the conclusion of the hearing, the trial court ruled that five of the six photographs were relevant and admissible to show the extent and nature of the injuries in order for the State to prove premeditation. The court reserved its ruling on the sixth photograph in order for the State to determine whether it depicted a bloody bandage on a victim's head, or a portion of the child's scalp, stating that if it were a bandage, it would admit the photograph. The defendant has, thus, waived review of this issue.

Even if not waived, we would conclude that the trial court did not err in admitting the photographs. Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character. See Banks, 564 S.W.2d at 950-51. The photographs admitted by the trial court were relevant to supplement the testimony of the medical examiner and the treating physician regarding the victims' injuries and to support the aggravating circumstances alleged by the State. See, generally, State v. Cole, 155 S.W.3d 885, 913 (Tenn. 2005) (Appendix). We conclude, therefore, that the probative value of the photographs was not outweighed by their prejudicial effect, and the trial court did not abuse its discretion in admitting them.

## IX. Denial of Motion to Provide DNA Analysis

The defendant next contends that the trial court erred in denying his second amended motion to provide DNA analysis for all those who were in contact with the crime scene. The defendant filed his initial motion on May 13, 2010, stating that the purpose of the request was to eliminate law enforcement, medical, and other personnel who were present at the crime scene from physical evidence at the scene that did not match the defendant or the victims. During a hearing, defense counsel informed the trial court that the motion was filed in response to a report from the FBI crime laboratory which stated that two Caucasian or Asian Mongoloid hairs that were discovered mixed in the blood on the buttocks and thigh region of Roberson's body could not be identified as belonging to the defendant or the victims. The trial court ordered the State to determine those of Caucasian or Asian Mongoloid descent

who had contact with the victim's body in investigating the crime scene.

During a subsequent hearing, the State informed the trial court that five individuals had direct contact with the victim's body: the medical examiner, the medical examiner's assistant, an emergency response officer, and two people from the private corpse removal service that the medical examiner's office used to transport the victims' bodies. The trial court denied the defendant's motion to require those five people to provide DNA samples for comparison with the unidentified hairs, observing that it was unaware of any authority that would permit it to compel private citizens who were not suspected of a crime to provide DNA samples to the court for testing by a criminal defendant. The court also noted that even if DNA testing were to exclude those five individuals as contributors, such evidence would not, alone, exculpate the defendant.

The trial court further noted that the defendant could request that those five people voluntarily provide a DNA sample and that defense counsel could, during trial: (1) question the State's experts regarding the availability of DNA testing and their decision not to perform such tests in order to eliminate investigators and medical personnel as contributors of the hairs; (2) question law enforcement and medical witnesses regarding the protocols they followed in preserving the evidence and avoiding scene contamination; and (3) argue that the hairs possibly belonged to an unknown perpetrator or an additional perpetrator. The defendant also could employ his own expert to review and potentially refute the State's findings upon a showing of particularized need for funding. Finally, the trial court prohibited the State from unfairly benefitting from its ruling by either claiming or inferring that the unidentified hairs conclusively belonged to one of those five individuals, or other individuals, who had entered the crime scene. The only inference that the trial court allowed the State to draw was that the hairs remained unidentified and could have been left by someone other than an unknown perpetrator.

Shortly thereafter, the defendant filed amended motions in which he argued that the testing was necessary in order to protect his rights to confront witnesses, compulsory process of the law, and present a third party defense. The defendant asserted that the trial court could enter a protective order prohibiting disclosure of the testing absent court order. The trial court, however, once again denied the request.

The defendant acknowledges there is no Tennessee precedent for court-ordered DNA testing of law enforcement and medical personnel. See, e.g., Bartlett v. Hamwi, 626 So. 2d 1040, 1042-43 (Fla. Dist. Ct. App. 1993) (upholding the trial court's denial of the defendant's motion to obtain a hair sample from a prosecution witness based upon the absence of a rule or statute authorizing such discovery, as well as a consideration of the witness's constitutional rights); State v. McKinney, 730 N.W.2d 74, 89-90 (Neb. 2007)

(applying the analysis in Bartlett in upholding the denial of the defendant's motion to obtain DNA samples from witnesses). The defendant argues, however, that such DNA testing is similar to law enforcement officers requesting "elimination fingerprints" when investigating a crime. We note, however, that in State v. Dailey, 273 S.W.3d 94, 97 (Tenn. 2009), the case upon which the defendant relies, the trial court did not order the fingerprinting, but individuals were instead asked to voluntarily provide elimination fingerprints. Id.

Moreover, the withdrawal of blood for testing "infringes an expectation of privacy" and is subject to the constraints of the Fourth Amendment. Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 616 (1989); State v. Scarborough, 201 S.W.3d 607, 616 (Tenn. 2006). Although we recognize that it is possible to "extract DNA by applying a sticky patch to the skin on an individual's forearm for a moment to acquire epidermal cells without puncturing the skin surface," Scarborough, 201 S.W.3d at 619 (quotations omitted), DNA analysis performed after the collection of a biological specimen "is a separate and distinct search which 'is potentially a far greater intrusion than the initial extraction of DNA, since the state analyzes DNA for information and maintains DNA records indefinitely.'" Id. (quoting Nicholas v. Goord, 430 F.3d 652, 670 (2d Cir. 2005)).

"[A] witness, who is not a suspect, defendant or victim, should have no *less* protection against bodily intrusion than defendants or suspects in criminal cases." Bartlett, 626 So. 2d at 1042 (footnote omitted). While the present case involves the defendant's request for evidence, a witness continues to be protected under the Fourth Amendment and the constitutional rights to privacy guaranteed by the United States Constitution. See id. at 1042-43. Thus, we must balance the constitutional rights of those third parties from whom the defendant sought to compel DNA samples against any rights that the defendant might have in presenting his defense. See McKinney, 730 N.W.2d at 90. In so doing, we agree with the trial court's observation that the exclusion of the personnel who came into contact with Roberson's body as the contributors of the hairs would not have exculpated the defendant, especially given the testimony at trial about the amount of traffic at the home during the five months in which Cecil lived there. After balancing these competing rights, we conclude that "[t]he circumstances presented here do not constitute a 'rare instance' where justice may require an invasion of a witness' privacy rights or an invasion of [a third party's] Fourth Amendment rights." Bartlett, 626 So. 2d at 1043.

## X. Denial of Motion for Production of Statements of Those Not Called as Witnesses

The defendant next contends that the trial court erred in denying his motion for production of statements of those not called as witnesses by the State and that the State was required to disclose those statements pursuant to Brady v. Maryland, 373 U.S. 83 (1963).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. In order to establish a Brady violation, a defendant must show that he or she requested the information, the State suppressed the information, the information was favorable to his or her defense, and the information was material. State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). Evidence is "material" only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. United States v. Bagley, 473 U.S. 667, 682 (1985). "Materiality" has been further explained as follows:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worth of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Kyles v. Whitley, 514 U.S. 419, 434 (1995) (quoting Bagley, 473 U.S. at 678). The burden of proving a Brady violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. Edgin, 902 S.W.2d at 389.

First, the defendant has failed to establish that the State suppressed the information or that the information was favorable to the defense. During the pretrial hearing on the motion, defense counsel acknowledged that the State provided open-file discovery. The prosecutor also commented that "anything that's in the possession of the Memphis Police Department has to be turned over to the Defense." The defendant identifies testimony from various officers at trial that they received numerous tips regarding problems that Cecil was having with a gang and money that he allegedly took. The defendant, however, was able to present evidence through cross-examination of the State's witnesses, as well as through witnesses that he called to testify, that Cecil was in trouble with the Gangster Disciples for committing a gang violation and that Cecil owed $300,000 to "the mob." The defendant does not state what additional information he alleges that the State failed to disclose.

Moreover, the defendant has failed to show that the information was material. Evidence of the defendant's guilt was overwhelming. The jury heard and rejected evidence suggesting that Cecil might have been killed due to his debt with "the mob," in retaliation for the shooting death of a member of a rival gang, or as the result of committing a violation against one of his fellow gang members. The defendant fails to establish a reasonable probability that the result of the proceedings would have been different had such additional evidence been disclosed to the defense. We conclude, therefore, that the defendant is not

entitled to relief on the basis of this issue.

## XI. Improper Jury Instructions

The defendant challenges as prejudicially improper multiple jury instructions given during the guilt phase of his trial. Because the defendant did not object to the instructions at trial or raise the issues in his motion for new trial, the issues are waived, and our review is limited to plain error. Faulkner, 154 S.W.3d at 58; see also Tenn. R. App. P. 3(e); Tenn. R. App. P. 36(a); Tenn. R. Crim. P. 52(b).

We must review jury instructions in their entirety, and we may not examine phrases in isolation. State v. Rimmer, 250 S.W.3d 12, 31 (Tenn. 2008). In determining whether a defendant is harmed by an ambiguous, erroneous instruction, we must consider "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Id. (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). The significant question is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." Id. (quotations omitted). An ambiguous term does not necessarily constitute error. Id.

> [J]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

Id. (quotations omitted).

The defendant first asserts that the trial court's instruction defining "reasonable doubt" at the close of proof in the guilt phase improperly reduced the State's burden of proof. The trial court instructed the jury as follows:

> The law presumes that the defendant is innocent of the charges against him, therefore, you as the jury, must enter upon this investigation with the presumption that the defendant is not guilty of any crime and this presumption stands as a witness for him unless it is rebutted and overturned by competent and credible proof. It is, therefore, incumbent upon the State, before you can convict the defendant, to establish to your satisfaction, beyond a reasonable doubt, that the crime charged in the indictment has been committed; that the same was committed in Shelby County, Tennessee, before the indictment was returned and that the defendant on trial committed the crime in such a manner

-83-

that would make him guilty under the law as it has been defined and explained to you.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden never shifts but it remains on the State throughout the trial of the case. The defendant is not required to prove his innocence. The State must have proven beyond a reasonable doubt all of the elements of the crime charged and that it was committed before the finding and returning of the indictment in this case.

A reasonable doubt is that doubt created by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every element of proof requisite to constitute the offense.

The defendant takes issue with the statement, "Reasonable doubt does not mean a doubt that may arise from possibility." This issue was addressed by the Tennessee Supreme Court in Rimmer, 250 S.W.3d at 30-31. The court stated that a fair interpretation of the phrase is that "reasonable doubt does not mean a doubt that may arise from mere possibility no matter how improbable." Id. at 31. The court concluded that the jury instruction did not result in the denial of due process and that there was not a reasonable likelihood that the jury applied the burden of proof in an unconstitutional way. Id.

The defendant attempts to distinguish Rimmer from the present case because the instruction in Rimmer was given in the penalty phase, rather than the guilt phase as in the present case. The defendant does not cite any authority holding that the meaning of "reasonable doubt" differs between the guilt and penalty phases. Under the circumstances of this case, we cannot conclude that the jury was reasonably likely to have applied the burden of proof in an unconstitutional way. While further use of this instruction is discouraged, see id., the instruction is not unconstitutional.

The defendant also takes issue with the trial court's instruction during the guilt phase that "[t]here are nine counts in this indictment. You will have a packet of *sentencing* forms for each count as to each victim." (emphasis added). According to the defendant, the instruction indicated that "guilt was a foregone conclusion and the jury was charged with sentencing." Given that the trial court repeatedly instructed the jury that the defendant was innocent until proven guilty, we cannot conclude that the instruction affected a substantial

right as to rise to the level of plain error.

The defendant next argues that the trial court improperly combined each of the six counts of first degree murder and each of the three counts of attempted first degree murder into one instruction. According to the defendant, the instruction suggested that all of the murder counts should have one verdict and all of the attempted murder counts should have one verdict. The trial court instructed the jury that it was to return a verdict on each of the nine counts, and the jury did as instructed. The defendant is not entitled to relief on this issue.

The defendant also complains about the following statement the trial court made after instructing the jury regarding the definitions of "intentionally," "knowingly," "recklessly," and "criminal negligence":

> These definitions apply to the offenses of Murder in the First Degree, Murder in the Second Degree, Voluntary Manslaughter, Reckless Homicide and Criminally Negligent Homicide. They also apply to the offenses of Attempted Murder in the First Degree, Attempted Murder in the Second Degree and Attempted Voluntary Manslaughter.

The defendant argues that through this instruction, the jury was told to apply the mental states of "recklessly" and "negligently" to the first degree murder charge. The trial court, however, then defined each of the offenses, which included the mental state applicable for each offense. The trial court specifically instructed the jury that in order to convict the defendant of premeditated first degree murder, it must find that the defendant acted "intentionally." Because the trial court's instruction for first degree and attempted first degree murder specifically limited their applications to an intentional mental state, we cannot conclude that the jury was told to apply and that the jury did apply the mental states of "recklessly" or "negligently" to the first degree and attempted first degree murder charges.

The defendant next asserts that the trial court's instruction to "[t]ake the case, consider all of the facts and circumstances fairly and impartially and return to the court with the verdict that TRUTH dictates and JUSTICE demands" informed the jury that if it believed that the defendant committed the offenses as alleged, it could render a verdict of guilt regardless of whether the State proved its allegations beyond a reasonable doubt. The trial court, however, repeatedly instructed the jury that the defendant was innocent until proven guilty. Thus, we cannot conclude that the instruction affected a substantial right of the defendant such as to rise to the level of plain error.

## XII.  Failure to Instruct Facilitation as a Lesser-Included Offense

The defendant next contends that the trial court erred in failing to instruct the jury on facilitation as a lesser-included offense of premeditated first degree murder and attempted first degree murder.  Whether a particular instruction regarding a lesser-included offense should have been given is a mixed question of law and fact.  State v. Hatfield, 130 S.W.3d 40, 41 (Tenn. 2004).  We review mixed questions of law and fact *de novo* with no presumption of correctness.  Carpenter v. State, 126 S.W.3d 879, 892 (Tenn. 2004).

Facilitation of the charged offense is a lesser-included offense under the test established in State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999).  The issue is whether the evidence presented at trial was sufficient to support an instruction for facilitation.  A two-step analysis is necessary to determine if an instruction on a lesser-included offense is supported by the evidence.  First, we must determine if any evidence exists that "reasonable minds could accept as to the lesser-included offense."  State v. Richmond, 90 S.W.3d 648, 660 (Tenn. 2002).  Second, we must determine "if the evidence, when viewed liberally in the light most favorable to the existence of a lesser-included offense, is legally sufficient to support a conviction for the lesser-included offense."  Id.

The theory presented by the State at trial was that the defendant acted alone in shooting the adults and stabbing and beating the children.  The theory presented by the defense was that someone else attacked the victims while the defendant hid in a bedroom under the bed.  Neither of these theories support a facilitation instruction. We conclude, therefore, that the trial court properly declined to instruct the jury on facilitation as a lesser-included offense of premeditated first degree murder and attempted first degree murder.

## XIII.  Denial of Motion to Strike Aggravating Circumstances

The defendant next contends that the trial court erred in denying his motion to strike the (i)(3) and (i)(12) aggravating circumstances as duplicitous.  The (i)(3) aggravating circumstance provides that the defendant "knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder."  Tenn. Code Ann. § 39-13-204(i)(3).  The (i)(12) aggravating circumstance provides that the defendant "committed 'mass murder,' which is defined as the murder of three (3) or more persons, whether committed during a single criminal episode or at different times within a forty-eight-month period."  Id. at (i)(12).  The defendant argues that these aggravating circumstances are duplicitous "[i]nasmuch as the risk of death factor in this case is inclusive in the mass murder factor."

Our supreme court has, however, already rejected the claim that the (i)(3) and (i)(12) aggravating circumstances are duplicitous, finding that each of these aggravating circumstances relies upon different policy justifications for rendering a defendant eligible for the death penalty. State v. Jordan, 325 S.W.3d 1, 74 (Tenn. 2010). The court recognized that the fact that "the same conduct may satisfy certain elements of different aggravating circumstances does not contaminate the jury's sentencing process, or invalidate its weighing process." Id. The court, thus, declined to hold as unconstitutional the use of the same evidence to satisfy elements of different but valid aggravating circumstances. Id. The defendant, therefore, is not entitled to relief on this issue.

## XIV.  Denial of Motion for Probable Cause Finding
### that Aggravating Circumstances Existed

The defendant next contends that the decision to charge a capital offense must be made by the grand jury and not the prosecutor. He further argues that the failure to allege any aggravating circumstances in the indictment violated his Fifth Amendment right to an indictment by grand jury. The Tennessee Supreme Court has, however, rejected this argument. See State v. Thomas, 158 S.W.3d 361, 406 (Tenn. 2005). The defendant is not, therefore, entitled to relief on the basis of this issue.

## XV.  Denial of Motion for Disclosure of Information
### Regarding Proportionality Review

The defendant next contends that the trial court erred in denying his motion for disclosure of information regarding proportionality review so that he may challenge the constitutionality of comparative proportionality review. Our supreme court has, however, rejected other similar challenges to the meaningfulness of comparative proportionality review. See, e.g., State v. Bland, 958 S.W.2d 651, 663 (Tenn. 1997); State v. Brimmer, 876 S.W.2d 75, 87 (Tenn. 1994). Moreover, as fully discussed below, we conclude that the defendant's death sentences are proportionate to the penalty imposed in similar cases. This issue is, therefore, without merit.

## XVI.  Admission of Victim Impact Evidence

The defendant next contends that the trial court erred in admitting victim impact evidence in the penalty phase of the trial. The defendant does not identify specific testimony that he claims was erroneously admitted, but instead urges this court to adopt Justice Stevens' dissent in Payne v. Tennessee, 501 U.S. 808, 859-60 (1991), in which he opines that victim impact evidence is improper in any capital case. Our supreme court has, however, recognized the admissibility of victim impact evidence during the penalty phase of a capital

case even after Justice Stevens' dissent in Payne. See State v. Nesbitt, 978 S.W.2d 872, 899-90 (Tenn. 1998) (finding no federal or state constitutional barriers to victim impact evidence at capital sentencing). This issue is, therefore, without merit.

## XVII. Denial of Motion to Argue Last

The defendant next contends that the trial court erred in denying his motion to argue last during the penalty phase. Tennessee Code Annotated section 39-13-204(d) provides that during the penalty phase, "the state shall be allowed to make a closing argument to the jury; and then the attorney for the defendant shall also be allowed such argument, with the state having the right of closing." The practice of allowing the State to argue last at sentencing has been held to be constitutional. See State v. Melson, 638 S.W.2d 342, 368 (Tenn. 1982). This issue is without merit.

## XVIII. Prosecutorial Misconduct

The defendant contends that the State committed prosecutorial misconduct during the rebuttal closing arguments in both the guilt and penalty phases of the trial. The defendant did not object to all the portions of the State's argument at trial that he claims are improper or raise the issue of prosecutorial misconduct in his motion for new trial. Therefore, the issue is waived, and our review is limited to plain error. Faulkner, 154 S.W.3d at 58; see also Tenn. R. App. P. 3(e); Tenn. R. App. P. 36(a); Tenn. R. Crim. P. 52(b).

Closing arguments are a "valuable privilege" and should not be unduly restricted. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." Id. We have explained that "arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

The generally recognized areas of prosecutorial misconduct in closing arguments occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence of the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those that are matters of common public knowledge. Id. at 6.

The defendant first argues that the State denigrated the defense by referring to alternate theories as "smoke and mirrors," "ridiculous," and "insane" and by referring to defense counsel as a "tricky lawyer." A review of the record reveals that the prosecutor used the phrase "smoke and mirrors" to refer to the defense's attempts to divert attention from the issues and not as a suggestion that evidence was fabricated by the defense. The prosecutor used the phrase "ridiculous" to rebut the defense's argument that the murders were committed by gang members who then remained at the crime scene to rearrange the scene, and to rebut defense counsel's argument that the defendant's behavior following the murders could not be explained. The prosecutor described defense counsel's attempts to use evidence that the State believed to be irrelevant to argue reasonable doubt as "ridiculous" and "insane." When viewed in their context, we cannot conclude that the prosecutor's comments violated a clear rule of law. Moreover, even if the arguments were improper, the error was harmless in light of the strong evidence of guilt. Thus, the defendant also has failed to establish that the issue involves a substantial right. Accordingly, the issue does not rise to the level of plain error.

The defendant also complains about the prosecutor's rebuttal argument in the guilt phase of the trial that the jury should not discredit the testimony of two of the surviving children "because of some tricky lawyer or expert." When viewed in its context, we cannot conclude that the prosecutor's comment was an attack on defense counsel's credibility. Rather, the comment was an attempt by the prosecutor to persuade the jurors to focus on their own views of the credibility of these witnesses and the evidence.

The defendant also complains of the following statement by the prosecutor:

And you want to talk about this tape and the five hours? Sure. The defense has a golden nugget because *The First 48* when they were editing their television show only played certain parts on TV and the rest they destroyed the raw footage. That wasn't in the Memphis Police Department's control. Remember that please because they're getting blamed for it.

So now [the defendant] can say whatever he wants. Oh, that five hours that you don't get to see, this is what I was doing.

At the conclusion of the prosecutor's argument, defense counsel objected, asserting that evidence was never presented that employees from *The First 48* destroyed the tape recording of the officers' interrogation of the defendant. The defendant, however, does not make this argument on appeal. Rather, the defendant argues that the prosecutor interjected his own opinion by arguing that the defendant can "say whatever he wants." Based upon our review of the record, we conclude that the prosecutor was not interjecting his own opinion

but was attacking the credibility of the defendant's testimony based upon the evidence presented at trial and the inferences drawn from the evidence.

The defendant also argues that the prosecutor testified when he stated the following:

> Prosecution witnesses are coached. That's another thing they're going to throw out at you. What proof do they have? Did they put me on the stand? Did they ask me hey, did you coach him last night? Because I would have given you an answer. These children wanted to come in here and tell you what happened to them the best they could.

We agree that the prosecutor's comment suggesting that defense counsel could have and should have called him to testify was improper. While the prosecutor's argument that the children who testified were not coached was not artfully made, we cannot conclude that the prosecutor's statement that "[t]hese children wanted to come in here and tell you want happened to them the best they could" constituted testimony from the prosecutor. After making the statement, the prosecutor discussed the trauma that the children suffered and the difficulties that the children experienced recalling details. Thus, the statement was consistent with the evidence presented at trial. The prosecutor's argument does not rise to the level of plain error.

The defendant also contends that the prosecutor injected his own opinion during closing arguments in the guilt phase by telling the jury that the defendant's testimony was "not believable" and that the defendant was "lying." The prosecutor did not offer his opinion. Rather, he argued that based on the evidence, the defendant's testimony was not believable and that he was lying. This argument was proper.

According to the defendant, the prosecutor encouraged the jury to experience the victims' fear during rebuttal argument in the penalty phase. The prosecutor's references to the fear that the victims must have felt related to the "nature and circumstances" of the offenses and, therefore, were proper. See State v. Odom, 336 S.W.3d 541, 562 (Tenn. 2011).

The defendant contends that the prosecutor misrepresented the weighing procedure for aggravating and mitigating circumstances. While true, the prosecutor later corrected himself and stated the appropriate burden of proof. The trial court also instructed the jury on the correct burden of proof. This issue is, therefore, without merit.

Finally, the defendant complains of the prosecutor's comment that the defendant "stamped them out like they were insects in a two-hour period," as well as the following argument:

What's going to stop him? You. You. And how are you going to do it? With the law, with the law. We're not asking anything of you but to follow the law. And the law does give you your verdict in this case, shall be death.

The defendant argues that by such language, the prosecutor urged the jurors to exact their personal retribution. When viewed in the context of the prosecutor's argument, these comments were not an effort to urge the jurors to exact their personal retribution but were an attempt to persuade the jury to impose the punishment afforded by the law. The prosecutor did not violate a clear rule of law in making such an argument. Thus, the issue does not rise to the level of plain error, and the defendant is not entitled to relief.

### XIX. Allowing Death Verdicts to Stand

The defendant next challenges the constitutionality of Tennessee's murder and death penalty statutes, arguing that the death penalty statute is unconstitutional because it limits the jury's discretion to exercise mercy by requiring the jury to impose a sentence of death if aggravating factors outweigh mitigating factors. The defendant also asserts that the statute does not require the jury to make the ultimate determination that the appropriate punishment is death, in violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The Tennessee Supreme Court has, however, rejected this argument. See State v. Smith, 857 S.W.2d 1, 22 (Tenn. 1993); State v. Boyd, 797 S.W.2d 589, 596 (Tenn. 1990).

The defendant next argues that Tennessee's murder and death penalty statutes violate the equal protection clauses of the state and federal constitutions because they do not provide uniform standards for qualifying jurors for service on capital cases. This challenge, however, was rejected in State v. Reid, 91 S.W.3d 247, 313 (Tenn. 2002).

The defendant also argues that the statutes are unconstitutional because they invest prosecutors with unlimited discretion to seek the death penalty. This argument has also been rejected. See State v. Hines, 919 S.W.2d 573, 582 (Tenn. 1995).

The defendant next argues that the "heinous, atrocious, or cruel" aggravating factor is vague and overbroad. This argument likewise has been rejected. See State v. Middlebrooks, 995 S.W.2d 550, 556-57 (Tenn. 1999).

According to the defendant, the language in the "mass murder" aggravating circumstance is too reminiscent of terrorism. The defendant does not cite to any authority in support of his claim. "Mass murder" is defined as "the murder of three (3) or more persons, whether committed during a single criminal episode or at different times within a

forty-eight-month period." Tenn. Code Ann. § 39-13-204(i)(12). We conclude that the plain language of this statute does not imply terrorism. Moreover, the Tennessee Supreme Court has upheld the application of this aggravating circumstance in other capital cases. See, e.g., Jordan, 325 S.W.3d at 70. The defendant is not entitled to relief regarding this issue.

The defendant next contends that Tennessee's death penalty statute is unconstitutional because it permitted evidence of his prior conviction for second degree murder. Tennessee Code Annotated section 39-13-204, which permits the admission of the conviction and the facts and circumstances underlying the conviction, has been upheld as constitutional. See Reid, 91 S.W.3d at 312.

The defendant contends that Tennessee's death penalty statute violates state and federal constitutions because it does not give the jury unlimited discretion not to impose the death penalty. This argument is similar to the argument that the defendant made above and has been rejected. See Smith, 857 S.W.2d at 22; Boyd, 797 S.W.2d at 596. The defendant also contends that the death penalty is capriciously and arbitrarily imposed. This argument likewise has been rejected. See Reid, 91 S.W.3d at 312-13.

## XX.  Mandatory Review

When reviewing a conviction for first degree murder and an accompanying sentence of death, Tennessee Code Annotated section 39-13-206(c)(1) requires this court to review the record to determine whether:

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

### A.  Manner in Which Death Sentences Were Imposed

In accordance with the trial court's instructions, the jury unanimously determined that the State proved beyond a reasonable doubt that several aggravating circumstances applied

to each of the murders committed by the defendant and that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. The record reveals that the sentencing hearing was conducted pursuant to the applicable statutory provisions and the rules of criminal procedure. We conclude that the defendant's sentences of death were not imposed in an arbitrary fashion.

## B. Evidence Supporting Aggravating Circumstances

In determining whether the evidence supports the jury's findings of statutory aggravating circumstances, we must determine, after viewing the evidence in the light most favorable to the State, whether a rational trier of fact could have found the existence of the aggravating circumstances beyond a reasonable doubt. State v. Rollins, 188 S.W.3d 553, 571 (Tenn. 2006).

### 1. Cecil Dotson, Sr.

In sentencing the defendant to death for the first degree murder of Cecil Dotson, Sr., the jury applied three aggravating circumstances. We will address the proof supporting each circumstance.

### a. (i)(2): Prior Violent Felony Conviction

During the penalty phase, the parties stipulated that the defendant had previously been convicted of second degree murder and that the felony conviction was a crime of violence against the person. This stipulation is sufficient to establish that the defendant "was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." Tenn. Code Ann. § 39-13-204(i)(2).

### b. (i)(3): Great Risk of Death to Two or More Persons

The jury also found that the defendant knowingly created a great risk of death to two or more persons in the course of murdering Cecil. See Tenn. Code Ann. § 39-13-204(i)(3). This aggravating circumstance "'contemplates either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based.'" Johnson v. State, 38 S.W.3d 52, 60 (Tenn. 2001) (quoting State v. Cone, 665 S.W.2d 87, 95 (Tenn. 1984)). "Most commonly, this aggravating circumstance 'has been applied where a defendant fires multiple gunshots in the course of a robbery or other incident at which persons other than the victim are present.'" Id. (quoting State v. Henderson, 24 S.W.3d 307, 314 (Tenn. 2000)). "In many of the cases upholding application of the (i)(3)

aggravator, the defendant fired random shots with others present or nearby, the defendant engaged in a shootout with other parties, or the defendant actually shot people in addition to the murder victim." Id. at 60-61 (footnotes omitted). We conclude that the evidence was more than sufficient to support this application of the (i)(3) aggravating circumstance.

### c. (i)(12): Mass Murder

In State v. Reid, 213 S.W.3d 792, 819 (Tenn. 2006), our supreme court acknowledged that for this factor to apply, "'the State must show beyond a reasonable doubt (1) that the defendant had been *convicted* of three or more murders, including the one for which he has just been tried, (2) within the State of Tennessee, (3) within a period of forty-eight (48) months, (4) perpetrated in a similar fashion, and (5) in a common scheme or plan.'" Id. (quoting Black, 815 S.W.2d at 183). As the court further acknowledged, the application of this aggravating circumstance has been approved in a case where the defendant shot his four children in the garage of his residence, see State v. Holton, 126 S.W.3d 845, 865 (Tenn. 2004); in a case where the defendant stabbed, shot, and disemboweled his estranged wife and two children, see Smith, 868 S.W.2d at 582; in a case where the defendant killed his girlfriend and her children, see Black, 815 S.W.2d at 184; in a case where the defendant killed three people during the robbery of a restaurant, see State v. Van Tran, 864 S.W.2d 465, 478 (Tenn. 1993); and in a sentence of life without parole where the defendants killed three members of the same family at a rest stop, see State v. Howell, 34 S.W.3d 484, 509 (Tenn. Crim. App. 2000). In the instant case, the defendant killed Cecil, Williams, Roberson, Seals, C.D.3, and C.D.4. The proof satisfies the application of the mass murder aggravating circumstance.

### 2. Williams, Seals, and Roberson

In sentencing the defendant to death for the premeditated first degree murders of Williams, Seals, and Roberson, the jury applied five aggravating circumstances. The jury applied the same three aggravating circumstances that it had applied with regard to the first degree murder of Cecil, as well as two additional aggravating circumstances: (1) the murder was committed for the purpose of avoiding, interfering with, or preventing the lawful arrest or prosecution of the defendant or another; and (2) the murder was knowingly committed while the defendant had a substantial role in committing, or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit any first degree murder. See Tenn. Code Ann. § 39-13-204(i)(6), (7).

### a. (i)(2): Prior Violent Felony Conviction

The parties' stipulation that the defendant had previously been convicted of second

degree murder and that the felony conviction involved the use of violence was sufficient to support the application of the (i)(2) aggravating circumstance.

### b. (i)(3): Great Risk of Death to Two or More Persons

The jury found that the defendant knowingly created a great risk of death to two or more persons in the course of murdering Williams, Seals, and Roberson. See Tenn. Code Ann. § 39-13-204(i)(3). Upon reviewing the evidence, we conclude that the evidence is more than sufficient to support the (i)(3) factor.

### c. (i)(6): Murder Committed to Avoid Arrest

The jury also found that the State had established that the defendant killed Williams, Seals, and Roberson in order to avoid his arrest and prosecution. See Tenn. Code Ann. § 39-13-204(i)(6). This aggravating circumstance focuses upon a defendant's motives in killing the victim. Reid, 164 S.W.3d at 315; Terry v. State, 64 S.W.3d 147, 162 (Tenn. 2001). Although there must be some "particular proof" supporting this aggravating circumstance, State v. Hartman, 42 S.W.3d 44, 58 (Tenn. 2001), the State need not prove that the defendant's desire to avoid prosecution was his sole motive in murdering the victim. Terry, 46 S.W.3d at 162. The evidence in the present case establishes that the defendant killed or attempted to kill everyone who was in the residence that night. The defendant acknowledged at trial that when he left the house, he believed that everyone else was dead. He informed Deputy Director Armstrong that the shooting began following an argument between him and Cecil. The defendant informed the officer and his mother that he killed the children because they had seen his face. The defendant fled on a bicycle, and evidence was presented that the defendant made some attempt to clean up following the attacks. We conclude that this evidence is sufficient to establish that the defendant killed Williams, Seals, and Roberson, in part, to avoid arrest and prosecution.

### d. (i)(7): Felony Murder

The jury found that the defendant knowingly committed the murders of Williams, Seals, and Roberson while he had a substantial role in committing or attempting to commit first degree murder. See Tenn. Code Ann. § 39-13-204(i)(7). The evidence at trial clearly establishes that Williams, Seals, and Roberson were killed while the defendant was committing other murders.

### e. (i)(12): Mass Murder

In the instant case, the defendant killed Cecil, Williams, Roberson, Seals, C.D.3, and

C.D.4 on the same night. The proof satisfies the application of the mass murder aggravating circumstance.

### 3. C.D.3 and C.D.4

In sentencing the defendant to death for the premeditated first degree murders of C.D.3 and C.D.4, the jury applied the same five aggravating circumstances that it had applied with regard to the first degree murders of Williams, Seals, and Roberson, as well as two additional aggravating circumstances: (1) the victim was less than twelve years old and the defendant was eighteen years old or older; and (2) the murder was especially heinous, atrocious, or cruel. See Tenn. Code Ann. § 39-13-204(i)(1), (5).

### a. (i)(1): Victim Less Than Twelve Years Old

The jury found that C.D.3 and C.D.4 were less than twelve years old and that the defendant was eighteen years old or older. See Tenn. Code Ann. § 39-13-204(i)(1). The evidence established that C.D.3 and C.D.4 were four years old and two years old, respectively, when they were killed and that the defendant was over the age of eighteen. This is sufficient to establish the application of the (i)(1) aggravating factor.

### b. (i)(2): Prior Violent Felony Conviction

The parties' stipulation that the defendant had previously been convicted of second degree murder and that the felony conviction involved the use of violence was sufficient to support the application of the (i)(2) aggravating circumstance.

### c. (i)(3): Great Risk of Death to Two or More Persons

The jury found that the defendant knowingly created a great risk of death to two or more persons in the course of murdering C.D.3 and C.D.4. See Tenn. Code Ann. § 39-13-204(i)(3). Upon reviewing the evidence, we conclude that the evidence is more than sufficient to support the (i)(3) factor.

### d. (i)(5): Heinous, Atrocious, or Cruel

The jury found that the murders of C.D.3 and C.D.4 were "especially heinous, atrocious, or cruel, in that [they] involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). This aggravating circumstance may be applied if the evidence is sufficient to support *either* torture *or* serious physical abuse beyond that necessary to produce death. The evidence established that C.D.3

and C.D.4 were stabbed repeatedly and severely beaten and that the number of wounds was more than necessary to cause death. The proof is more than sufficient to support the jury's finding of this aggravating circumstance.

### e. (i)(6): Murder Committed to Avoid Arrest

The jury also found that the State had established that the defendant killed C.D.3 and C.D.4 in order to avoid his arrest and prosecution. See Tenn. Code Ann. § 39-13-204(i)(6). The defendant told both Deputy Director Armstrong and his mother that he killed the children because they saw his face. This evidence is sufficient to establish this aggravating circumstance.

### f. (i)(7): Felony Murder

The jury found that the defendant knowingly committed the murders of C.D.3 and C.D.4 while he had a substantial role in committing or attempting to commit first degree murder. See Tenn. Code Ann. § 39-13-204(i)(7). The evidence submitted at trial clearly establishes that C.D.3 and C.D. 4 were killed while the defendant was committing other murders.

### g. (i)(12): Mass Murder

The defendant's killing Cecil, Williams, Roberson, Seals, C.D.3, and C.D.4 on the same night satisfies the application of the mass murder aggravating circumstance.

### C. Weighing Each Victim

We next turn to our inquiry of whether a reasonable jury could find beyond a reasonable doubt that the aggravated circumstances proved by the State with respect to each victim's murder outweigh the mitigating circumstances. The proof supporting the aggravating circumstances is set forth above. Mitigating circumstances instructed to the jury included: (1) any lingering or residual doubt regarding the defendant's guilt; (2) the defendant was raised in a dysfunctional family since birth; (3) the defendant suffered childhood neglect; (4) the defendant's parents separated when he was six years old, and his father was not part of his life; (5) the defendant changed residences and schools on multiple occasions throughout early childhood; (6) the defendant was retained in the fourth grade twice due to truancy and was absent from school many times as a child; (7) the defendant was diagnosed with a learning disability; (8) the defendant's mother did not attend scheduled meetings and did not appear at juvenile court hearings on multiple occasions; (9) at the age of eighteen, the defendant witnessed what he believed to be intentional physical abuse of his

younger brother by his mother; and (10) any other mitigating factor raised by the evidence produced by either the prosecution or defense in the guilt or sentencing hearing.

In addition to proving aggravating circumstances, the State presented evidence contradicting the defendant's mitigation evidence. We conclude that a rational juror could have found that the three aggravating circumstances established by the State regarding the first degree murder of Cecil Dotson, Sr. outweighed the mitigating circumstances, that the five aggravating circumstances established by the State regarding the first degree murders of Williams, Seals, and Roberson outweighed the mitigating circumstances, and that the seven aggravating circumstances established by the State regarding the first degree murders of C.D.3 and C.D.4 outweighed the mitigating circumstances.

### D. Proportionality Review

When this court conducts the proportionality review required by Tennessee Code Annotated section 39-13-206(c)(1)(D), we do not function as a "super jury" that substitutes our judgment for the judgment of the sentencing jury. See State v. Godsey, 60 S.W.3d 759, 782 (Tenn. 2001). Rather, we must take a broader perspective than the jurors to determine whether the defendant's sentences are "'disproportionate to the sentences imposed for similar crimes and similar defendants.'" State v. Thacker, 164 S.W.3d 208, 232 (Tenn. 2005) (quoting Bland, 958 S.W.2d at 664). The pool of cases upon which we draw in conducting this analysis are "first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment without possibility of parole, or death." State v. Rice, 184 S.W.3d 646, 679 (Tenn. 2006).

The purpose of our review of other capital cases is not to identify cases that correspond precisely with the particulars of the case being analyzed. State v. Copeland, 226 S.W.3d 287, 306 (Tenn. 2007); Thacker, 164 S.W.3d at 233. Rather, our task is to "identify and invalidate the aberrant death sentence." Thacker, 164 S.W.3d at 233. A sentence is not disproportionate because other defendants have received a life sentence under similar circumstances. Carruthers, 35 S.W.3d at 569. A death sentence is excessive or disproportionate where "the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Thacker, 164 S.W.3d at 233 (quoting Bland, 958 S.W.2d at 668).

This court uses "'the precedent-seeking method of comparative proportionality review, in which we compare a case with cases involving similar defendants and similar crimes.'" Copeland, 226 S.W.3d at 305 (quoting State v. Davis, 141 S.W.3d 600, 619-20 (Tenn. 2004)). We examine "the facts and circumstances of the crime, the characteristics of

the defendant, and the aggravating and mitigating circumstances involved, and we compare this case with other cases in which the defendants were convicted of the same or similar crimes." State v. Stevens, 78 S.W.3d 817, 842 (Tenn. 2002).

In conducting this comparison with regard to the nature of the crime, we generally consider

> (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

State v. Rimmer, 250 S.W.3d 12, 35 (Tenn. 2008); see Rollins, 188 S.W.3d at 575. We also compare the defendant's "(1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." Rimmer, 250 S.W.3d at 35; Rollins, 188 S.W.3d at 575.

In the present case, the evidence established that on March 2, 2008, the defendant shot and killed his brother, Cecil; Williams; Seals; and Roberson. The defendant then stabbed and beat with wooden boards his four nephews and his niece, who ranged in ages from nine years old to two months old. C.D.3, who was four years old, and C.D.4, who was two years old, died as a result of the attacks. Cecil had eight gunshot wounds, including wounds to his head, neck, chest, thigh, leg, and foot. Williams had five gunshot wounds, including wounds to her head, chest, leg, thigh, and abdomen. Seals had three gunshot wounds, including one to his mouth and two to his chest. Roberson had four gunshot wounds, including wounds to her thigh and knee. C.D.3 suffered blunt force injuries to his head, hand, and arm and sharp force injuries to his head, neck, hand, and chest. C.D.4 suffered multiple sharp force injuries to his head, torso, and extremities and blunt force injuries to his face, head, neck, and elbow.

The defendant admitted to the police and his mother that he killed the victims and told his mother that he attacked the children because they saw him shoot the adults. C.D.1 and C.D.2 identified the defendant at trial as their attacker.

The defendant altered the scene to make it appear as if the murders were drug-related or gang-related, moved bodies, disposed of or hid kitchen knives and handles, and collected the cartridge casings. He escaped on a bicycle, hid it in his girlfriend's shed, and used bleach in an attempt to clean up while at his girlfriend's home. The defendant never attempted to render aid or summon help, but instead went to a restaurant for dinner the next night with his

brother and a friend. He also reported for work on the Monday following the weekend killings and attempted killings. The defendant admittedly lied to his family about the last time that he had seen Cecil.

The defendant came from a dysfunctional family in which his parents married at a very young age, argued often, and physically fought. As a child and youth, the defendant witnessed his father physically abuse his mother and his mother tear out windows in an apartment complex and place her baby in a bathtub of scalding water. When the defendant was six years old, his mother left his father, taking the defendant and his siblings with her and not contacting the defendant's father until four or five months later. The defendant's family was poor, and his mother was not home often, leaving the defendant's sister, Nicole, to care for the defendant and Cecil. As children, the defendant and Cecil sometimes went hungry and were discovered taking money from their grandmother to purchase food. As a result, they were no longer welcome in their grandmother's home.

The defendant was diagnosed with a learning disability in reading and math, was enrolled in resource classes, failed the fourth grade twice due to excessive absences, was socially promoted, was teased for not having the proper clothing, and left school at the age of sixteen while still only in the eighth grade, having attended ten different schools and been suspended so often that the school system refused to allow him to continue to attend.

The defendant had disciplinary problems both at school and at home and was provided with individual counseling. Counselors attempted to meet with his mother, but she either cancelled the appointments or did not attend them. By the time that the defendant was fifteen years old, he became involved in the juvenile court system and had several arrests and juvenile adjudications. One such juvenile adjudication involved the use of weapons. The defendant fought often, and school and juvenile records referenced problems with his brother. The defendant's mother attended juvenile court with him on many occasions. When she could not attend, Nicole attended on her behalf.

The only legitimate job that the defendant ever held was as a security guard at the age of eighteen. At the age of nineteen, he pled guilty to second degree murder and was sentenced to eighteen years in prison. He joined the Crips gang while in prison and was written up for refusing to participate, for cursing an officer, and for cutting an inmate who was trying to leave the Crips. The defendant was denied parole twice before it was ultimately granted, which meant that he had completed fourteen years of his eighteen-year sentence in prison. The defendant's mother and her husband only visited him once while he was in prison, and he spoke to his father on only a few occasions over the telephone.

The sentence of death has been upheld in numerous cases in which the defendant committed mass murder. See, e.g., State v. Jordan, 325 S.W.3d 1 (Tenn. 2010) (defendant shot and killed his estranged wife and two men at his wife's place of employment; risk of death to two or more, felony murder, and mass murder aggravators to the two men, same three aggravators and heinous, atrocious, or cruel, and mutilation of body aggravators as to wife); State v. Holton, 126 S.W.3d 845 (Tenn. 2004) (defendant shot and killed his four children; mass murder and, as to three victims, under-twelve-years-old aggravators); State v. Carruthers, 35 S.W.3d 516 (Tenn. 2000) (defendants shot two men, strangled the mother of one of the men, and buried all three victims alive; prior violent felony, heinous, atrocious, or cruel, felony murder, and mass murder aggravators); State v. Smith, 868 S.W.2d 561 (Tenn. 1993) (defendant shot and stabbed his wife and two stepsons; heinous, atrocious, or cruel, murder to avoid apprehension, felony murder, and mass murder aggravators).

The sentence of death has also been upheld in numerous cases in which the victim was a young child who was either well-acquainted with the defendant or related to the defendant. See, e.g., Holton, 126 S.W.3d at 868-69; State v. Keen, 31 S.W.3d 196 (Tenn. 2000) (upholding sentence of death where defendant raped and choked his girlfriend's eight-year-old daughter and threw her into a river while she was still alive; age of victim and heinous, atrocious, or cruel aggravators); Smith, 868 S.W.2d at 582-83; State v. Black, 815 S.W.2d 166 (Tenn. 1991) (upholding death sentence where defendant shot and killed his girlfriend and her two daughters, ages nine and six; five aggravators including the young ages of the victims and mass murder); State v. Payne, 791 S.W.2d 10 (Tenn. 1990) (upholding death sentence in case where defendant stabbed his girlfriend's neighbor and the neighbor's two-year-old daughter; age of victim, risk of death to two or more, and heinous, atrocious, or cruel aggravators as to the child).

In completing our review, we need not conclude that this case is exactly like prior cases in every respect or determine that this case is "more or less" like other death penalty cases. State v. Thomas, 158 S.W.3d 361, 383 (Tenn. 2005). Rather, we need only identify aberrant death sentences by analyzing whether a capital case plainly lacks circumstances similar to those cases in the pool of cases in which a death sentence has been upheld. Based on our review, we conclude that the penalty imposed by the jury in the present case is clearly not disproportionate to the penalty imposed for similar crimes.

## XXI. Sentencing for Non-Capital Offenses

The defendant challenges the trial court's order imposing forty-year consecutive sentences for each of the three attempted first degree murder convictions and also challenges the reasonableness of the sentencing hearing.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory minimum sentence and rendered enhancement factors advisory only. See Tenn. Code Ann. §§ 40-35-114, 40-35-210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must consider them. Tenn. Code Ann. § 40-35-210(c). Although the application of the factors is advisory, the court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." Tenn. Code Ann. § 40-35-210(b)(5). The trial court also must place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." Tenn. Code Ann. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. Id. (citations omitted).

When a defendant challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor, the error will not remove the presumption of reasonableness from its sentencing determination. Id. at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under such circumstances, we may not disturb the sentence even if we had preferred a different result. See Carter, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In sentencing the defendant, the trial court considered the purposes of sentencing set forth in Tennessee Code Annotated sections 40-35-102 and 40-35-103. The court found that based upon the defendant's prior conviction for second degree murder, he was a Range II, multiple offender.

The trial court applied seven enhancement factors to each of the three convictions for attempted first degree murder. The court found the following enhancement factors applied:

(1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

(2) A victim of the offense was particularly vulnerable because of age or physical or mental disability;

(3) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;

(4) The personal injuries inflicted upon, or the amount of damage to property, sustained by or taken from the victim was particularly great;

(5) The defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense;

(6) The felony resulted in death or serious bodily injury or involved the threat of death of serious bodily injury to another person and the defendant has previously been convicted of a felony that resulted in death or serious bodily injury; and

(7) During the commission of the felony, the defendant intentionally inflicted serious bodily injury upon another person, or the actions of the defendant resulted in the death of or serious bodily injury to a victim or a person other than the intended victim.

Tenn. Code Ann. § 40-35-114(1), (4), (5), (6), (9), (11), (12). The trial court placed little weight on the prior criminal history enhancement factor and no weight on the serious bodily injury during the commission of a felony enhancement factor. See id. (1), (12). With regard to the defendant's conviction for the attempted first degree murder of C.D.1, the trial court placed little weight on the particularly vulnerable victim enhancement factor. See id. (4). The trial court found that no mitigating factors applied. The court sentenced the defendant to forty years for each conviction of attempted first degree murder. The court also found that

the defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See Tenn. Code Ann. § 40-35-114(b)(5). The court ordered the defendant to serve his three convictions for attempted first degree murder consecutively to each other and to his death sentences.

## A. Reasonableness of Sentencing Hearing

The defendant challenges the reasonableness of the sentencing hearing and argues that the trial court did not allow defense counsel to respond to the State's argument before imposing the sentences. The trial court asked defense counsel whether they wished to present any evidence and whether the defendant wished to make a statement. Defense counsel declined both offers. Defense counsel did not object or request that they be allowed to respond to the State's argument. This issue is without merit.

## B. Reasonableness of Sentences

The defendant contends that the forty-year sentences were unreasonable. The defendant does not challenge the trial court's application of the seven enhancement factors. Rather, the defendant contends that the trial court erred in not considering evidence of non-statutory mitigating factors presented during the penalty phase.

As a Range II, multiple offender convicted of a Class A felony, the defendant was subject to a sentence of twenty-five to forty years. See Tenn. Code Ann. §§ 39-11-117, 40-35-112(b)(1). The trial court imposed the maximum sentence within the range. Upon a challenge to the sentence imposed, it is the duty of this court to analyze the issues under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Bise, 380 S.W.3d 707. Because the application of enhancement and mitigating factors to adjust a sentence was rendered advisory by the 2005 amendments, the trial court may set a sentence anywhere within the applicable range so long as the sentence is consistent with the principles and purposes of the Act, regardless of the presence or absence of mitigating and enhancement factors. The trial court in this case thoroughly considered the purposes and principles of the Sentencing Act in rendering its decision. The trial court did not abuse its discretion in imposing the maximum sentence within the applicable range.

## C. Consecutive Sentences

The defendant asserts that the trial court erred in ordering that he serve his sentences

for attempted first degree murder consecutively to each other and to his death sentences. In ordering consecutive sentences, the trial court found that the defendant is a "dangerous offender whose behavior indicates little or no regard to human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). "[W]hen a trial court uses the 'dangerous offender' factor, it must also decide whether consecutive sentences (1) reasonably relate to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing." State v. Alder, 71 S.W.3d 299, 307 (Tenn. Crim. App. 2001).

The trial court found that the circumstances of the offenses were "aggravated," stating, "I don't know of anything that I can think of is more aggravated than this." The court further found that consecutive sentences were reasonably related to the severity of the offenses and were necessary to protect the public from the defendant and his "reserve to criminal activity." The record fully supports these findings. We conclude, therefore, that the trial court properly imposed consecutive sentences based on its classification of the defendant as a dangerous offender.

## XXII.  Cumulative Error

The defendant asserts that the cumulative effect of the errors at trial rendered both the guilt, penalty, and sentencing phases of his trial fundamentally unfair. As explained above, any errors, when considered both individually and cumulatively, did not result in prejudice. The defendant is not, therefore, entitled to relief on the basis of this issue.

## CONCLUSION

After review of the record and the applicable law, we affirm the defendant's convictions and sentences.

_____
ALAN E. GLENN, JUDGE

-105-